# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Emmanuel THIERSAINT,

Plaintiff,

v.

DEPARTMENT OF HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT;
WILLIAM CHAMBERS, in his individual capacity;
JOHN DOE DEFENDANTS 1-10, unknown ICE
Agents, in their individual capacities; SUFFOLK
COUNTY SHERIFF'S DEPARTMENT; JOHN DOE
DEFENDANTS 11-16, unknown officers of the
Suffolk County Sheriff's Department, in their
individual capacities; and UNITED STATES OF
AMERICA,

Defendants.

Civil Action No. ___

**COMPLAINT FOR
COMPENSATORY,
INJUNCTIVE, AND
DECLARATORY RELIEF**

Dated: November 16, 2018

**INTRODUCTION**

In the early afternoon on February 29, 2016, Immigration and Customs Enforcement (ICE) officers seeking to hastily deport Emmanuel Thiersaint ordered him to climb up a flight of stairs from an airport tarmac to an ICE aircraft, despite knowing that he used a wheelchair to ambulate due to the amputation of his right leg. A longtime lawful permanent resident of the United States, Mr. Thiersaint pleaded for assistance, only to be mocked by ICE officers. One officer told him, "You're too heavy. Do you think somebody is going to carry you to the plane?" The officer continued, "You need to go back to your country." The officers then stood by as Mr. Thiersaint lowered himself, sat on his bottom on the first stair with his back toward the plane, and then hoisted himself up, slowly and painfully, one by one, for about fifteen steps. Finally arriving at the top of the stairway, Mr. Thiersaint then hopped on one leg down the aisle of the plane to a seat as other passengers watched in dismay.

That day in February was only one of approximately twenty occasions in which ICE agents inflicted severe pain and humiliation on Mr. Thiersaint as they transported him in and out of Massachusetts through a network of ICE sites, seeking to speed his deportation to life-threatening conditions in Haiti. ICE's egregious conduct in their transportation and attempted removal of Mr. Thiersaint was compounded by discriminatory treatment on the basis of his disability at the multiple jails where he was detained, including the Suffolk County House of Correction. Despite their best efforts to deport Mr. Thiersaint, they were ultimately unsuccessful, as Mr. Thiersaint mounted legal challenges resulting in the termination of his removal proceedings and a full and unconditional pardon of the crimes for which ICE sought to remove him. The man whom ICE subjected to dehumanizing treatment as they attempted to rush him out of the country is now on the threshold of U.S. citizenship.

The pattern of mistreatment of and discrimination by ICE and Suffolk County Sheriff's Department officials against Mr. Thiersaint violates the Rehabilitation Act of 1973,

the American with Disabilities Act, the Federal Tort Claims Act, and the Constitution. Mr. Thiersaint brings this civil rights action for: (1) declaratory and injunctive relief against the Department of Homeland Security (DHS) and ICE under the Rehabilitation Act of 1973, 29 U.S.C. § 794; (2) declaratory, injunctive, and compensatory relief against the Suffolk County Sheriff's Department under the Rehabilitation Act and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*; (3) compensation for the federal government's tortious acts under the Federal Tort Claims Act, 28 U.S.C. § 1346; and (4) damages for ICE officers' violation of Mr. Thiersaint's Fifth Amendment due process rights; and (5) damages for Suffolk County Sheriff's Department officers' violation of his Fourteenth Amendment equal protection rights, under 42 U.S.C § 1983.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because the action arises under the Constitution and laws of the United States, pursuant to 28 U.S.C. § 1346(b) because this action seeks to redress injury caused by the negligent or wrongful act or omission of employees of the United States government, and pursuant to 42 U.S.C. § 1983 because this action seeks to redress harms caused by state officials in violation of the Constitution and laws of the United States. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

2.      Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1402(b).

## PARTIES

3.      Plaintiff Emmanuel Thiersaint is a thirty-eight-year-old lawful permanent resident who lives with his family in Connecticut. From February to April 2016, Defendants held Mr. Thiersaint in custody while attempting to remove him from the country and denied him the basic treatment, resources, and facilities provided to other individuals with greater mobility.

4.      Defendant U.S. Department of Homeland Security (DHS) is an executive agency with the responsibility for enforcing the immigration laws of the United States.

5.      Defendant U.S. Immigration and Customs Enforcement (ICE) is the sub-agency of DHS that is responsible for the detention and removal operations of DHS, including the transportation of immigrants between detention facilities.

6.      Officer William Chambers is an employee of ICE and is sued in his individual capacity. Officer Chambers was the ICE officer responsible for supervising Mr. Thiersaint's detention at the Suffolk County House of Correction and responding to Mr. Thiersaint's requests for accommodation.

7.      John Doe Defendants 1-10 are ICE agents, currently unknown to Mr. Thiersaint, who were responsible for transporting him between detention facilities, overseeing his detention in state and local facilities, and ensuring that he was provided adequate medical care. They are sued in their individual capacities.

8.      Suffolk County Sheriff's Department operates the Suffolk County House of Correction at South Bay ("SCHC"), a correctional facility in Boston, Massachusetts where ICE kept Mr. Thiersaint detained in 2016. It is considered an instrumentality of the Commonwealth of Massachusetts.

9.      John Doe Defendants 11-16 are officers of the Suffolk County Sheriff's Department, who were responsible for overseeing Mr. Thiersaint's detention while at Suffolk County House of Correction. They are sued in their individual capacities.

## LEGAL BACKGROUND

### *The Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990*

10.      The United States has a long history of overlooking the dignity of people with disabilities. The evolution of civil rights for people with disabilities in the United States in recent decades closely parallels the broader civil rights movement of the 1950s and 1960s.

Today, our country's laws vigorously protect the civil rights of people living with disabilities.

11.     Congress passed, and later amended, the Rehabilitation Act of 1973 to prohibit discrimination on the basis of disability in programs conducted by federal agencies, programs receiving federal financial assistance, and employment by the federal government or its contractors. Section 504 of the Rehabilitation Act, as amended and codified as 29 U.S.C. § 794, states that "[n]o qualified individual with a disability in the United States . . . shall . . . be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" any program or activity that either receives federal financial assistance or is conducted by an executive agency. Disability is defined to include "a physical or mental impairment that substantially limits one or more major life activities," 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1), such as "caring for oneself, performing manual tasks . . . walking, standing, lifting, [and] bending." 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(2)(A). This groundbreaking provision incorporated key language from the Civil Rights Act of 1964.

12.     Nearly two decades later, the Americans with Disabilities Act of 1990 (ADA) expanded the civil rights protections of Section 504 of the Rehabilitation Act. The ADA prohibits discrimination on the basis of disability in employment, state and local government, public accommodations, commercial facilities, transportation, and telecommunications. Title II of the ADA, codified at 42 U.S.C. §§ 12131–65, requires state and local governments to give people with disabilities an equal opportunity to benefit from all of their programs, services, and activities.

13.     Aggrieved individuals have a private right of action under Section 504 of the Rehabilitation Act and Title II of the ADA. The standards for determining discrimination under each section are the same.

***Regulations Implementing the Obligations Imposed By Section 504 and Title II***

14.     Each federal agency has its own set of Section 504 regulations that implement its statutory obligations. DHS's implementing regulations under Section 504, located at 6 C.F.R. §§ 15 *et seq.*, also apply to all components of the department, including ICE. 6 C.F.R. § 15.1.

15.     Additionally, all "public entities" must comply with U.S. Department of Justice (DOJ) Title II regulations, 28 C.F.R. pt. 35. A public entity is defined as any state or local government, or department, agency, or other instrumentality of a state or local government. 28 C.F.R. § 35.104. The Suffolk County Sheriff's Department is a public entity governed by Title II of the ADA. These two sets of regulations, 6 C.F.R. § 15 and 28 C.F.R. § 35, though applicable to different actors, are structured similarly and share much of the same language.

16.     Both sets of regulations provide that "[n]o qualified individual with a disability, shall, by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30(a); *see also* 28 C.F.R. § 35.130(a).

17.     Furthermore, in "providing any aid, benefit, or service," a federal department or public entity "may not directly or through contractual, licensing, or other arraignments, on the basis of disability . . . deny a qualified person with disability the opportunity to participate in or benefit from the aid, benefit or service." 6 C.F.R. § 15.30(b)(1)(i); 28 C.F.R. § 35.130(b)(i).

