**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Emmanuel THIERSAINT,

    Plaintiff,

    v.

DEPARTMENT OF HOMELAND
SECURITY, et al.,

    Defendants.

Case No. 1:18-cv-12406-DJC

Date: April 12, 2021

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT UNITED STATES

i

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

STANDARD OF REVIEW ............................................................................................. 8

ARGUMENT .................................................................................................................. 8

     I.     ICE NEGLIGENTLY TRANSPORTED MR. THIERSAINT IN FLORIDA. ...... 9

          A.     ICE Employees Owed a Duty to Transport Mr. Thiersaint in a Manner That Was Safe, Accessible, and Humane.......................................................... 10

          B.     By Transporting Mr. Thiersaint Without Any Accommodations, ICE Employees Breached Their Duty of Care. ................................................. 12

          C.     ICE's Failure to Transport Mr. Thiersaint Safely Caused Him Mental and Physical Injury. .......................................................................................... 14

     II.     ICE NEGLIGENTLY HOUSED MR. THIERSAINT IN FLORIDA................. 16

          A.     ICE Employees Owed a Duty to Provide Safe, Appropriate, and Integrated Housing to Mr. Thiersaint.......................................................................... 16

          B.     By Housing Mr. Thiersaint in Medical Segregation, ICE Employees Breached Their Duty............................................................................... 18

          C.     ICE's Failure to Safely and Humanely House Mr. Thiersaint Caused Him Emotional Injury. .......................................................................................... 19

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

### CASES

*A.O. v. Dep't of Health & Rehab. Servs.*, 696 So. 2d 1358 (Fla. Dist. Ct. App. 1997) ............... 20

*Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151 (D.C. Cir. 1985) ..................................... 12

*Brice v. Palm Tran, Inc.*, No. 9:00-cv-08099, 2000 WL 35911249 (S.D. Fla. Dec. 12, 2000).... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 8

*Comeau v. Volusia Cty.*, No. 609-CV-1907, 2010 WL 2293291 (M.D. Fla. June 7, 2010) ......... 14

*Curd v. Mosaic Fertilizer*, 39 So. 3d 1216  (Fla. 2010) ................................................................ 10

*DeJesus v. Seaboard Coast Line R. Co.*, 281 So. 2d 198 (Fla. 1973 ........................................... 13

*Dep't of Health & Rehab. Services v. Whaley*, 574 So. 2d 100 (Fla. 1991) .......................... 11, 19

*FDIC v. Meyer*, 510 U.S. 471 (1994) ........................................................................................... 9

*Great N. Ins. Co. v. Paino Assocs.*, 364 F. Supp. 2d 7 (D. Mass. 2005) ....................................... 8

*Greene v. Seminole Elec. Coop.*, 701 So. 2d 646 (Fla. Dist. Ct. App. 1997) .............................. 21

*Hernandez v. United States*, No. 11-21309, 2011 WL 13223706 (S.D. Fla. July 19, 2011) ........ 11

*Hinckley v. Palm Beach Cty. Bd. of County Comm'rs*, 801 So. 2d 193 (Fla. Dist. Ct. App. 2001)

   ........................................................................................................................................................ 12

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) .............................................................. 9

*Kaisner v. Kolb*, 543 So. 2d 732 (Fla. 1989) .................................................................... 14, 19, 22

*Limone v. United States*, 579 F.3d 79 (1st Cir. 2009) .................................................................. 16

*Limones v. School Dist. of Lee Cty.*, 161 So. 3d 38 (Fla. 2015) ............................................. 10, 11

*McCain v. Fla. Power Corp.*, 593 So. 2d 500 (Fla. 1992) ............................................................ 18

*McCloskey v. Mueller*, 446 F.3d 262 (1st Cir. 2006) ................................................................... 10

*McDonald v. Fla. Dep't of Transp.*, 655 So. 2d 1164 (Fla. Dist. Ct. App. 1995) ....................... 18

*Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715 (11th Cir. 2002)............................ 12

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)..................................................... 19, 20, 21

*R.J. v. Humana of Fla., Inc.,* 652 So. 2d 360 (Fla. 1995) ........................................................ 17, 23

*Rayonier v. United States*, 352 U.S. 315 (1957) ............................................................................ 9

*Rodriguez v. Metropolitan Miami-Dade Cty.*, JVR No. 386553, 2000 WL 33951068 (Fla. Dist.

    Ct. Oct. 1, 2000)................................................................................................................. 12

*Rowell v. Holt,* 850 So. 2d 474 (Fla. 2003)........................................................................... 17, 23

*Sea Air Shuttle Corp. v. United States,* 112 F.3d 532 (1st Cir. 1997) ......................................... 10

*Seaboard Coast Line R. Co. v. Clark*, 491 So. 2d 1196 (Fla. Dist. Ct. App. 1986) ................... 13

*Soto-Cintron v. United States*, 227 F. Supp. 3d 178 (D.P.R. 2017)................................................ 9

*Soto-Cintron v. United States*, 901 F.3d 29 (1st Cir. 2018)............................................................ 9

*Sumpter v. Tamiami Trail Tours, Inc*., 123 So. 2d 732 (Fla. Dist. Ct. App. 1960) ...................... 12

*Sykes v. MMG Transp.*, 97 FJVR 4-58, 1996 WL 885363 (Fla. Dist. Ct. Nov. 21, 1996).......... 12

*Tampa Electric Co. v. Jones*, 190 So. 26 (Fla. 1939) ................................................................... 16

*Tanner v. Hartog*, 696 So. 2d 705 (Fla. 1997)........................................................................ 17, 23

*United States v. Gaubert*, 499 U.S. 315 (1991) ........................................................................... 16

*United States v. Olson*, 546 U.S. 43 (2005)................................................................................... 9

*Williams v. Davis*, 974 So. 2d 1052 (Fla. 2007) .......................................................................... 18

*Zigman v. Cline*, 664 So. 2d 968 (Fla. Dist. Ct. App. 1995)........................................................ 17

## STATUTES

28 U.S.C. § 1346(b)(1) .................................................................................................................. 8

28 U.S.C. § 2674............................................................................................................................ 8, 9

42 U.S.C. § 12101(a)(2)................................................................................................................. 18

49 U.S.C. § 41705 ........................................................................................................ 11

Federal Rule of Civil Procedure 56(a) ........................................................................ 8

Florida Adult Protective Services Act (APSA) ................................................... 12, 18

Florida Civil Rights Act (FCRA) ............................................................................... 18

### REGULATIONS

14 C.F.R. § 382.95 ...................................................................................................... 11