18.     Federal agencies and public entities also may not (1) "afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;" (2) "provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement

as that provided to others;" or (3) "provide different or separate aid, benefits or services to individuals [with disabilities] . . . than is provided to others unless such action is necessary to provide qualified individuals [with disabilities] with aid, benefits or services that are as effective as those provided to others." 6 C.F.R. §§ 15.30(b)(1)(ii) -15.30(b)(1)(iv); 28 C.F.R. §§ 35.130(b)(ii) - 35.130(b)(iv).

19.     For existing facilities, a federal agency or public entity "shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with a disability." 6 C.F.R. § 15.50(a); *see also* 28 C.F.R. § 35.150(a).

*Detention Facilities' Obligations under Title II of the ADA*

20.     The DOJ's regulations for public entities include a specific section on the obligations of jails, detention centers and correctional facilities. 28 C.F.R. § 35.152. This section applies to entities that have both direct responsibility or responsibility "through contractual, licensing, or other arrangements with public or private entities" for managing detention facilities. 28 C.F.R. § 35.152(a).

21.     These regulations stipulate that detention facilities: (1) "shall not place inmates or detainees with disabilities in inappropriate security classifications because no accessible cells or beds are available;" (2) "shall not place inmates or detainees with disabilities in designated medical areas unless they are actually receiving medical care or treatment;" (3) "shall not place inmates or detainees with disabilities in facilities that do not offer the same programs as the facilities where they would otherwise be housed;" and (4) "shall not deprive inmates or detainees with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed." 28 C.F.R. § 35.152(b)(2).

## FACTUAL ALLEGATIONS

### *Plaintiff Emmanuel Thiersaint suffers from multiple serious disabilities.*

22.     Plaintiff Emmanuel Thiersaint is a thirty-eight-year-old lawful permanent resident of the United States. He arrived in the United States from Haiti in 1994, after three years the military coup in that country.

23.     For nearly twenty-five years, Mr. Thiersaint has resided in Connecticut. Mr. Thiersaint is a caring father to his three U.S. citizen children and a devoted caretaker for his U.S. citizen wife, who has epilepsy and as a result has frequent seizures. He is also a bilingual music producer who dreams of teaching new generations of the Haitian diaspora his native Haitian Creole through music.

24.     Mr. Thiersaint has severe physical and mental disabilities. Specifically, Mr. Thiersaint has a mobility impairment in his legs and right arm that interferes with his ability to stand, lift, behind, place weight on his arm, and perform some manual tasks, such as showering without a chair designed specifically for a person with mobility disabilities. These impairments are exacerbated by Mr. Thiersaint's documented chronic pain. In addition, Mr. Thiersaint has been diagnosed with depression and anxiety.

25.     When he was 17 years old, Mr. Thiersaint was in a near-fatal car accident. As a result of the accident, Mr. Thiersaint's right leg was amputated above the knee. Since then, for over 20 years,  Mr. Thiersaint has used a wheelchair to ambulate. At times, he has also used a prosthetic leg, but has been unable to do so consistently because of sores and infections that result from the rubbing of the prosthesis on his skin.

26.     Mr. Thiersaint's injuries also forced doctors to implant a metal rod in Mr. Thiersaint's right arm. Because of the metal rod, Mr. Thiersaint cannot use crutches or put significant weight on his arm without experiencing severe pain.

27.     Since the accident, Mr. Thiersaint has experienced chronic pain, migraines, depression and anxiety. In 2016, as today, he relied on daily medication for these conditions.

28.     The fact that Mr. Thiersaint's leg is amputated and the resulting mobility limitations are plainly visible and his mental illnesses and the metal rods in his arms were clearly documented in medical records that DHS and ICE had in its possession or control during all periods relevant to the events alleged in this Complaint.

29.     Mr. Thiersaint was placed in removal proceedings in 2008 due to criminal convictions which have since been fully pardoned by the State of Connecticut. An immigration court terminated his removal proceedings on November 1, 2018, but the government has not yet waived appeal.

***Rushing to deport Mr. Thiersaint, ICE moved him through a removal operations network.***

30.     On February 5, 2016, ICE officers from the Hartford Enforcement and Removals Office of ICE took Mr. Thiersaint into custody after he was released from Osborn Correctional Institution, a state prison in Somers, Connecticut. Mr. Thiersaint had just completed a six-month sentence for a probation violation.

31.     On information and belief, ICE officers detained Mr. Thiersaint with the intention of removing him from the United States as quickly as possible.

32.     Over the subsequent two months, ICE transferred Mr. Thiersaint from facility to facility across five different states. In doing so, ICE officers forced Mr. Thiersaint to enter and exit vans that were not wheelchair-accessible over twenty times. Each time, ICE officers refused to offer Mr. Thiersaint any assistance, despite his repeated requests. As a result, Mr. Thiersaint suffered extreme pain in his leg and arm, which exacerbated his chronic pain symptoms.

33.     In the course of these transfers, ICE officers also required Mr. Thiersaint to enter and exit four planes. On multiple occasions, they forced Mr. Thiersaint to crawl up and

down stairways on an airport tarmac, without assistance or a boarding ramp, in order to board and de-plane aircraft.

34.     On only one occasion did ICE officers assist Mr. Thiersaint into a plane.

35.     Every other time he was transferred by plane, ICE officers forced Mr. Thiersaint to use his arms to hoist himself up and down the staircase. This caused Mr. Thiersaint extreme pain in his leg and right arm, which also further aggravated his chronic pain. Mr. Thiersaint also suffered severe humiliation, as ICE officers and other ICE detainees stood by and watched him drag himself on and off these planes.

36.     Mr. Thiersaint left the Osborn Correctional Institution in a wheelchair. ICE officers brought Mr. Thiersaint from that facility to Hartford, Connecticut in a wheelchair-accessible van owned by Osborn Correctional Institution. However, on information and belief, ICE agents did not bring the medications that had been prescribed to Mr. Thiersaint while at the Osborn facility.

37.     ICE then detained Mr. Thiersaint at its Hartford office for a period of hours, after which two ICE officers transferred Mr. Thiersaint to the Franklin County House of Correction ("FCHC"), in Greenfield, Massachusetts.

38.     On information and belief, ICE regularly uses FCHC as a transit point when it removes Connecticut residents from the United States.

39.     On information and belief, two ICE officers transferred Mr. Thiersaint approximately four more times. Both were white men and one was tall and muscular.

40.     Although ICE officers could see that Mr. Thiersaint used a wheelchair, they transported him to FCHC in a van that was not wheelchair accessible. They did so even though ICE had utilized a wheelchair-accessible van to transport Mr. Thiersaint from the Osborn Correctional Institution earlier that day.

41.     When he was being transferred from Hartford to the FCHC, Mr. Thiersaint asked ICE officials for help entering the van that lacked wheelchair accessibility. The two ICE officers transporting Mr. Thiersaint refused. They told him: "You have to do what you have to do, or else we will leave you by yourself upstairs."

42.     To enter the van, Mr. Thiersaint was forced to exit his wheelchair, drag himself on the dirty floor of the van, and then hoist himself into his seat in front of approximately twelve other persons being transported. This incident caused him severe pain in his arm even after the transfer, humiliation and degradation, and extreme emotional distress.

***While detaining Mr. Thiersaint in Massachusetts, ICE ignored Mr. Thiersaint's basic needs and subjected him to humiliation.***

43.     Upon arrival at FCHC, the same two ICE officers forced Mr. Thiersaint to exit the van just as he entered it—by using his arms to hoist himself out of his seat and onto the vehicle floor, and then moving himself to his wheelchair. The ICE officers transporting Mr. Thiersaint did not assist him with his exit from the vehicle, causing him physical pain and severe emotional distress.

44.     During Mr. Thiersaint's first days at FCHC, ICE and FCHC held him in a single-person cell separate from other detainees. ICE and FCHC officers permitted him to leave this cell for only one hour each day, during which time they permitted him to take a shower. Neither ICE nor FCHC officials gave Mr. Thiersaint an explanation for why he had to be separate from the general population.

45.     After the initial forty-eight hours, FCHC officers placed Mr. Thiersaint in the general population.

46.     On February 18, 2016, ICE transferred Mr. Thiersaint to SCHC in Boston, Massachusetts.

47.     On information and belief, SCHC is a staging site for removal from the Northeast region.

48.     The same ICE officials who had transferred Mr. Thiersaint from Hartford to FCHC transferred him from FCHC to SCHC. Once again, although they were aware of his mobility disability, ICE officials failed to use a wheelchair-accessible van to transfer Mr. Thiersaint. He asked for help entering the van but, again, the officers told him that he must "cooperate." Instead of helping him enter the van, they repeatedly asked if he was cooperating.