6 C.F.R. § 15.30(a) ..................................................................................................... 14

6 C.F.R. § 15.30(d) ............................................................................................... 17, 18

IHSC Directive No. 03-17 .......................................................................................... 17

### TREATISES

Restatement (2d) of Torts § 320 ................................................................................. 10

## INTRODUCTION

U.S. Immigration & Customs Enforcement (ICE) took Plaintiff Emmanuel Thiersaint into custody on February 5, 2016, and in the six weeks that followed, rushed him through four detention centers and five states in its haste to deport him to Haiti. Although ICE knew that Mr. Thiersaint—a lawful permanent resident of the United States for more than 20 years with a U.S. citizen wife and children—required a wheelchair to ambulate due to an above-the-knee amputation of his right leg and injury to his right arm, detention centers and ICE employees at each location were ill-prepared and unwilling to provide the accommodations Mr. Thiersaint needed and the law mandated. As a result, ICE subjected Mr. Thiersaint to repeated humiliation, pain, and suffering.

In Florida, ICE employees transported Mr. Thiersaint without appropriate accommodations on two separate occasions, offering no accessible method for Mr. Thiersaint to embark or disembark from aircraft or vans and refusing to provide the assistance he requested. Instead, Mr. Thiersaint had to drag himself on the ground and up and down stairs, placing painful pressure on his amputated leg and his right arm and causing Mr. Thiersaint to feel humiliated, degraded, and distressed. Further, ICE employees at the Krome North Service Processing Center (Krome) placed Mr. Thiersaint in medical segregation for over 20 hours a day solely because he used a wheelchair, repeatedly denying his requests to be placed in general population.

This conduct directly violated federal law, as well as Department of Homeland Security (DHS) and ICE policies, all of which recognize the necessity of providing reasonable accommodations in order to respect the autonomy of individuals with disabilities and ensure that they are not deprived of their ability to participate in the full range of government services, programs, and activities. But to successfully implement these policies requires preparation, communication, training, and supervision. ICE invested in none of these essential systems. Instead,

its focus on removing people from the country as quickly as possible led its officers to disrespect the basic needs and dignity of the individuals it held within its custody, including Mr. Thiersaint.

In the face of legal challenges brought by Mr. Thiersaint, the government's efforts to rush him out of the country ultimately failed, and he was released from custody and reunited with his family. He subsequently regained his lawful permanent residence and filed claims against the United States pursuant to the Federal Tort Claims Act (FTCA) for tortious conduct in each of the five states through which ICE transported him, as well as against ICE and DHS under the Rehabilitation Act.[1] Even after multiple internal investigations and discovery spanning nearly two years, the government claims not to know what happened throughout the entirety of Mr. Thiersaint's detention. The limited evidence it has offered is often implausible and contradictory, and Mr. Thiersaint plans to rebut that testimony at trial. But the facts related to Mr. Thiersaint's detention and transportation in Florida are undisputed.

In Florida, by repeatedly transporting Mr. Thiersaint in non-accessible transportation and medically segregating him against his will on the basis of his disability, ICE employees breached their duty to transport and house Mr. Thiersaint in a safe and secure manner, causing him physical and emotional injury. Their failures constitute negligence under Florida law. Therefore, Mr. Thiersaint moves for summary judgment as a matter of law on Count 22 under the FTCA.

## **STATEMENT OF FACTS**

Plaintiff Emmanuel Thiersaint is a 41-year-old lawful permanent resident of the United States who immigrated from Haiti in 1994. Statement of Undisputed Facts (SOUF) ¶ 1. Mr. Thiersaint has lived in Connecticut for over 25 years and is a caring husband and father. *Id.* ¶ 2.

---

[1] Mr. Thiersaint also asserts claims against two other Defendants: (1) the Suffolk County Sheriff's Department pursuant to the Rehabilitation Act and the Americans with Disabilities Act (which are the subject of a separate motion for summary judgment), and (2) ICE agent William Chambers. The claim against Mr. Chambers is not at issue in this motion.

2

Following a serious car accident in 1997, Mr. Thiersaint's right leg was amputated above the knee, and surgical screws were inserted in his right arm and femur, causing chronic pain. *Id.* ¶ 13. In early 2016, Mr. Thiersaint relied on a wheelchair to ambulate. *Id.* ¶ 15. The prosthesis Mr. Thiersaint occasionally used had been damaged and required repairs, *id.* ¶ 16, and using crutches causes Mr. Thiersaint extreme pain because it places pressure on the screws in his right arm. *Id.* ¶ 18. With the use of a wheelchair, Mr. Thiersaint was able to perform the activities of daily living. *Id.* ¶ 19. In addition to his physical disability, Mr. Thiersaint had documented diagnoses of depression and anxiety before his detention. *Id.* ¶ 21.

On February 5, 2016, ICE detained Mr. Thiersaint. *Id.* ¶ 3. Although Mr. Thiersaint had lived in the United States for over 20 years and had deep family ties, ICE intended to remove him to Haiti as quickly as possible. *Id.* ¶ 4. ICE denied Mr. Thiersaint's requests for prosecutorial discretion and humanitarian parole. *Id.* ¶ 6. Despite ICE's efforts, the Board of Immigration Appeals (BIA) granted an emergency stay of Mr. Thiersaint's deportation on March 14, 2016, the day before ICE intended to remove him to Haiti. *Id.* ¶ 7. Forced to slow its heedless charge to deport him, ICE released Mr. Thiersaint under supervision on April 1, 2016. *Id.* ¶ 8. On November 1, 2018, an Immigration Judge terminated Mr. Thiersaint's removal proceedings and restored his status as a lawful permanent resident. *Id.* ¶ 10.

Despite the termination of his immigration proceedings, Mr. Thiersaint remains scarred by his treatment in ICE's custody. *Id.* ¶ 11. During his detention, ICE shuttled Mr. Thiersaint between four detention centers via a combination of ground and air transportation spanning five states up and down the eastern United States. *Id.* ¶ 5. ICE had repeatedly documented Mr. Thiersaint's physical and mental disabilities. *Id.* ¶ 12. However, the ICE officers responsible for Mr. Thiersaint's detention and transportation were repeatedly unable or unwilling to accommodate his

needs. *E.g.*, *id.* ¶¶ 35-37, ¶¶ 65-66, ¶¶ 73-74, ¶¶ 112-114, ¶¶ 116-119. In October 2016, six months after his release, Mr. Thiersaint was diagnosed with post-traumatic stress disorder. *Id.* ¶ 22.