49.     Mr. Thiersaint understood that he would be penalized if he did not enter the van without assistance and acquiesced. He hoisted himself up with his arms from his wheelchair and onto the dirty van floor, and then up to his seat. Again, he felt severe pain in his right arm and in his leg during and after the transfer.

50.     During the ride to SCHC, Mr. Thiersaint requested a bathroom. His request was denied. Eventually, he could no longer control his bladder and was forced to urinate on himself.

51.     When they arrived at SCHC, the officers again forced Mr. Thiersaint to exit the vehicle just as he had entered—by hoisting himself off his chair and onto the ground and then into his wheelchair. Again, Mr. Thiersaint told the officers that he needed help exiting the vehicle, and the two ICE agents refused, telling him that he needed to cooperate. Again, this caused Mr. Thiersaint pain in his right arm and in his leg. At the same time, these ICE officers started to make fun of Mr. Thiersaint for having soiled himself. Their actions harmed him both physically and emotionally, worsening his depression.

***SCHC segregated Mr. Thiersaint from the general population and denied him basic medical care, and ICE refused to correct these actions.***

52.     At SCHC, Mr. Thiersaint was placed in the facility's medical wing, where he was separated from the general population for twenty-three hours a day. He remained in the medical wing for the entire eleven days that ICE held him at SCHC.

53.     When Mr. Thiersaint asked to join the general population, officials denied his request. Officials at the facility informed him that it was for his safety and security and that the detention center was not equipped for individuals with a mobility disability.

54.     During the time he was in segregation, Mr. Thiersaint did not have access to services and facilities such as the library and the computer area. On information and belief, these services and facilities were available to detainees held in general population.

55.     Throughout his entire eleven-day stay at SCHC, Mr. Thiersaint had only one hour each day in which he could engage in activities such as showering and watching TV. On most days, he had to use much of this hour to shower.

56.     The shower in Mr. Thiersaint's cell in the medical wing was not wheelchair accessible and did not have a seat. Mr. Thiersaint could not use it without risking a fall. Instead, Mr. Thiersaint used the shower offered in the recreational area. The shower in the recreational area also lacked a medical shower chair appropriate for people with mobility disabilities. Instead, the shower had only an ordinary chair for Mr. Thiersaint to use, which he feared was unstable in the slippery shower area.

57.     Despite being in the medical wing of SCHC, Mr. Thiersaint was denied access to necessary medication and medical care that he had been receiving at Osborn and FCHC.

58.     On information and belief, in his role supervising Mr. Thiersaint's detention at SCHC, Defendant William Chambers was empowered to ask SCHC staff to provide Mr. Thiersaint his medication needs but failed to do so.

59.     Without his medication, Mr. Thiersaint lost his appetite, and suffered unusual sweating, loss of sleep, and nightmares. At times, he would sit in his cell or lay on his bed and cry, feeling very depressed.

60.     Mr. Thiersaint made repeated requests to obtain necessary medication to treat his depression. SCHC officials denied his requests.

61.     During his first week at SCHC, Mr. Thiersaint was unable to place calls to his family or legal counsel. SCHC officials told Mr. Thiersaint that he could not call his family or legal counsel because he was in ICE custody, and he would have to speak with an ICE officer, Defendant William Chambers, who visited on Thursdays, to resolve the situation. Mr. Thiersaint's inability to call his legal counsel and family exacerbated his depression and anxiety.

62.     Mr. Thiersaint complained to SCHC and ICE officials about these conditions and the lack of accommodations for his physical and mental disabilities. He informed SCHC and ICE officials that he needed to be detained in a location that could accommodate his disabilities.

63.     Rather than address Mr. Thiersaint's request for accommodations, the ICE case manager, Defendant Chambers, refused to let Mr. Thiersaint transfer to the general population section of SCHC unless he agreed to use crutches instead of a wheelchair.

64.     Mr. Thiersaint explained that he could not use crutches because of the rods in his arm. Defendant Chambers continued to bring up using crutches in subsequent conversations with Mr. Thiersaint.

***ICE forced Mr. Thiersaint to board a plane and vehicles that were not accessible to him, further humiliating him in the process.***

65.     On February 29, 2016, SCHC or ICE officials woke Mr. Thiersaint early in the morning and informed him that he was being transferred to Louisiana.

13

66.     On information and belief, in 2016, ICE Air Operations (IAO) regularly deported individuals ordered removed to Haiti on chartered flights from Alexandria, Louisiana.

67.     On information and belief, ICE agents intended to remove Mr. Thiersaint on such a flight.

68.     ICE agents drove Mr. Thiersaint in a non-accessible car from SCHC to Hartford.

69.     When they arrived at ICE's Hartford office, ICE officers again forced Mr. Thiersaint to exit the non-accessible car without providing assistance, and then required him to board a bus. Like the van, the larger bus was not wheelchair accessible.

70.     Rather than help him enter the van, ICE officers forced Mr. Thiersaint to enter the non-accessible bus by pulling himself up the stairs and hopping to his seat in front of approximately thirty other people. Again, this caused Mr. Thiersaint extreme physical pain in his right arm and also his leg. The other detainees on board the bus repeatedly made statements to the effect of, "This is wrong." Mr. Thiersaint was embarrassed and humiliated.

71.     The bus brought Mr. Thiersaint to Newark Liberty International Airport in Newark, New Jersey, where he was to board a plane for Louisiana.

72.     When Mr. Thiersaint arrived at Newark, ICE officers forced him to exit the bus in the same way he had entered. Again, this caused Mr. Thiersaint to experience physical pain.

73.     At approximately 1:00 PM on or about February 29, 2016, ICE officials required Mr. Thiersaint to enter an airplane from the tarmac. Although they knew Mr. Thiersaint used a wheelchair, ICE officials failed to provide an accessible lift or ramp to enable him to board the plane. Instead, they required Mr. Thiersaint to board the plane from the tarmac using the passenger stairs.

74.     Mr. Thiersaint asked for an accommodation, but ICE officers told him that he was required to cooperate by entering the plane himself. Instead of assisting him, an ICE agent told Mr. Thiersaint, "You're too heavy. Do you think somebody is going to carry you to the plane? Do you think I'm going to carry you?" The agent made jokes about Mr. Thiersaint's weight before finally saying, "You need to go back to your country."

75.     With no other option, Mr. Thiersaint hoisted himself up the passenger stairs backwards, stair-by-stair, after everyone else had entered the airplane. Having to do so dirtied Mr. Thiersaint's clothes and hands and caused physical pain. Once on the plane, Mr. Thiersaint hopped, one-legged, down the aisle until he reached his seat as other passengers on the plane watched.

76.     Mr. Thiersaint was forced to sit in the back of the plane in order to have access to the bathroom. Later, to use the bathroom, he had to sit on the floor and scoot to the bathroom.

77.     Other passengers on the plane shouted comments like "Whoa, what is going on here?" and "Why are they doing this to you?" and that the treatment was "not right." ICE agents told those people to "shut up" and mind their own business.

78.     Throughout this incident, Mr. Thiersaint suffered immense humiliation, degradation, and severe emotional distress, as well as physical pain in his arm and lower back. These harms worsened his depression.

***ICE caused Mr. Thiersaint further physical and emotional harm while detaining him in Louisiana.***

79.     Once the plane landed at Alexandria International Airport, in Alexandria, Louisiana, ICE agents again forced Mr. Thiersaint to exit the plane by hopping down the aisle and then hoisting himself down the stairs. Mr. Thiersaint again suffered both physical pain and humiliation.

80.     Again, ICE agents required Mr. Thiersiant to board a non-accessible bus to from the airport to their next location, LaSalle ICE Processing Center ("LaSalle"), an immigration detention center operated by ICE in Jena, Louisiana. Although Mr. Thiersaint asked for assistance in boarding the bus, ICE officers denied him assistance. Instead, ICE officers forced Mr. Thiersaint to crawl up the bus stairs without assistance, causing him intense pain.

81.     When the bus arrived at LaSalle, ICE agents forced Mr. Thiersaint to exit the bus in the same way. Again, Mr. Thiersaint experienced physical pain and humiliation.

82.     While detained at LaSalle, Mr. Thiersaint was denied access to facilities that permitted him to use his wheelchair to complete life's daily activities.

83.     The absence of accessible facilities placed Mr. Thiersaint at risk of physical injury. There were no grab-bars near his bed to so that he could balance as he got into bed, helping him to avoid a fall. Mr. Thiersaint further worried for his safety after being placed in a dorm with many people who were fighting.