## A.  Transportation to Miami and to the Krome North Service Processing Center

On March 3, 2016, ICE transported Mr. Thiersaint from the LaSalle ICE Processing Center in Jena, Louisiana to the Krome North Service Processing Center in Miami, Florida via the Alexandria International Airport in Louisiana and Miami International Airport (Miami Airport) in Florida.[2] *Id.* ¶ 23. ICE intended for Miami to be Mr. Thiersaint's final stop before his deportation to Haiti, which was scheduled for March 15, 2016. *Id.* ¶ 7.

When Mr. Thiersaint's flight landed at the Miami Airport, he asked the ICE Air officer on board for help to disembark from the aircraft down a flight of stairs,[3] *id.* ¶ 35, but the officer refused. *Id.* ¶ 36.  ICE had access to specialized chairs that could assist Mr. Thiersaint down the stairs. *Id.* ¶¶ 31-32. ICE had used such a chair to help Mr. Thiersaint board the plane in Louisiana, which allowed him to board safely and painlessly. *Id.* ¶ 33. However, no ICE employee involved in Mr. Thiersaint's transportation in Florida provided a specialized chair to help him down the stairs. *Id.* ¶¶ 37, 40. Instead, the ICE Air officer left Mr. Thiersaint to sit on the floor of the airplane and drag himself to the top of the stairs. *Id.* ¶ 41. The officer watched as Mr. Thiersaint scooted down the flight of stairs by himself, seated, step by step. *Id.* ¶¶ 41-42. This placed pressure on Mr. Thiersaint's amputated leg and the screws in his right arm, causing him physical pain and humiliating him before the officers and detainees watching on the ground. *Id.* ¶¶ 43-46.

---

[2] Following his detention on February 5, Mr. Thiersaint was detained at Franklin County House of Correction in Greenfield, Massachusetts until February 18; Suffolk County House of Correction in Boston between February 18 and February 29; and LaSalle ICE Processing Center in Jena, Louisiana, between February 29 and March 3. SOUF ¶ 5. Although this litigation seeks to vindicate Mr. Thiersaint's mistreatment during his detention and transportation at each of these facilities, the present motion is limited to Mr. Thiersaint's treatment in Florida.

[3] ICE Air officers are employees of ICE. SOUF ¶ 25. The Government has identified Daniel Torres as the ICE Air Flight Officer in Charge for this flight. *Id.* ¶ 28. The FOIC or their supervisor is responsible for authorizing the boarding of any detainee who is "unable to board the aircraft on their own." *Id.* ¶ 30.

ICE deportation officers based in Miami met Mr. Thiersaint at the bottom of the stairs with a van that would bring him to Krome.[4] *Id.* ¶¶ 48-49. On February 26, 2016, approximately one week before Mr. Thiersaint arrived in Florida, Detention and Deportation Officer Christopher LaBier of ICE Air Operations sent a notice to the transportation unit at the Miami Enforcement and Removal Operations (ERO) Field Office that Mr. Thiersaint required accommodations. *Id.* ¶ 61. ICE officers were responsible for checking whether they received any notification that a detained person they were transporting required accommodations. *Id.* ¶¶ 63-64. Although a wheelchair-accessible van was available to the Miami-based ICE transportation team, *id.* ¶¶ 53-56, the ICE employees did not use it to transport Mr. Thiersaint, *id.* ¶¶ 65-66, despite his request for such transportation.[5] *Id.* ¶ 51. The officers instructed Mr. Thiersaint to get into the inaccessible van by himself, under threat of segregation from the general population. *Id.* ¶ 66. Mr. Thiersaint managed to board the van by placing pressure on his left leg, turning around, sitting on the ground, and crawling on the ground into the van. *Id.* ¶ 70. Once again, Mr. Thiersaint was in pain and felt humiliated. *Id.* ¶ 71. When he arrived at Krome, Mr. Thiersaint asked for help exiting the vehicle, but the officers refused. *Id.* ¶ 73. Mr. Thiersaint exited the van by dragging himself out on the floor of the van and lowering himself into his wheelchair outside. *Id.* ¶ 74.

### B. Confinement to the Medical Housing Unit at Krome

Upon Mr. Thiersaint's arrival at Krome, ICE Health Service Corps (IHSC) employees placed him into medical segregation in the Medical Housing Unit (MHU).[6] SOUF ¶¶ 79-80. ICE held Mr. Thiersaint in the MHU for the entirety of his two-week detention at Krome. *Id.* ¶ 80.

---

[4] The deportation officers were employees of ICE. SOUF ¶ 48. Although the Government has been unable to identify the specific officers that were responsible for Mr. Thiersaint's ground transportation in Florida, these officers were under the supervision of Supervising Detention & Deportation Officer Orestes Cruz. *Id.* ¶ 48.

[5] When he was first taken into ICE custody, Mr. Thiersaint was transported in a wheelchair-accessible van safely and painlessly. *Id.* ¶ 52.

[6] IHSC employees are employees of ICE. SOUF ¶ 78. The initial placement determination was made by Nurse Gregory Gunter upon Mr. Thiersaint's arrival at Krome. *Id.* ¶ 79.

While in medical segregation, Mr. Thiersaint was confined to his cell for 20 hours or more each day and had limited time to recreate or to make phone calls. *Id.* ¶ 81-84. He was not permitted to recreate with the general population. *Id.* ¶ 82. Although he was actively seeking to reopen his case and to obtain a stay of his deportation, Mr. Thiersaint was only allowed to use the law library upon request early in the morning for one hour. *Id.* ¶ 87-88. As a result, Mr. Thiersaint could not discuss his case with other detainees. *Id.* ¶ 88.

Under IHSC policy, MHU placements are supposed to be case-by-case determinations. *Id.* ¶ 89. However, IHSC staff at Krome had an established practice of placing all individuals with wheelchairs in medical segregation solely because of their disability. *Id.* ¶ 91-92. IHSC employees placed Mr. Thiersaint in medical segregation pursuant to this practice. *Id.* ¶ 93.