84.     Additionally, the communal shower area that Mr. Thiersaint used placed Mr. Thiersaint at risk of injury. There were no grab bars in the showers. In addition, instead of a medical chair, the shower contained only an ordinary, unsecured chair. Again, because of the slippery conditions, Mr. Thiersaint felt unsafe using the chair.

85.     While at LaSalle, ICE failed to provide Mr. Thiersaint with proper medication. Instead of providing Mr. Thiersaint with his medication, staff at LaSalle merely gave him Ibuprofen.  As a result of the denial of his medication, Mr. Thiersaint experienced loss of appetite, unusual sweating, loss of sleep, and nightmares when he was able to sleep. He also suffered from heightened depression and anxiety.

86.     On or around March 3, 2016, ICE officers woke Mr. Thiersaint at approximately 4:45 a.m. to transfer him to a fourth facility. Officers told Mr. Thiersaint that he was being transferred to an accessible facility.

87.     ICE officers required Mr. Thiersaint to enter a non-accessible van by hoisting himself onto the vehicle floor and then into his seat, causing him physical pain. When he reached an airport in Louisiana, he had to exit the vehicle in the same way. Again, this caused Mr. Thiersaint intense pain.

88.     At the airport, ICE officials provided Mr. Thiersaint with assistance entering non-accessible transportation for the first and only time throughout his detention: When it came time for Mr. Thiersaint to board the airplane, ICE officials strapped Mr. Thiersaint to a chair and carried him up the passenger stairs of the plane and to his seat.

***ICE transferred Mr. Thiersaint to Florida where they subjected him to further harm.***

89.     Although they had helped Mr. Thiersaint enter the plane in Louisiana, ICE officers did not help him exit the plane once it arrived in Florida. Mr. Thiersaint told the officers that he was afraid for his safe exiting the plane without assistance, but they refused to assist him. ICE officers left Mr. Thiersaint to drag himself down the aisle of the plane and down the stairs. As a result, he felt physical pain in his right arm and also experienced humiliation and degradation as other passengers watched, an experience that worsened his depression.

90.     Once on the tarmac, ICE officers forced Mr. Thiersaint to enter a non-accessible van by hoisting himself up on to the floor of the van, and then onto his seat.

91.     The van took Mr. Thiersaint to the Krome Detention Center ("Krome"), an ICE detention facility in Miami. ICE When Mr. Thiersaint arrived at Krome, the officers again forced him to hoist himself up out of the van. Again, Mr. Thiersaint felt pain in his arm throughout his forced entry and exit from the van.

17

92.     Mr. Thiersaint was detained at Krome for approximately two weeks. During this time, ICE officials kept him in the medical wing. When he asked ICE officials why he was housed in the medical wing, they told him that it was because the rest of the facility was not wheelchair accessible.  They also claimed it was because he had low blood pressure.

93.     In the medical wing, ICE officers segregated Mr. Thiersaint from other persons incarcerated without disabilities.

94.     Mr. Thiersaint was denied access to the services and facilities provided to inmates without disabilities. ICE restricted his access to the law library at a critical moment in his immigration case. Although he was able to sign up to visit the library early in the morning when no one else was there, such limited access deprived him of the opportunity to discuss his case with other detainees.

95.     While at Krome, Mr. Thiersaint was able to see a psychiatrist and finally receive his medication for depression.

***Mr. Thiersaint filed timely complaints regarding ICE misconduct and moved to stop his removal.***

96.     Throughout his detention, Mr. Thiersaint did his best to keep his family and his attorneys informed of his whereabouts, although he was often denied access to a telephone.

97.     Based upon Mr. Thiersaint's accounts of his gross mistreatment by Defendants, his counsel filed complaints with the DHS Office for Civil Rights and Civil Liberties ("CRCL") on March 4, March 9, and March 31, 2016. The correspondence with CRCL documented Defendants' mistreatment of Mr. Thiersaint, including transportation-related discrimination and denial of services, segregation from the general population, and denial of medical care.

98.     His counsel also made applications for legal relief on his behalf. On March 7, 2016, they filed an application for humanitarian parole with ICE. That application was supported by a letter from Dr. Paul Farmer, a professor at Harvard Medical School and one of the world's foremost experts on public health in Haiti, who wrote:

> [I]t is likely that if deported to Haiti, Mr. Thiersaint will be detained
> in a police station holding cell where there are upwards of sixty
> prisoners in a 10 x 10 cell, where he would be unable to use his
> wheelchair, and his already-limited mobility would be further
> hindered. Furthermore, prolonged standing and an inability to
> properly care for the stump of his amputated leg in prison would
> render him likely to contract a stump infection. *The absence of any
> medical care in prison would then place him at risk for bacteremia,
> sepsis, and death.* (Emphasis added)

99.     ICE was unmoved, and proceeded apace with his deportation. On March 22,

2016, it denied Mr. Thiersaint's application for humanitarian parole.

100.     On March 14, 2016, counsel for Mr. Thiersaint filed with the Board of

Immigration Appeals (BIA) a motion to reopen Mr. Thiersaint's case on the basis of his

disability, changed country conditions in Haiti, and developments in the law regarding the

classification of state convictions as removable offenses. The motion was accompanied by an

emergency request to stay Mr. Thiersaint's removal.

101.     On March 14, 2016, the BIA granted Mr. Thiersaint's emergency request to

stay his removal.

102.     Although the BIA later denied Mr. Thiersaint's motion to reopen, they

subsequently granted a motion to reconsider. On October 17, 2017, Mr. Thiersaint's case was

reopened and his lawful permanent resident status was restored.

103.     On June 11, 2018, the State of Connecticut issued a full pardon to Mr. Thiersaint

on the criminal convictions for which ICE seeks to remove him from the country.

104.     On November 1, 2018, an Immigration Judge subsequently found Mr.

Thiersaint was not removable. The government has not indicated whether it will waive appeal

of the decision, and thus Mr. Thiersaint still faces a threat of re-detention and harm. Mr.

Thiersaint also continues to wear an ICE ankle monitor and is subject to check-ins with ICE,

including agents coming to his home. Mr. Thiersaint remains a lawful permanent resident to

this day, and in light of the pardons by the State of Connecticut, may seek to become a U.S. citizen.

***Even after his removal was stayed, ICE denied Mr. Thiersaint accessible transportation, causing further pain and humiliation.***

105.    On information and belief, following the BIA's grant of a stay of removal, ICE determined to return Mr. Thiersaint to Connecticut and to release him custody.

106.    On March 17, 2016, ICE officials transferred Mr. Thiersaint from Krome back to LaSalle in Louisiana.

107.    ICE officials transported Mr. Thiersaint from Krome to a nearby airport by bus. Again, they forced Mr. Thiersaint to board and exit the non-accessible bus without assistance, causing him physical pain.

108.    At the airport, an ICE officer initially asked Mr. Thiersaint if he needed assistance to get on the plane. Mr. Thiersaint replied that he did, as it was extremely painful for him to use his arms to crawl up the passenger stairs and he felt unsafe. The ICE officer explained that if he carried Mr. Thiersaint up the stairs in a chair, Mr. Thiersaint would have to remain strapped in the chair for the duration of the flight to Louisiana. The ICE officer explained further that Mr. Thiersaint would also have to be at the front of the plane, which was far away from the bathroom. Mr. Thiersaint responded that he accepted those conditions. The ICE officer then said that he was not going to help Mr. Thiersaint enter the plane and that he would have to "find a way to get onto the plane" on his own.

109.    As a result, Mr. Thiersaint had to drag himself up the passenger stairs to get on the plane. Again, he did so by hoisting himself up, step by step, suffering significant pain and dirtying his hands and clothes. Once on the plane, Mr. Thiersaint dragged himself down the aisle to his seat in front of the other detainees, humiliating him and leading to severe pain in his right arm.

110.    When Mr. Thiersaint's plane landed in Louisiana, ICE agents forced Mr. Thiersaint to exit the plane in the same way he entered. Once again, this caused Mr. Thiersaint extreme pain and humiliation. He then had to hoist himself into the non-accessible van that would take him to LaSalle, causing him more pain in his arms.

111.    Once back at LaSalle, ICE again failed to provide Mr. Thiersaint with accessible accommodations. As during his prior detention at LaSalle, Mr. Thiersaint again had to maneuver a facility that had no grab bars or a medical chair in the bathroom to help him shower, and had no grab bars near his bed to help him transfer to his bed.