IHSC employees are the individuals with the authority to release a detainee from the MHU. *Id.* ¶ 89, 97. For his two weeks in Krome, IHSC staff examined Mr. Thiersaint twice daily on nursing rounds. *Id.* ¶ 96. IHSC employees recognized that Mr. Thiersaint could perform the activities of daily living unassisted with his wheelchair. *Id.* ¶ 100. This was consistent with Mr. Thiersaint's experience in ICE detention at Franklin County House of Correction, where he was free to participate in general-population activities. *Id.* ¶ 101. Mr. Thiersaint made multiple requests to be placed in general population while at Krome. *Id.* ¶ 98. Moreover, on March 4, 2016, Mr. Thiersaint's attorney sent a letter to DHS's Office of Civil Rights and Civil Liberties (CRCL) expressing concerns about his treatment. *Id.* ¶ 104. On March 7, a CRCL administrator at DHS headquarters sent an alert that Mr. Thiersaint was "in urgent need of the provision of reasonable accommodations" to the ICE Civil Liberties group and an IHSC administrator. *Id.* ¶ 105. Despite Mr. Thiersaint's requests and this alert from headquarters, IHSC employees did not move Mr. Thiersaint to general population. *Id.* ¶¶ 98, 99, 104-105. Confinement in the MHU led Mr.

Thiersaint to feel sad, upset, stressed, and stigmatized. *Id.* ¶¶ 102-103.

### C. Transportation Out of Miami

On March 14, 2016, the BIA's emergency stay of Mr. Thiersaint's removal frustrated ICE's ability to deport him as planned the following day. *Id.* ¶ 7. As a result, ICE initiated Mr. Thiersaint's transportation back to the Boston Area of Responsibility. *Id.* ¶ 106. On March 16, 2016, IHSC staff Marthania Jean-Baptiste, a nurse, cleared Mr. Thiersaint for travel and recorded that he did not need special equipment for traveling. *Id.* ¶ 107. IHSC policy required notification when an individual requires medical equipment, including a wheelchair, to travel. *Id.* ¶ 109.

On March 17, 2016, ICE officers transported Mr. Thiersaint to the Miami Airport. *Id.* ¶ 110. Although ICE had access to a wheelchair-accessible van, *id.* ¶ 53, ICE again failed to use this vehicle to transport him, despite Mr. Thiersaint's requests. *Id.* ¶ 111. Once again, the deportation officers refused to assist Mr. Thiersaint in boarding the vehicle. *Id.* ¶ 112. The officers stood by as Mr. Thiersaint was forced to move from his wheelchair to the steps of the bus, lift himself using his arms and his leg up the steps, drag himself on the floor to his seat, and lift himself into his seat. *Id.* ¶ 113. Once at the airport, he had to exit his vehicle in the same manner. *Id.* ¶ 114.

When boarding the plane at the Miami Airport, Mr. Thiersaint asked for assistance in going from the tarmac up a flight of stairs. *Id.* ¶ 116. Once more, no one provided Mr. Thiersaint a specialized chair or any other assistance. *Id.* ¶ 117. The ICE officers on the ground not only refused assistance but also threatened him with segregation if he did not board the plane—a credible threat given his recent segregation at Krome. *Id.* ¶ 118. Mr. Thiersaint seated himself on the first step and then dragged himself up each step of the plane until he reached the top of the stairs, and then dragged himself down the aisle and lifted himself into his seat, *id.* ¶ 119, while the officers on the ground and in the plane watched Mr. Thiersaint and did nothing. *Id.* ¶ 121. The experience was

painful and humiliating. *Id.* ¶¶ 120-121. Mr. Thiersaint said it made him "feel like I was a nobody; like I was less than human." *Id.* ¶ 121.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a party to move for partial summary judgment on identified claims. Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant has the 'initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record showing the absence of a genuine dispute of material fact." *Great N. Ins. Co. v. Paino Assocs.*, 364 F. Supp. 2d 7, 14 (D. Mass. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## ARGUMENT

ICE breached its duty to transport and house Mr. Thiersaint in a secure and accessible manner in Florida, causing Mr. Thiersaint physical and mental injury. Thus, ICE is liable for negligence under Florida law, triggering liability under the FTCA. The FTCA permits:

> [C]ivil actions on claims against the United States, for money damages . . . [for] personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674. For this motion, the "law of the place" is Florida law; the state's common and statutory law will provide "the source of [the United States'] substantive liability under the FTCA." *FDIC v. Meyer*, 510 U.S. 471, 478 (1994).

ICE is liable for negligence consistent with the liability imposed on private persons in Florida. "[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State

where the acts occurred." *Rayonier v. United States*, 352 U.S. 315, 319 (1957).[7] "[T]his [private person] requirement is to be read liberally." *Soto-Cintron v. United States*, 227 F. Supp. 3d 178, 183 (D.P.R. 2017), *aff'd, Soto-Cintron v. United States*, 901 F.3d 29, 33 (1st Cir. 2018). The FTCA does not "exclude[e] liability in the [Government's] performance of activities which private persons do not perform." *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955); *see also Sea Air Shuttle Corp. v. United States,* 112 F.3d 532, 536 (1st Cir. 1997) (noting that "a peculiarly governmental function does not, of course, necessarily preclude FTCA coverage"). Courts will look for "some *relationship* between the government employee and the plaintiff to which state law would attach a duty of care in purely private circumstances." *McCloskey v. Mueller*, 446 F.3d 262, 267 (1st Cir. 2006) (emphasis added) (citation and internal quotation marks omitted). Here, ICE assumed the relationships of custodian, caregiver, transporter, and lodger. Florida law attaches a duty of care for private persons in each of these relationships.

To prove negligence in Florida, a plaintiff must show a legal duty, breach of that duty, proximate causation, and damages. *See Curd v. Mosaic Fertilizer*, 39 So. 3d 1216, 1227 (Fla. 2010). Duty of care in a negligence action is a question of law in Florida. *Limones v. School Dist. of Lee Cty.*, 161 So. 3d 384, 389 (Fla. 2015). Mr. Thiersaint is entitled to summary judgment on the question of duty, as he has identified duties owed to him by ICE under Florida law. Breach of duty, proximate causation, and injury are issues of fact. *Id*. Because the facts establishing negligence in Florida are undisputed, Mr. Thiersaint is entitled to summary judgment on this claim.

## I.    ICE NEGLIGENTLY TRANSPORTED MR. THIERSAINT IN FLORIDA.

ICE breached its duty to transport Mr. Thiersaint in an accessible and safe manner by

---

[7] The private person analogue does not require the "*same* circumstances" for liability. *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955) (emphasis added). Instead, the words "like circumstances" [in 28 U.S.C. § 2674] require a court to "look further afield." *United States v. Olson*, 546 U.S. 43, 46 (2005).

failing to provide accessible vehicles and appropriate assistance to Mr. Thiersaint during his transportations in Miami to and from Krome. Their breach caused injury to Mr. Thiersaint, rendering ICE liable for negligence under Florida law.