***ICE's mistreatment of Mr. Thiersaint continued as it transferred him back to Connecticut via Louisiana, New Jersey and Massachusetts.***

112.    On or about March 21, 2016, ICE officials began the process of transferring Mr. Thiersaint from LaSalle ICE Processing Center back to SCHC.

113.    ICE officials at LaSalle transported Mr. Thiersaint to the airport in a non-accessible van. Again, ICE officers forced him to enter and exit the non-accessible van by hoisting himself out of his wheelchair and on to the seat, causing Mr. Thiersaint pain in his right arm.

114.    At the airport in Louisiana, ICE officers again required Mr. Thiersaint to board a plane without assistance or an accessible means of boarding. Although ICE agents from LaSalle had previously assisted Mr. Thiersaint in boarding an airplane, this time, they refused to do so. Instead, for the third time, Mr. Thiersaint hoisted himself up the passenger stairs, one by one, and hopped to his seat in front of the other detainees. This experience caused Mr. Thiersaint both severe physical pain and humiliation.

115.    The plane landed in Newark, New Jersey, where ICE agents again refused to assist Mr. Thiersaint in exiting the plane, thus forcing Mr. Thiersaint again to drag himself down the passenger stairs, causing pain in his right arm.

116. ICE officers then required Mr. Thiersaint to enter a non-accessible van without any assistance. The van took Mr. Thiersaint to Hartford ICE headquarters. ICE agents refused Mr. Thiersaint assistance in exiting the same van. Being forced by ICE to both enter and exit the van without assistance caused Mr. Thiersaint pain in his right arm.

117. From Hartford, the two ICE officers who had first transported Mr. Thiersaint from Hartford to FCHC were again charged with the same duty. Again, these two officers again required Mr. Thiersaint to enter another non-accessible van, which took him to FCHC. Again, this caused him physical pain. Upon arrival at FCHC, these two ICE officers demanded Mr. Thiersaint also exit the non-accessible van without assistance, causing him pain.

118. ICE held Mr. Thiersaint at FCHC overnight. The next day, the same two ICE officers who had transported Mr. Thiersaint from Hartford to FCHC the day prior, and several weeks prior, transported him to SCHC. Again, those officers used on a non-accessible van, to SCHC. Each time Mr. Thiersaint had to enter and exit a vehicle, ICE officials refused to assist Mr. Thiersaint. Instead, he had to hoist himself up and down from his seat, leading to physical pain.

119. When he returned to SCHC for the second time, ICE officers placed Mr. Thiersaint in the general population at SCHC.

120. A few weeks prior, doctors, jail officials, and ICE officials at SCHC had told Mr. Thiersaint that he could not be held with others and had confined him in SCHC's medical wing. Mr. Thiersaint asked SCHC officials about this discrepancy, but they could not provide an explanation.

121. Unlike his confinement in the medical wing, Mr. Thiersaint's detention in general population at SCHC did not require segregation for twenty-three hours per day. Mr.

Thiersaint had improved access to the telephone, law library, and other detainees. He also was able to use a bathroom accessible to individuals with mobility disabilities.

122.    However, Mr. Thiersaint's bed at SCHC was not equipped with grab bars to help him transfer from his wheelchair to his bed.

123.    In addition, officials at SCHC again denied Mr. Thiersaint his medication.

124.    The denial of his medications caused him to suffer withdrawal symptoms, such as loss of appetite, unusual sweating, loss of sleep, and nightmares when he was able to sleep. This denial of medication continued despite the fact that ICE had been put on notice, by the letter to the Office of Civil Rights and Civil Liberties, of Mr. Thiersaint's mistreatment at SCHC.

125.    Prior to and during the course of Mr. Thiersaint's detention at SCHC, ICE failed to provide meaningful oversight of the facility to ensure provision of adequate services for people with disabilities.

***The Impact of Defendants' Mistreatment Continues.***

126.    On April 1, 2016, Mr. Thiersaint was finally released from ICE custody. ICE agents drove him in a car from SCHC to Hartford. For Mr. Thiersaint, it was like coming from hell to home.

127.    The pain and injury caused to Mr. Thiersaint's right arm by Defendants' conduct persisted long after his release. He continues to have nightmares and anxiety related to his mistreatment by Defendants. including strong emotional reactions when he sees a plane.

128.    During the nearly two months he spent in immigration detention, DHS and ICE, along with their agents, forced Mr. Thiersaint to suffer repeated harms across approximately ten vehicles, four plane rides, and five states. Defendants caused him these harms on the basis of a disability. DHS and ICE violated their own standards to transport

detainees in a safe and humane manner, including requirements to have the appropriate and necessary equipment to transport detainees with disabilities.

129.    DHS and ICE and federal contractors failed to follow their standards of care for detainees with chronic conditions, including failing to provide medical care although Mr. Thiersaint's medical needs were clearly listed in medical records in their possession or control.

130.    ICE and DHS failed to follow their own standards to provide reasonable accommodations, and as result denied Mr. Thiersaint equal access to programs, services, and activities, let alone accommodations, as required by the PBNDS detention standards.

***ICE failed to prevent or correct its officers' mistreatment of Mr. Thiersaint.***

131.    At no point during Mr. Thiersaint's two-month detention did ICE take any corrective action with respect to the agents who denied Mr. Thiersaint access to programs and services, injured and humiliated Mr. Thiersaint by forcing him to enter vehicles and aircraft by hopping or dragging himself on the ground, or denied Mr. Thiersaint medical care.

132.    Although ICE had actual knowledge of the mistreatment that its officers imposed on Mr. Thiersaint and had authority and ample opportunity to intervene to change the manner in which its officers transported and detained Mr. Thiersaint, it failed to do so.

133.    On information and belief, ICE failed to adequately train its agents with regard to the treatment of individuals with disabilities.

134.    On information and belief, ICE has not disciplined any of the agents who mistreated Mr. Thiersaint.

135.    To this day, Mr. Thiersaint suffers mentally and emotionally as a result of how Defendants treated him, and believes that he was treated as less than human because of his physical and mental disabilities.

136.    Since his detention, Mr. Thiersaint has lived in fear that ICE may at any time re-detain him and again subject him to the painful, humiliating, and discriminatory conditions. As he pursued a legal challenge, Mr. Thiersaint wanted to request that ICE use less restrictive monitoring but refrained from doing so out of fear that he would be re-detained, and ICE would once again subject him to these egregious conditions.

### *Exhaustion of Administrative Remedies*

137.    The United States is liable pursuant to the Federal Tort Claims Act for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

138.    At all times relevant to this Complaint, ICE officials acted within the scope of their employment and/or their official duties as employees of DHS, a U.S. agency.

139.    Pursuant to 28 U.S.C. § 2675(a), Mr. Thiersaint filed an FTCA administrative claim with DHS for all the tortious actions alleged here and committed by ICE officials acting under the supervision of DHS.

140.    DHS denied Mr. Thiersaint's claim on June 27, 2017.

141.    Mr. Thiersaint timely filed a request for reconsideration of the denial.

142.    On May 16, 2018, DHS denied Mr. Thiersaint's request for reconsideration of his claim under the FTCA.

143.    Mr. Thiersaint has administratively exhausted his claim under the FTCA.

## CAUSES OF ACTION

## COUNT 1

### Rehabilitation Act, 29 U.S.C. § 794
### (Against DHS, ICE, and Suffolk County Sheriff's Department)

144.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

145.     Mr. Thiersaint's mobility disability and mental illnesses constitute disabilities under the Rehabilitation Act because they substantially limit one or more major life activities.

146.     Mr. Thiersaint was "otherwise qualified" to participate in any activities related to his removal proceedings, as well as in the programs and activities of the detention centers while in DHS and/or ICE custody in 2016.

147.     Defendant DHS, and its component ICE, are executive agencies within the meaning of 29 U.S.C. § 794(a).

148.     SCHC, an instrumentality of the Commonwealth of Massachusetts, receives financial assistance from the federal government, including to operate "programs or activities" for housing and caring for immigrants. 29 U.S.C. § 794(b)(1)(A).

149.     ICE intentionally discriminated against Mr. Thiersaint on the basis of his disabilities, repeatedly denied his requests for reasonable and necessary accommodations for his disabilities, and caused Mr. Thiersaint serious physical pain, emotional distress, and humiliation. ICE acted intentionally, including with animus and/or deliberate indifference to the likelihood that it was violating Mr. Thiersaint's federally-protected rights.