### A. ICE Employees Owed a Duty to Transport Mr. Thiersaint in a Manner That Was Safe, Accessible, and Humane.

Once ICE took custody of Mr. Thiersaint, ICE employees owed a duty to prevent him from an unreasonable risk of physical harm. Under Florida law, a "special relationship" between two individuals triggers an affirmative legal duty "to act with reasonable care toward the person in need of . . . aid." *Limones*, 161 So. 3d at 390. Florida courts have recognized state custody as a special relationship. *Dep't of Health & Rehab. Services v. Whaley*, 574 So. 2d 100, 103 (Fla. 1991) (quoting Restatement (2d) of Torts § 320); *see Hernandez v. United States*, No. 11-21309, 2011 WL 13223706, at *2 (S.D. Fla. July 19, 2011) (recognizing the duty to persons in custody as a basis for FTCA liability under Florida law). ICE employees had custody over Mr. Thiersaint in Florida from March 3 to March 17, 2016, including during transportation. SOUF ¶ 5, 48, 110. Since Florida law attaches an affirmative duty to special relationships such as custody, ICE had a duty to protect Mr. Thiersaint from foreseeable harm.

Transporting an individual creates a risk of foreseeable harm, which is heightened when transporting individuals with disabilities. ICE recognizes these foreseeable risks in binding standards that require ICE officials to transport detainees in their custody "in a safe and humane manner, under the supervision of trained and experienced staff."[8] *Id.* ¶ 57. Exercising reasonable care towards individuals with disabilities may require affirmative accommodations to board, ride,

---

[8] Although ICE regulations and guidance do not establish duty under the FTCA, they are relevant to foreseeability. *Cf. Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 723 (11th Cir. 2002) (finding that, where an agency issued a directive mandating equipment tests to avoid a specific accident,, that type of accident was foreseeable under Florida law); *see also Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1158-59 (D.C. Cir. 1985) (holding that statutes and regulations can "provide evidence that the government has assumed duties analogous to those recognized by local tort law" and "provide the standard of care against which the government's conduct should be assessed").

and disembark from transportation without being harmed. Florida courts have repeatedly recognized "a transporter's duty to provide safe carriage for some of society's most vulnerable citizens, the disabled." *Hinckley v. Palm Beach Cty. Bd. of County Comm'rs*, 801 So. 2d 193, 196 (Fla. Dist. Ct. App. 2001) (holding that "when the County undertook to provide transportation services to appellant's developmentally disabled daughter, it created a special relationship with her and a duty to protect her from foreseeable harm).[9] Offering assistance and accessible methods for boarding and deplaning aircraft have long been industry standard; since 1986, the federal Air Carrier Access Act has made it illegal for airlines to discriminate against passengers because of disabilities, and implementing require air carriers to provide accommodations for boarding and disembarking.[10] 49 U.S.C. § 41705; 14 C.F.R. § 382.95. As part of its custodial relationship, ICE has a duty to protect Mr. Thiersaint from foreseeable harm by providing appropriate accommodations for boarding, riding, and disembarking.

Florida law imposes similar duties on those who assume a caregiver role. The Florida Adult Protective Services Act (APSA) protects "vulnerable adult[s]" from "abuse[], neglect[], or exploit[ation]" by a caregiver.[11] *Id.* § 415.101(2). The statute defines vulnerable adults to include

---

[9] *See also Sumpter v. Tamiami Trail Tours, Inc.*, 123 So. 2d 732, 735 (Fla. Dist. Ct. App. 1960) (holding, in a case involving injuries sustained by a plaintiff while boarding a bus, that "[i]f passenger is . . . infirm, and his condition is apparent or made known to the carrier, it is bound to render him the necessary assistance in boarding or alighting from its trains or cars . . . .") (citations omitted).

Juries have reached similar conclusions under instructions from Florida law. *See Rodriguez v. Metropolitan Miami-Dade Cty.*, JVR No. 386553, 2000 WL 33951068 (Fla. Dist. Ct. Oct. 1, 2000) (finding transportation company and county negligent where plaintiff received no assistance in boarding the company's bus, causing plaintiff to slip and fall); *Sykes v. MMG Transp.*, 97 FJVR 4-58, 1996 WL 885363 (Fla. Dist. Ct. Nov. 21, 1996) (finding negligence when defendant transportation company failed to secure plaintiff's wheelchair, causing wheelchair to tip over in transit); *Brice v. Palm Tran, Inc.*, No. 9:00-cv-08099, 2000 WL 35911249 (S.D. Fla. Dec. 12, 2000) (applying Florida law and finding transportation company negligent where driver refused to kneel a bus so plaintiff with disability affecting her wrist and ankles could disembark, resulting in physical and emotional injuries).

[10] Violations of industry standards provide evidence of negligence. *Seaboard Coast Line R. Co. v. Clark*, 491 So. 2d 1196, 1198 (Fla. Dist. Ct. App. 1986).

[11] Under Florida law, such statutes can impose duty cognizable in the tort of negligence. *DeJesus v. Seaboard Coast Line R. Co.*, 281 So. 2d 198, 201 (Fla. 1973) (violation of a statute constitutes negligence per se where plaintiff is "of the class the statute was intended to protect, that he suffered injury of the type the statute was designed to protect, and that violation of the statute was the proximate cause of the injury").

persons like Mr. Thiersaint whose ability to ambulate "is impaired" due to "mental, emotional, . . . [or] long-term physical disability." *Id.* § 415.102(2), (28). Caregivers include entities like ICE who have "assumed responsibility for frequent and regular care of services to a vulnerable adult."[12] *Id.* § 415.102(5). Caregivers are liable for their "neglect," including any "failure or omission on the part of the caregiver or vulnerable adult to provide the care, supervision, and services necessary to maintain the physical and mental health of the vulnerable adult . . . which a prudent person would consider essential for the well-being of a vulnerable adult." *Id.* § 415.102(16), 415.1111. This can take the form of "repeated conduct or a single incident of carelessness." *Id.* § 415.102(16). As outlined above, a failure to arrange for accommodations and refusal to provide assistance "could reasonably be expected to result in serious physical . . . injury" and thus renders a caregiver liable for their actions under the APSA. *Id.*

### B. By Transporting Mr. Thiersaint Without Any Accommodations, ICE Employees Breached Their Duty of Care.

An individual breaches the affirmative duty of care when they fail to "lessen" the foreseeable zone of risk created by their actions "or see that sufficient precautions are taken to reduce the harm." *Kaisner v. Kolb*, 543 So. 2d 732, 735 (Fla. 1989). ICE employees did not protect Mr. Thiersaint from foreseeable harm, as they failed to provide appropriate accommodations for his disability. Instead, ICE employees *exacerbated* the risk posed to Mr. Thiersaint, requiring him to embark and disembark from transportation without accommodation and in a degrading manner, at times on threat of punishment. SOUF ¶¶ 65, 118.