150.     The Suffolk County Sheriff's Department repeatedly denied Mr. Thiersaint the benefit of services and programs that other inmates without disabilities could enjoy, and intentionally discriminated against him on the basis of his disabilities despite his repeated requests for accommodations. The Suffolk County Sheriff's Department acted intentionally, including with animus and/or deliberate indifference to the likelihood that it was violating Mr. Thiersaint's federally-protected rights.

151.     By returning Mr. Thiersaint to SCHC, even after it was put on notice that the facility had mistreated Mr. Thiersaint, ICE acquiesced in SCHC's discriminatory policies and practices.

26

152.    DHS, ICE, and SCHC denied Mr. Thiersaint reasonable accommodations. The reasonable accommodations requested by Mr. Thiersaint would not have been unduly burdensome nor would they have required a fundamental alteration in the programs. 6 C.F.R. § 15.50(a)(2).

153.    As a result of discrimination and failure to reasonably accommodate Mr. Thiersaint's disabilities, and solely based on his disabilities, Mr. Thiersaint was kept from participating in, and denied the benefits of, DHS, ICE, and SCHC programs and activities, including those related to detention, deportation, and deportation proceedings.

## COUNT 2

**Violation of the Americans with Disabilities Act**
**(Against Suffolk County Sheriff's Department)**

154.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

155.    Section 202 of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

156.    Disability is defined to include "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1), such as "caring for oneself, performing manual tasks … walking, standing, lifting, [and] bending." 42 U.S.C. § 12102(2)(A).

157.    Mr. Thiersaint's mobility disability and mental illnesses substantially limit one or more major life activities and so constitute a disability under the Americans with Disabilities Act. 42 U.S.C. § 12102(1).

158.    Mr. Thiersaint was "otherwise qualified" to participate in any activities related to his deportation proceedings, as well as in the services, programs and activities at SCHC, including those provided for immigration detainees held at SCHC in 2016.

159.    A public entity is defined as an "instrumentality of a State." 42 U.S.C. § 12131(1)(B). SCHC is operated by the Suffolk County Sheriff's Department, which has been directly controlled by, and therefore an instrumentality of, the Commonwealth of Massachusetts, Mass. St. 2009, c. 61, §§ 3, 13 (effective January 1, 2010).

160.    SCHC provided services, programs, and activities to immigration detainees, including bathrooms and other facilities, access to the law library, exercise, and telephone access to family and counsel.

161.    The Suffolk County Sheriff's Department denied Mr. Thiersaint access to services, programs, and activities that other inmates without disabilities could enjoy by, *inter alia,* segregating Mr. Thiersaint in a medical unit from other individuals without disabilities and repeatedly failing to provide wheelchair-accessible bathrooms and other facilities and necessary medication, despite his repeated requests. The Suffolk County Sheriff's Department acted intentionally, including with animus and/or deliberate indifference to the strong likelihood that they were violating Mr. Thiersaint's federally-protected rights.

162.    By, *inter alia,* separating Mr. Thiersaint from the general population of detainees without disabilities, the Suffolk County Sheriff's Department excluded Mr. Thiersaint from participating in, denied him benefits of, and subjected him to discrimination under a service, program, or activity of the Suffolk County Sheriff's Department.

163.    As a result of the Suffolk County Sheriff's Department's actions, Mr. Thiersaint has suffered harm.

## COUNT 3

### Fourteenth Amendment, 42 U.S.C. § 1983
### (Against John Doe Defendants 11-16, Unknown Officers of Suffolk County Sheriff's Department, in their individual capacities)

164.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

165.    John Doe Defendants 11-16, unknown officers of Suffolk County Sheriff's Department kept Mr. Thiersaint in segregation away from the rest of the general population without justification or adequate process, and denied him access to medication. This conduct shocks the conscience and imposed an atypical and significant hardship on Mr. Thiersaint. These officers violated Mr. Thiersaint's equal protection rights, procedural due process rights, and substantive due process, as guaranteed by the Fourteenth Amendment of the Constitution.

## COUNT 4

### Fifth Amendment Due Process Clause
### (Against ICE Officer William Chambers and John Doe Defendants 1-10, Unknown ICE Officers )

166.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

167.    The Supreme Court has held that, in some circumstances, a person whose constitutional rights are violated by federal actors can sue those federal actors for damages. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

168.    John Doe Defendants 1-10, unknown ICE officers were deliberately indifferent to Mr. Thiersaint's serious medical needs, there violating Mr. Thiersaint's rights under the Constitution to adequate medical care while incarcerated. Over the course of his two months in detention, Mr. Thiersaint was denied necessary medication for critical time

periods and denied access to mobility assistance during ICE transportation and removal operations.

169.    Defendant Chambers refused to assist Mr. Thiersaint in accessing adequate medical care, acting with deliberate indifference to Mr. Thiersaint's serious medical needs.

170.    As a result of the John Doe Defendants 1-10 and Defendant Chambers' actions, Mr. Thiersaint suffered not only severe physical pain, but also humiliation, degradation, and worsening mental health.

## COUNTS 5 – 22: FEDERAL TORT CLAIMS ACT

### COUNT 5

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**
**(Against the United States of America)**
**(Connecticut)**

171.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

172.    Under Connecticut law, the elements of an intentional infliction of emotional distress claim are (1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his or her conduct; (2) the conduct was "extreme and outrageous"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was severe. *Gleason v. Smolinski*, 125 A.3d 920, 933 n.14 (Conn. 2015).

173.    ICE officials engaged in extreme and outrageous conduct in carrying out Mr. Thiersaint's transfer between Hartford and Massachusetts on multiple occasions in February 2016.

174.    As a result of ICE officials' actions, Mr. Thiersaint suffered severe emotional distress, including degradation, humiliation, and worsening of his depression.

30

175.    ICE officials intended to inflict emotional distress or knew or should have known that Mr. Thiersaint would experience severe emotional distress.

## COUNT 6

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligent Infliction of Emotional Distress**
**(Against the United States of America)**
**(Connecticut)**

176.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

177.    In Connecticut, a defendant engages in the tort of negligent infliction of emotional distress when: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (2003).

178.    When transferring Mr. Thiersaint between Hartford and FCHC, ICE officials engaged in conduct that created an unreasonable risk of causing Mr. Thiersaint emotional distress.

179.    It was foreseeable that Mr. Thiersaint would experience emotional distress from having to crawl into the van without assistance.

180.    DHS, ICE, and ICE officials caused Mr. Thiersaint to be so severely emotionally distressed that it might result in illness or bodily harm.

181.    Mr. Thiersaint suffered emotional distress as a result of Defendants' action, including degradation, humiliation, and exacerbation of his pre-existing depression.

## COUNT 7

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligent Supervision
### (Against the United States of America)
### (Connecticut)

182.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

183.    Negligent supervision occurs in Connecticut when (1) the plaintiff suffers an injury due to the defendant's failure to supervise an employee and (2) that the defendant had a duty to supervise the employee. *Roberts v. Circuit-Wise, Inc*, 142 F. Supp. 2d 211, 214 (D. Conn. 2001). The defendant has a duty of care where the defendant "knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Id.*

184.    DHS and ICE supervisors knew or should have known that the ICE officials had the propensity to commit the torts that were committed.

185.    As a result of DHS and ICE's failure to supervise their employees, Mr. Thiersaint suffered injury, including significant physical pain and extreme emotional distress.

## COUNT 8

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligence
### (Against the United States of America)
### (Connecticut)

186.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

187.    Under Connecticut law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Lawrence v. O & G Indus.*, 126 A.3d 569, 574 (Conn. 2015).

188.    DHS, ICE, and ICE officials owed Mr. Thiersaint a duty of care as a result of them detaining him. 6 C.F.R. § 15.30(a); 6 C.F.R. § 15.50(a)*; PBNDS § 1.3.*

189.    DHS, ICE, and ICE officials breached the agencies' duty to Mr. Thiersaint by, *inter alia,* requiring him to drag himself into non-accessible vehicles and refusing to provide assistance when he asked for it.

190.    Mr. Thiersaint suffered harm, including severe pain in his arm, degradation, humiliation, and exacerbation of his depression.

191.    DHS's, ICE's, and ICE officials' actions in forcing Mr. Thiersaint to get in and out of vehicles without assistance were the proximate cause of Mr. Thiersaint's harm.

## COUNT 9

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Intentional Infliction of Emotional Distress
### (Against the United States of America)
### (Massachusetts)

192.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

193.    Under Massachusetts law, the elements of intentional infliction of emotional distress are: (1) the defendant intended to inflict emotional distress, or he or she knew or should have known that emotional distress was the likely result of his or her conduct; (2) the conduct was "extreme and outrageous"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was "severe." *Polay v. McMahon*, 10 N.E.3d 1122, 1128 (Mass. 2014).