The undisputed facts show that ICE employees in Florida knew or should have known

---

[12] This definition of "caregiver" extends to government entities holding people in custody. *See Comeau v. Volusia Cty.*, No. 609-CV-1907, 2010 WL 2293291, at *5 (M.D. Fla. June 7, 2010) (finding county and prison health services provider were each a "caregiver" because they assumed responsibility for plaintiff's care when she was placed in their detention facility).

about Mr. Thiersaint's physical disability. Mr. Thiersaint's right leg was amputated above the knee, a disability which was apparent upon meeting Mr. Thiersaint and documented frequently in ICE medical records and travel documents. *Id.* ¶ 12. Mr. Thiersaint could not ambulate without a wheelchair, which ICE officers knew or should have known. *Id.* ¶ 15. Approximately one week before Mr. Thiersaint arrived in Florida, DHS headquarters notified the Miami ERO Field Office that Mr. Thiersaint required accommodations. *Id.* ¶ 61.

Yet ICE failed to provide any accommodations for Mr. Thiersaint's transportation on four occasions. *First*, when Mr. Thiersaint arrived at the Miami Airport on March 3, 2016, he had to drag himself down a stairway between the aircraft and the tarmac without any assistance. SOUF ¶¶ 40-47. *Second*, on March 3, 2016, ICE employees transported Mr. Thiersaint from the Miami Airport to Krome in a non-wheelchair-accessible vehicle, and forced him to clamber in and out of the vehicle without assistance. *Id.* ¶¶ 65-66, 70-71. *Third*, on March 17, 2016, ICE employees transported Mr. Thiersaint from Krome to the Miami Airport in a non-wheelchair-accessible vehicle and again forced him to maneuver in and out of the vehicle without assistance. *Id.* ¶¶ 111-114. *Fourth*, on March 17, 2016, Mr. Thiersaint was forced to climb a stairway between the tarmac and aircraft at the Miami Airport without any assistance. *Id.* ¶¶ 117-119.  On each of these four occasions, ICE officers and other detainees watched as Mr. Thiersaint painfully struggled to maneuver himself in and out of the aircraft and vehicles. *Id.* ¶¶ 42, 66, 71, 112, 120-21.

Each of these instances posed a foreseeable risk of harm. On each occasion, Mr. Thiersaint was forced to get in or out of vehicles, including planes, using his arms to lift and maneuver himself. This was painful for Mr. Thiersaint, who has surgical screws in his right arm, rendering the act of putting weight on that arm excruciating. Although he asked for help on each occasion, *id.* ¶¶ 35, 51, 112, 116, ICE officers refused to help Mr. Thiersaint. *Id.* ¶¶ 36-37, 65-66, 112, 117-

18. They did not procure wheelchair-accessible transportation, *id.* ¶ 65, even though ICE possessed such a vehicle for use between Krome and the Miami Airport, *id.* ¶¶ 53-55. ICE officers also failed to use a specialized chair that would have allowed Mr. Thiersaint to safely board and disembark the airplanes although ICE had access to such equipment. *Id.* ¶¶ 32-33, 39-40. In short, ICE employees failed to prepare for any of Mr. Thiersaint's transportations in advance or to use available equipment to accommodate him.[13] These failures persisted even after Mr. Thiersaint had been in Krome for two weeks, his attorneys had sent a notice to CRCL alerting them to his mistreatment, and DHS headquarters had communicated his "urgent need" for accommodations. *Id.* ¶¶ 104-05. These continued failures demonstrate that ICE breached its duty to Mr. Thiersaint.

## C. ICE's Failure to Transport Mr. Thiersaint Safely Caused Him Mental and Physical Injury.

Florida imposes liability for negligence when the negligent act is "the proximate cause of the injury." *Tampa Electric Co. v. Jones*, 190 So. 26, 27 (Fla. 1939). "[N]egligence may be a legal cause of the harm even though acting in combination with some other cause," including "where the defendant's negligence acts in combination with plaintiff's physical conditions to produce the resulting injury." *Zigman v. Cline*, 664 So. 2d 968, 969-70 (Fla. Dist. Ct. App. 1995) (internal citations omitted).[14] Moreover, emotional distress constitutes a cognizable injury for the purposes of the tort of negligence in Florida. *See, e.g.*, *Tanner v. Hartog*, 696 So. 2d 705, 708 (Fla. 1997).

---

[13] Although the FTCA contains an exception for employees performing a discretionary function, 28 U.S.C. § 2680(a), ICE employees' conduct here does not qualify. The exception is limited, since, as the First Circuit has noted, "[v]iewed from 50,000 feet, virtually any action can be characterized as discretionary." *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009). It is intended to protect decisions that implicate valid public-policy choices. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). At minimum, employees do not have the discretion to violate statutes or regulations. *Id.* at 324; *Limone*, 579 F.3d at 101. ICE employees' conduct violates Section 504 of the Rehabilitation Act and DHS's implementing regulations not to discriminate against individuals with disabilities. *See* 6 C.F.R. § 15.30(a). Moreover, ICE employees were not exercising discretion in the context of public policy here.

[14] Mr. Thiersaint does not need to prove the *amount* of damages to prevail at the summary-judgment stage; showing concrete injury is sufficient. The amount of damages will be an issue to be resolved at trial.

The emotional distress suffered need not flow from physical injuries sustained in impact.[15]

Mr. Thiersaint's transportation by ICE employees in Florida caused him significant physical and mental injuries. ICE employees' refusal to provide Mr. Thiersaint with assistance or accommodations while they transported him meant that Mr. Thiersaint had to crawl and drag himself in and out of vehicles. SOUF ¶¶ 41, 70, 113-14, 119. This forced him to place pressure on his injured arm, causing intense physical pain. *Id.* ¶ 43, 71, 120. Further, this experience caused Mr. Thiersaint to feel ashamed and stigmatized, particularly since he was forced to degrade himself in front of other people, injuring Mr. Thiersaint mentally and emotionally. *Id.* ¶ 44-46, 71, 121-22.