194.    By, *inter alia,* transferring Mr. Thiersaint to and from Suffolk House of Corrections without a wheelchair accessible van, segregating him in the medical unit, and denying him access to his depression medication, ICE officials acted in a way that was extreme and outrageous.

195.    ICE officials knew or should have known that emotional distress would result from their actions towards Mr. Thiersaint.

196.    ICE officials caused Mr. Thiersaint to suffer severe emotional distress.

33

## COUNT 10

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligent Supervision
### (Against the United States of America)
### (Massachusetts)

197.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

198.    In order to show that an employer negligently supervised its employees, the plaintiff must show that he was harmed by the actions of an employee and that the employer should have "reasonably anticipated" the risk of injury. *Foley v. Boston Housing Authority*, 555 N.E.2d 234, 237-38 (Mass. 1990).

199.    Through their actions during Mr. Thiersaint's transfer between FCHC and SCHC, two ICE agents caused Mr. Thiersaint physical and emotional harm.

200.    As his custodians, ICE owed Mr. Thiersaint a duty of care, as required by even the agency's own standards. *See* 6 C.F.R. § 15.30(a); 6 C.F.R. § 15.50(a); *PBNDS* § 1.3. Their failure to exercise that duty of care caused Mr. Thiersaint's injuries, such as arm pain.

201.    DHS and ICE supervisors knew or should have reasonably anticipated the risk that the agents who transported Mr. Thiersaint between FCHC and SCHC would cause Mr. Thiersaint harm. DHS and ICE knew that Mr. Thiersaint used a wheelchair, and was therefore unable to safely transport himself into and out of vehicles without assistance.

## COUNT 11

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligence
### (Against the United States of America)
### (Massachusetts)

202.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

34

203.    Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Bennett v. Eagle Brook Country Store*, 557 N.E.2d 1166, 1168 (Mass. 1990).

204.    DHS, ICE, and ICE officials owed Mr. Thiersaint a duty of care as a result of their detention of him. *See* 6 C.F.R. § 15.30(a); 6 C.F.R. § 15.50(a); *PBNDS* § 1.3.

205.    In transporting and detaining Mr. Thiersaint for almost a month in conditions that caused Mr. Thiersaint physical and mental harm, DHS, ICE, and ICE officials breached their duty of care in both FCHC and SCHC.

206.    By denying him necessary accommodations and medical care, DHS, ICE, and ICE officials caused Mr. Thiersaint to suffer physical pain, emotional distress, and withdrawal symptoms from his medication.

207.    Defendants' actions were the proximate cause of Mr. Thiersaint's harm.

## COUNT 12

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligent Infliction of Emotional Distress
### (Against the United States of America)
### (Massachusetts)

208.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

209.    Under Massachusetts law, the elements of negligent infliction of emotional distress are: (1) the defendant was negligent; (2) the plaintiff suffered emotional distress; (3) the plaintiff's emotional distress was caused by the defendant's negligence; (4) the plaintiff's emotional distress was evidenced by objective, physical symptoms; (5) a reasonable person would have suffered emotional distress under the circumstances of the case. *Payton v. Abbott Labs*, 437 N.E.2d 171, 181 (Mass. 1982).

210.     Under Massachusetts law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Bennett v. Eagle Brook Country Store*, 557 N.E.2d 1166, 1168 (1990).

211.     DHS, ICE, and ICE officials were negligent in that they breached their duty of care to Mr. Thiersaint and proximately caused his harm.

212.     Mr. Thiersaint suffered emotional distress in the form of degradation, humiliation, and exacerbation of his already existing depression.

213.     Mr. Thiersaint's emotional distress was caused by DHS's, ICE's, and ICE officials' negligence.

214.     Mr. Thiersaint's emotional distress was demonstrated in his physical symptoms.

215.     A reasonable person would have suffered emotional distress under these circumstances.

## COUNT 13

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**
**(Against the United States of America)**
**(New Jersey)**

216.     All of the foregoing allegations are repeated and realleged as though fully set forth herein.

217.     Under New Jersey law, the elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions were the proximate cause of the plaintiff's emotional distress; and (4) the plaintiff suffered extreme emotional distress. *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (N.J. 1988).

218.     DHS, ICE, and ICE officials engaged in extreme and outrageous conduct at

Newark International Airport by requiring Mr. Thiersaint to hoist himself up a flight of stairs,

backwards, one stair at a time, and hop down the aisle to his seat.

219.     As Mr. Thiersaint has an amputated leg and obviously requires assistance to

climb stairs, ICE officials' conduct amounts, at the very least, to recklessness.

220.     DHS's, ICE's, and ICE officials' conduct proximately caused Mr. Thiersaint

to suffer extreme emotional distress, including degradation, humiliation, and depression.

**COUNT 14**

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligent Supervision**
**(Against the United States of America)**
**(New Jersey)**

221.     All of the foregoing allegations are repeated and realleged as though fully set

forth herein.

222.     In order to prove negligent supervision in New Jersey, the plaintiff must show

(1) "that the employer knew or had reason to know of the particular unfitness, incompetence,

or dangerous attributes of the employee and could reasonably have foreseen that such

qualities created a risk of harm to other persons" and (2) the employee's "incompetence,

unfitness, or dangerous characteristics proximately caused the injury." *Di Cosala v. Kay*, 450

A.2d 508, 516 (N.J. 1982).

223.     DHS and ICE supervisors knew or had reason to know of the dangerous

attributes of ICE officials and could reasonably have foreseen that ICE officials' conduct

would create a risk of harm to Mr. Thiersaint.

224.     Mr. Thiersaint suffered pain in his right arm and emotional degradation and

humiliation that worsened his depression as a result of DHS's and ICE's failure to supervise

their employees.

## COUNT 15

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligent Infliction of Emotional Distress
### (Against the United States of America)
### (New Jersey)

225.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

226.    In New Jersey, a plaintiff claiming negligent infliction of emotional distress must show: (1) a duty of reasonable care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; (3) severe emotional distress on the part of the plaintiff; and (4) proximate cause. *G.D. v. Kenny*, 984 A.2d 921, 933 (N.J. Super. App. Div. 2009), *aff'd*, 15 A.3d 300 (N.J. 2011).

227.    As his custodians in detention, DHS, ICE, and ICE officials owed Mr. Thiersaint a duty of care. 6 C.F.R. § 15.30(a), § 15.50(a); *PBNDS* § 1.3.

228.    DHS, ICE, and ICE officials breached their duty of care by requiring Mr. Thiersaint to drag himself onto a plane at Newark International Airport, failing to provide Mr. Thiersaint with a reasonable accommodation.

229.    Mr. Thiersaint suffered severe emotional distress as a result of this incident, including degradation, humiliation, and worsening of depression.

230.    By refusing to assist him and watching him struggle to comply with their orders, ICE officials were the proximate cause of his emotional distress.

## COUNT 16

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligence
### (Against the United States of America)
### (New Jersey)

231.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

232.    In New Jersey, negligence requires a showing of: (1) a duty of care to the

plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff.

*Polzo v. Cty. of Essex*, 960 A.2d 375, 384 (N.J. 2008).

233.    As his custodians in detention, DHS, ICE, and ICE officials owed Mr.

Thiersaint a duty of care. 6 C.F.R. § 15.30(a), § 15.50(a); *PBNDS* § 1.3.

234.    ICE officials breached that duty when they required Mr. Thiersaint to drag

himself onto an airplane at Newark International Airport without providing assistance.

235.    Due to these breaches of duty, Mr. Thiersaint suffered significant physical

pain. ICE officials' actions degraded and humiliated Mr. Thiersaint.

236.    ICE officials' actions were the proximate cause of harm to Mr. Thiersaint.

**COUNT 17**

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**
**(Against United States of America)**
**(Louisiana)**

237.    All of the foregoing allegations are repeated and realleged as though fully set

forth herein.

238.    Under Louisiana law, intentional infliction of emotional distress requires that:

(1) the conduct of the defendant was "extreme and outrageous"; (2) the emotional distress

suffered by the plaintiff was severe; and (3) "the defendant desired to inflict severe emotional

distress or knew that severe emotional distress would be certain or substantially certain to

result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991).

239.    In transporting and detaining Mr. Thiersaint, DHS's, ICE's, and ICE officials'

conduct was extreme and outrageous.