ICE employees' failure to fulfill their duty to accommodate Mr. Thiersaint's disabilities during transportation was the proximate cause of Mr. Thiersaint's injuries. Florida courts have held that "establishing proximate cause requires a factual showing that the dangerous activity foreseeably caused the specific harm suffered by those claiming injury in the pending legal action." *Williams v. Davis*, 974 So. 2d 1052, 1056 n.2 (Fla. 2007). ICE officers' decisions to force Mr. Thiersaint to board vehicles and airplanes without assistance despite his mobility disability predictably led to his injuries. Mr. Thiersaint's below-the-knee amputation was visible and documented. SOUF ¶¶ 12-13. He consistently requested help and told ICE officers that boarding without assistance would cause him intense physical pain. *Id.* ¶ 35, 51, 112, 116.

Further, Florida courts consider repetition as a salient factor when evaluating foreseeability: "the same harm can be expected to recur if the same act or omission is repeated in a similar context." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). The sequence

---

[15] Florida courts sometimes follow the impact rule, which requires that "before a plaintiff can recover damages for emotional distress caused by the negligence of another, the emotional distress suffered must flow from physical injuries sustained in an impact." *R.J. v. Humana of Fla., Inc.,* 652 So. 2d 360, 362 (Fla. 1995). The rule "is not, however, an inflexible, unyielding rule of law . . . ." *Rowell v. Holt,* 850 So. 2d 474, 478 (Fla. 2003). Courts decline to follow the rule where the "foreseeability and gravity of the emotional injury involved, and lack of countervailing policy concerns, have surmounted the policy rationale undergirding application of the impact rule." *Id.*

of events that led to Mr. Thiersaint's injuries on March 3, 2016 occurred in an almost identical fashion on March 17. Both times, Mr. Thiersaint was forced to enter and exit vehicles by dragging himself, even after reporting his injuries. *Compare* SOUF ¶¶ 41, 70 *with id.* ¶¶ 113-14, 119.

Causation requires "a natural, direct and continuous sequence between the negligent act and the injury [so] that it can reasonably be said that but for the act the injury would not have occurred." *McDonald v. Fla. Dep't of Transp.*, 655 So. 2d 1164, 1168 (Fla. Dist. Ct. App. 1995). On the one occasion Mr. Thiersaint was afforded access to an assistive device to board an airplane, and on the one occasion when ICE transported him in a wheelchair-accessible van, he experienced no mental or physical injuries. SOUF ¶ 33, 53. But for ICE employees' refusal to provide accommodations, Mr. Thiersaint would not have sustained injuries while in transit in Florida. The conduct of ICE employees transporting Mr. Thiersaint was a foreseeable, proximate cause of his physical and mental injuries.

## II.   ICE NEGLIGENTLY HOUSED MR. THIERSAINT IN FLORIDA.

ICE breached its duty to house Mr. Thiersaint in accessible and integrated housing while he was in their care. Their failure to do so caused him injury, rendering ICE liable for negligence.

### A.  ICE Employees Owed a Duty to Provide Safe, Appropriate, and Integrated Housing to Mr. Thiersaint.

By virtue of the "special relationship" of custody, ICE employees owed an affirmative duty to avoid exposing Mr. Thiersaint to foreseeable harm. *See Dep't of Health & Rehab. Services v. Whaley*, 574 So. 2d 100, 103 (Fla. 1991) (citing *Kaisner v. Kolb*, 543 So.2d 732, 734 (Fla. 1989)); *supra* Section I.A.

Segregation on the basis of disability is a form of grave discrimination that creates distinct harm. As noted by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600-01 (1999), segregation "perpetuates unwarranted assumptions" about the capability and worthiness

of individuals with disabilities and forces them to "relinquish participation in community life they could enjoy given reasonable accommodations." Moreover, segregation can compound existing physical and mental health conditions.[16]

Harm created by segregation on the basis of disability was objectively foreseeable for ICE employees in Florida. DHS regulations emphasize the importance of providing services in an integrated setting and of not segregating detainees based on disability.[17] Binding regulations require the agency to deliver programs, services, and activities "in the most *integrated setting* appropriate to the needs of qualified individuals with a disability." 6 C.F.R. § 15.30(d) (emphasis added). IHSC Directive No. 03-17 permitted placement in the MHU only for certain reasons. SOUF ¶ 90. Moreover, the Performance-Based National Detention Standards (PBNDS) barred discrimination on the basis of disability and required the provision of appropriate facilities and support for detainees with disabilities, including recreational opportunities. *Id.* ¶ 57. By virtue of its custodial relationship with Mr. Thiersaint, ICE owed a duty to avoid exposing him to the foreseeable harm caused by segregation.

Florida law imposes a similar duty on caregivers who provide services to vulnerable adults. As outlined in Section I.A, *supra*, caregivers in Florida owe a duty to avoid "neglect" under APSA. Fla. Stat. § 415.102(16). Segregation on the basis of disability meets APSA's definition of neglect, as it constitutes a "failure or omission on the part of the caregiver . . . to provide the care . . . and services necessary to maintain the physical and mental health of the vulnerable adult." *Id.* To make this determination under APSA, Florida courts look to "generally accepted . . . care standards,"

---

[16] *See* Ex. K, ECF No. 143-1, Decl. of Kshithij Shrinath, Expert Report of Dr. Paul Bryant, at 15 & nn.45-46 (noting the "considerable amount of scientific literature describing the significantly detrimental effect [solitary] confinement inflicts on individuals with mental illness").

[17] Federal statutes and regulations are relevant to determinations of foreseeability. *See supra* note 9.

17

*A.O. v. Dep't of Health & Rehab. Servs.*, 696 So. 2d 1358, 1361 (Fla. Dist. Ct. App. 1997). Segregation runs afoul of these standards in violating anti-discrimination laws and policies. *See, e.g.*, *Olmstead*, 527 U.S. at 600; 6 C.F.R. § 15.30(d). Additionally, segregation deprives the isolated individual of socialization and access to recreation and other services. These are "essential to the wellbeing of a vulnerable adult," Fla. Stat. § 415.102(16), especially in the case of an individual who the caregiver knows has multiple diagnosed mental health conditions.

Finally, Florida law imposes duties on lodgers to avoid segregation under the Florida Civil Rights Act (FCRA). Fla. Stat. § 760.08. ICE entered into a lodging relationship with Mr. Thiersaint, housing him for 15 days in Florida. SOUF ¶¶ 75-106. The FCRA, which applies to, *inter alia*, "[a]ny establishment which provides lodging to transient guests," Fla. Stat. § 760.02(11)(a), forbids "discrimination or segregation on the ground of . . . handicap . . . ." Fla. Stat. § 760.08. The FCRA's plain text proscribes segregation based on disability. Moreover, Florida courts construe the act in conformity with federal disability laws. *Greene v. Seminole Elec. Coop.*, 701 So. 2d 646, 647 (Fla. Dist. Ct. App. 1997). Segregation on the basis of disability is impermissible under federal disability laws. *See Olmstead*, 527 U.S. at 600 (citing 42 U.S.C. § 12101(a)(2)). Consequently, the FCRA imposes a duty on entities offering lodging, analogous to what ICE did in this case, to avoid segregation.