240.    ICE officials' conduct towards Mr. Thiersaint caused him to suffer continuing

physical pain and medical issues. ICE officials' degrading and humiliating treatment caused

Mr. Thiersaint to suffer severe emotional distress that worsened his mental health.

39

241.    DHS, ICE, and ICE officials knew that severe emotional distress would result from ICE officials' actions.

## COUNT 18

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligence**
**(Against the United States of America)**
**(Louisiana)**

242.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

243.    In Louisiana, a plaintiff in a negligence lawsuit must prove that: (1) the conduct in question was a cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to the plaintiff; (3) the defendant breached the requisite duty of care; and (4) the risk, and harm caused, was within the scope of protection afforded by the duty breached. *Faucheaux v. Terrebonne Consolidated Government*, 615 So. 2d 289 (La. 1993).

244.    DHS, ICE, and ICE officials owed Mr. Thiersaint a duty of care when they transferred him to Jena, Louisiana and detained him for four days. 6 C.F.R. § 15.30(a); 6 C.F.R. § 15.50(a); *PBNDS* § 1.3.

245.    DHS, ICE, and ICE officials breached this duty by, *inter alia,* (a) requiring Mr. Thiersaint to drag himself down the stairs of the plane and into the van; (b) forcing Mr. Thiersaint to use non-accessible bathrooms and living quarters; and (c) denying Mr. Thiersaint access to his medications.

246.    DHS's, ICE's, and ICE officials' conduct caused Mr. Thiersaint's physical pain, medical issues, humiliation, and degradation.

247.    The risk of Mr. Thiersaint's harm was within the scope of protection afforded by the duty that DHS, ICE, and ICE officials have to him.

**COUNT 19**

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligent Supervision**
**(Against DHS and ICE)**
**(Louisiana)**

248.   All of the foregoing allegations are repeated and realleged as though fully set forth herein.

249.   Under Louisiana law, "[a] claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee generally is governed by the same duty-risk analysis used for all negligence cases in Louisiana." *Griffin v. Kmart Corporation*, 776 So. 2d 1226 (La. App. 5th Cir. 2000).

250.   A plaintiff in a negligence lawsuit in Louisiana must prove that: (1) the conduct in question was a cause-in-fact of the resulting harm; (2) the defendant owed a duty of care to the plaintiff; (3) the defendant breached the requisite duty of care; and (4) the risk, and harm caused, was within the scope of protection afforded by the duty breached. *Faucheaux v. Terrebonne Consolidated Government*, 615 So. 2d 289 (La. 1993).

251.   DHS's and ICE's conduct in failing to supervise their officials was a cause-in-fact of Mr. Thiersaint's harm.

252.   DHS, ICE, and their supervisors, owed a duty of care to Mr. Thiersaint.

253.   DHS, ICE, and their supervisors breached their duty of care by failing to train and supervise their officials in the treatment of individuals with mobility disabilities.

254.   The risk and harm caused was within the scope of protection afforded by DHS's and ICE's duty to Mr. Thiersaint.

## COUNT 20

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Intentional Infliction of Emotional Distress**
**(Against the United States of America)**
**(Florida)**

255. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

256. Under Florida law, a Defendant commits intentional infliction of emotional distress when (1) the defendant committed an independent tort, and acted with malice or great indifference to the plaintiff's rights, *Kirksey v. Jernigan*, 45 So. 2d 188 (Fla. 1950), or (2) the defendant's conduct was "extreme and outrageous," even if an independent tort was not committed, *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985).

257. ICE officials' conduct in transporting and detaining Mr. Thiersaint was extreme and outrageous, showing great indifference to his rights.

258. ICE officials' extreme and outrageous refusal to offer Mr. Thiersaint basic assistance entering and exiting planes and vans caused Mr. Thiersaint to suffer pain and humiliation and fear for his safety and health, resulting in significant distress.

## COUNT 21

**Federal Tort Claims Act, 28 U.S.C. § 1346(b)**
**Negligent Supervision**
**(Against the United States of America)**
**(Florida)**

259. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

260. Under Florida law, a plaintiff can recover against a defendant for negligent supervision when the defendant "negligently placed [the plaintiff] under the supervision of [an employee], when [the defendant] either knew or should have known that [the employee]

42

had the propensity to commit [the torts committed]." *Malicki v. Doe*, 814 So. 2d 347, 362 (Fla. 2002).

261.    DHS and ICE supervisors negligently placed Mr. Thiersaint under the supervision of ICE officials when they knew or should have known that the ICE officials supervising Mr. Thiersaint had the propensity to commit the torts that were committed as, *inter alia*, Mr. Thiersaint had filed complaints about multiple transportation-related torts.

262.    DHS and ICE's actions proximately caused Mr. Thiersaint's pain in his right arm, humiliation, and degradation, which exacerbated his depression.

## COUNT 22

### Federal Tort Claims Act, 28 U.S.C. § 1346(b)
### Negligence
### (Against the United States of America)
### (Florida)

263.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

264.    Under Florida law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Curd v. Mosaic Fertilizer*, LLC, 39 So. 3d 1216, 1227 (Fla. 2010).

265.    DHS and ICE officials owed Mr. Thiersaint a duty of care as a result of their detention of him, as established in DHS's regulations and detention standards. 6 C.F.R. § 15.30(a); 6 C.F.R. § 15.50(a); *PBNDS* § 1.3.

266.    ICE officials breached the agencies' duty by failing to provide Mr. Thiersaint with adequate methods of transportation and adequate facilities.

267.    When ICE officials forced Mr. Thiersaint to board vans and planes without assistance, ICE officials caused Mr. Thiersaint physical pain in his right arm, degradation, humiliation, damage that exacerbated his depression.

268.    ICE officials' actions were the proximate cause of Mr. Thiersaint's harms.

## JURY DEMAND

269.   Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

270.   Mr. Thiersaint respectfully requests that this Court enter a judgment against Defendants and award the following relief:

a.   Declare the treatment of Mr. Thiersaint by DHS, ICE, Suffolk County Sheriff's Department, Officer Chambers, and both the state and federal unnamed officers unlawful, including but not limited to a declaration that all Defendants' treatment of Mr. Thiersaint was intentionally discriminatory, negligent, negligent inflection of emotional distress, an intentional infliction of emotional distress, barred by the Rehabilitation Act of 1973, barred by the Americans with Disabilities Act, and in violation of the Fourteenth Amendment;

b.   Declare that the failure of DHS, ICE, and the Suffolk County Sheriff's Department to reasonably accommodate Mr. Thiersaint's disabilities, or their failure to provide Mr. Thiersaint equal and effective access to a federal program, violates Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act;

c.   Enjoin DHS, ICE, and the Suffolk County Sheriff's Department from continuing to deny Mr. Thiersaint reasonable accommodations and from continuing to discriminate against Mr. Thiersaint, including, but not limited to, transporting Mr. Thiersaint in non-accessible vehicles, segregating Mr. Thiersaint from the general population on the basis of his disability, and denying Mr. Thiersaint access to necessary medical care;

d.   Award Mr. Thiersaint damages pursuant to the Rehabilitation Act; the American with Disabilities Act; *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971); 42 U.S.C. 1983; and the Federal Tort Claims Act in an amount to be proven at trial;

44

e.      Order pre-judgment and post-judgment interest at the highest lawful rate;

f.      Require Defendants to pay Plaintiff's reasonable fees, costs, and expenses,

including attorneys' fees, pursuant to 29 U.S.C.A § 794a(b), 42 U.S.C § 1988, and the Equal

Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A); and

g.      Order all other relief that is just and proper.


Dated: November 16, 2018                     Respectfully submitted,

New Haven, Connecticut                       /s/ Michael Wishnie

Roxana Moussavian, Law Student Intern[*]
Carolyn O'Connor, Law Student Intern[*]
Hannah Schoen, Law Student Intern[*]
Samantha Smith, Law Student Intern[*]
Iva Velickovic, Law Student Intern[*]
Muneer I. Ahmad[†]
Marisol Orihuela[†]
Michael Wishnie (BBO# 568654)
Jerome N. Frank Legal Services Organization
Yale Law School[**]
127 Wall Street
New Haven, CT 06511
203-432-4800
muneer.ahmad@ylsclinics.org
marisol.orihuela@ylsclinics.org
michael.wishnie@ylsclinics.org

*Counsel for Plaintiff*

---

[*] Motion for law student appearance forthcoming.
[†] *Pro hac vice* motion forthcoming.
[**] This complaint has been prepared by a clinic operated by Yale Law School, but does not purport to present the school's institutional views, if any.