### B.  By Housing Mr. Thiersaint in Medical Segregation, ICE Employees Breached Their Duty.

ICE breached its duty by keeping Mr. Thiersaint in medical segregation on the basis of his disability. ICE records confirm that Mr. Thiersaint's disability was the only reason for his placement in medical segregation. Upon his intake at Krome, Mr. Thiersaint was admitted to the MHU "until medically evaluated." SOUF ¶ 79. Subsequent evaluation notes indicate that Mr. Thiersaint was placed in the MHU "due to h/o lower extremity amputation." *Id.* ¶ 94. He requested

18

to move to general population, to socialize at recreation, and to use the law library with other detainees. *Id.* ¶¶ 80-88. Medical notes state that "he was explained multiple times that all the other detainees who use wheelchair [sic] are housed as boarders as it is in his case." *Id.* ¶ 91.

MHU conditions improperly segregated Mr. Thiersaint from the general population at Krome. Mr. Thiersaint was forced to stay in his cell for 20 or more hours a day. *Id.* ¶ 81. He could not recreate with individuals from the general population. *Id* ¶¶ 83-86*.* He could only use the law library on request early in the morning. *Id.* ¶ 88. These restrictive conditions were unnecessary; Mr. Thiersaint had successfully lived in general population with reasonable accommodations at other facilities. *Id.* ¶ 101. Moreover, IHSC employees observed that Mr. Thiersaint was capable of carrying out activities of daily living unassisted, using his wheelchair. *Id.* ¶ 100.

ICE employees at Krome failed to take "sufficient precautions" to reduce the foreseeable risk of harm that medical segregation posed. *Kaisner*, 543 So. 2d at 735 (requiring "sufficient precautions" to avoid breach of an affirmative duty). Instead, their actions made it *more* likely that disabled individuals would be improperly isolated. Krome employees did not allow people detained in the MHU to challenge their placement. SOUF ¶ 97. Therefore, although Mr. Thiersaint repeatedly requested to move to general population, as documented in ICE records, his alarm went unheeded. *Id.* ¶¶ 98-99. Krome employees also required all persons in a wheelchair to be placed in medical segregation, *id.* ¶ 91, which contradicted ICE policy. *Compare id.* ¶¶ 89-90 (stating MHU determinations were case-by-case) with *id.* ¶ 91 (stating "all the other detainees who use wheelchair [sic] are housed as boarders as it is in his case").[18] ICE employees breached their duty to house Mr. Thiersaint in safe, accessible, and integrated housing.

### C. ICE's Failure to Safely and Humanely House Mr. Thiersaint Caused Him

---

[18] As with transportation, this conduct is not protected by the FTCA's discretionary-function exception. Employees do not have discretion to violate statutes or regulations, and the ICE employees here were not exercising policy-making discretion. *See supra* note 13.

**Emotional Injury.**

Emotional distress constitutes a cognizable injury for the tort of negligence in Florida. *See, e.g.*, *Tanner v. Hartog*, 696 So. 2d 705, 708 (Fla. 1997) (citing *R.J. v. Humana of Florida*, 652 So.2d 360, 363 (Fla. 1995); *supra* Section I.C. Wrongful detention is a circumstance where the breach of a "special professional duty […] coupled with the clear foreseeability of emotional harm […] render application of the impact rule unjust." *Rowell v. Holt,* 850 So. 2d 474, 479 (Fla. 2003). ICE's unlawful medical segregation of Mr. Thiersaint directly caused him emotional harm. Mr. Thiersaint's confinement in the MHU made him feel sad, upset, stressed, and stigmatized. SOUF ¶ 102. The emotional harm from medical segregation was foreseeable because IHSC policies permitted housing someone in the MHU only in limited circumstances, and Mr. Thiersaint *requested* to be placed in an integrated setting, general population, and to be able to use the library and socialize with other detainees. *Id.* ¶¶ 85-88, 90. ICE denied him this request on the grounds that all detainees in wheelchairs were housed in the MHU, keeping him in a setting which it knew was causing him harm. ICE therefore caused Mr. Thiersaint foreseeable and cognizable harm in its decision to segregate him from general population and keep him in the MHU where he was in his cell for over 20 hours a day.

## CONCLUSION

For the foregoing reasons, Plaintiff Emmanuel Thiersaint respectfully requests that this Court issue an order entering partial summary judgment from the Federal Defendants.

Dated: April 12, 2021                     Respectfully submitted,

/s/ Elizabeth A. DiMarco                  /s/ Muneer I. Ahmad
Gregory F. Corbett (BBO #646394)          Muneer I. Ahmad, Esq.*
Elizabeth A. DiMarco (BBO #681921)        Sara Zampierin, Esq.*
Michelle K. Nyein (BBO #685870)           Julia Geiger, Law Student Intern

Anant Saraswat (BBO #676048)
Emma Frank (BBO #703424)
Bryan Conley (BBO #666830)
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Phone: (617) 646-8000
Fax: (617) 646-8646

Kathleen Olds, Law Student Intern
Derrick Rice, Law Student Intern
Kshithij Shrinath, Law Student Intern
Rebecca Steele, Law Student Intern
Angela Uribe, Law Student Intern**
JEROME N. FRANK LEGAL SVCS. ORG.
YALE LAW SCHOOL[†]
P.O. Box 209090
New Haven, CT 06520
Phone: (203) 432-4800
Fax: (203) 432-1426

* admitted pro hac vice
** motion for law student appearance
forthcoming

*Counsel for Plaintiff Emmanuel Thiersaint*

---

[†] This brief has been prepared by a clinic operated by Yale Law School but does not purport to present the school's institutional views, if any.

## CERTIFICATE OF SERVICE

I hereby certify that, on April 12, 2021, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of this court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

Date:   April 12, 2021

Respectfully submitted,

/s/ Muneer I. Ahmad
Muneer I. Ahmad
Jerome N. Frank Legal Services Org.
P.O. Box 209090
New Haven, CT 06520
P: (203) 432-4800
F: (203) 432-1426