## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EMMANUEL THIERSAINT,<br><br>                Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HOMELAND SECURITY;<br>U.S. IMMIGRATION AND CUSTOMS<br>ENFORCEMENT;WILLIAM CHAMBERS, in his<br>individual capacity; JOHN DOE DEFENDANTS 1-<br>10, unknown ICE Agents, in their individual<br>capacities; SUFFOLK COUNTY SHERIFF'S<br>DEPARTMENT; JOHN DOE DEFENDANTS 11-<br>16, unknown officers of the Suffolk County Sheriff's<br>Department, in their individual capacities; and<br>UNITED STATES OF AMERICA,<br><br>                Defendants. | Civil Action No.: 1:18-CV-<br>12406-DJC |

## DEFENDANT SUFFOLK COUNTY SHERIFF'S DEPARTMENT'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Suffolk County Sheriff's Department ("**SCSD**" and/or "***Defendant***") respectfully moves for summary judgment with respect to Plaintiff Emmanuel Thiersaint's ("***Plaintiff***") claims on the grounds that the undisputed material facts demonstrate as a matter of law that the Defendant did not violate the Plaintiff's rights with respect to the American's with Disability Act ("**ADA**"), and the Rehabilitation Act (**Counts I & II**).

The Suffolk County Sheriff's Department is responsible for the operation of the Nashua Street Jail and the Suffolk County House of Correction in Boston, MA.   From 2003 until 2019 the SCSD contracted with the Department of Homeland Security to house ICE detainees.  The mission of the Suffolk County Sheriff's Department is to ensure the safety of each and every detainee and inmate committed to its custody.

The Plaintiff alleges that he suffers from significant medical issues including but not limited to an above the knee leg amputation, an arm injury that prevents him using crutches, traumatic brain injury from

several falls, depression and chronic pain.   The Plaintiff primarily uses a wheelchair for mobility even though he has used a prosthetic leg at times. In November of 2016, less than three months prior to Mr. Thiersaint's incarceration with the SCSD he was committed to the CT Department of Correction and suffered a fall while taking a shower in a non-handicapped accessible shower. After this fall Mr. Thiersaint was unconscious for six hours, and it resulted in a traumatic brain injury, according to the Plaintiff.

The crux of the Plaintiff's Complaint against the SCSD (*Dkt. No. 1*) is that for two brief periods from February 18, 2016, through February 29, 2016, and from March 22, 2016, through April 1, 2016 he was an ICE detainee housed at the Suffolk County House of Correction in Boston, MA. The Plaintiff alleges that during this time period the Defendant violated his rights by housing him in the medical unit for eleven days in February of 2016, and by failing to provide him with certain accommodations due to his medical needs. The Plaintiff alleges in doing so that the Defendant violated the Americans with Disabilities Act and the Rehabilitation Act.   The Plaintiff also asserts that in March of 2016, when he was returned to the SCSD for ten days, his rights under the ADA and Rehabilitation Act were violated, despite the fact that he was housed in general population, because he did not receive his necessary medications and certain accommodations due to his medical needs.

The Plaintiff's complaint seeks judgment against the Defendant on Counts I and II, and Injunctive Relief in the form of a judicial order that (if issued) would, enjoin the Defendant from "continuing to deny Mr. Thiersaint reasonable accommodations." (*Dkt.1. ¶ 270*). As discussed below, the Defendant is entitled to summary judgment as a matter of law because the Defendant did not intentionally discriminate against the Plaintiff when its medical provider made a medical decision to admit Mr. Thiersaint to the Medical Housing Unit (MHU) in order to assess his mobility and to ensure his safety in the facility, and when it's medical provider made clinical decisions regarding what medications to prescribe to Mr. Thiersaint, and necessary medical accommodations.   Lastly, Plaintiff's claims for Injunctive Relief against the SCSD are moot as the

Plaintiff is no longer in the custody of the SCSD.[1]

## PROCEDURAL HISTORY

On November 16, 2018, the Plaintiff filed a Complaint (***DKt. No. 1***). On August 23, 2019, the Defendant filed an Answer to the Complaint. (***DKt. No.26***) On April 9, 2021, the Plaintiff voluntarily dismissed John Doe Defendants 11-16, unknown officers of the SCSD, in their individual capacities. (***Dkt. No. 141***.)

## UNDISPUTED MATERIAL FACTS

The Defendant incorporates the Suffolk County Sheriff's Department's Concise Statement of Material Facts, filed pursuant to District of Massachusetts Local Rule 56.1.

## SUMMARY JUDGMENT STANDARD

A party moving for summary judgment must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is mandated when the party who has the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment is not required to negate the opposing party's claim by producing affirmative evidence disproving that essential element; the moving party must only show that there is an absence of evidence by which the non-moving party can prove its case. Catrett, 477 U.S. at 325

In order to defeat a motion for summary judgment, a plaintiff must demonstrate a genuine issue of material fact on every element essential to his case in chief.  A genuine issue is one where the party

---

[1]  "A prisoner's challenge to prison conditions or policies is generally rendered moot by his transfer or release." Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996) ("[A] transfer from a prison facility moots an action for injunctive relief against the transferring facility."). Further, the Court does not find that that there is "a reasonable expectation that the same complaining party [will] be subject to the same action again." Reeves v. Department of Correction, 392 F.Supp. 195, 210 (2019).

opposing summary judgment provides evidence "such that a reasonable jury could return a verdict for the nonmoving party." Daury v. Smith, 842 F.2d 9, 11 (1st Cir.1988).   A plaintiff is not allowed to rely upon unreasonably speculative inferences, (see Mesnick v. General Elec. Co., 950 F.2d 816, 826 (1st Cir.1991)), but must present concrete evidence in support of the essential elements of his or her case. Catrett, 477 U.S. at 322.   "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

I.   **THE DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO THE PLAINTIFF'S CLAIMS UNDER THE ADA AND REHABILITATION ACT.**

### Americans with Disabilities Act Standard

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2012). The Rehabilitation Act provides that "no otherwise qualified individual with a disability… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Plaintiff's claims under the ADA and the Rehabilitation Act are identical, and therefore may be addressed together. See McCauley v. Groblewski, No. 14-CV-12732, 2018 WL 4119641, at *13 (D. Mass. Aug. 29, 2018).

In order to establish a violation under Title II of the ADA, the Plaintiff must establish: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities…; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability." Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006) quoting Parker v. Universidad de Puerto Rico, 225 F.3d 1, 4 (1st Cir. 2000).

"The ADA does not provide a remedy for medical malpractice, and courts have differentiated ADA claims based on negligent medical care from those based on discriminatory medical care." Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 284 (1st Cir. 2006), and cases cited.  Therefore, to fall within the ADA, "a plaintiff's showing of medical unreasonableness must be framed within some larger theory of disability discrimination." Lesley v. Hee Man Chie, 250 F.3d 47, 55 (1st Cir. 2001).  "For example, a plaintiff may argue that her physician's decision was so unreasonable as to imply that it was pretext for some discriminatory motive, such as animus, fear, or apathetic attitudes. Or a plaintiff may argue that her physician's decision was discriminatory on its face, because it rested on stereotypes of the disabled rather than an **individualized** inquiry into the patient's condition." Id. at 284–85, quoting Lesley, 250 F.3d at 55. (e*mphasis added*.)

For the purposes of this Motion the Defendant does not dispute that the SCSD is a public entity, and that Mr. Thiersaint is a qualified individual with a disability.  However, the Defendant denies that it intentionally discriminated against Mr. Thiersaint by denying him the benefit of a program or service **because** of his disability.  Further, Mr. Thiersaint's Complaint against the SCSD is based upon the medical decisions of its medical provider, a private corporation.  While Thiersaint is free to disagree with the medical decision making, medical judgments "do not ordinarily fall within the scope of the ADA or Rehab Act." See Fitzgerald v. Corrections Corporation of America, et al., 403 F.3d 1134, 1144 (10th Cir. 2005); Schiavo v. Schiavo, 403 F.3d 1289, 1294 (11th Cir. 2005) ("The Rehab[ ] Act, like the ADA, was never intended to apply to decisions involving ... medical treatment."). As one court succinctly put it, "[t]he decision was simply a reasoned medical judgment with which the patient disagreed. As to such disagreements, when they warrant litigation, state medical malpractice law, not the Rehab [] Act, provides the appropriate law of resort." Lesley v. Hee Man Chie, 250 F.3d 47, 58 (1st Cir. 2001).

Accordingly, Mr. Thiersaint's allegations that the medical providers' decisions to taper him off the medications Gabapentin and Remeron[2], to admit him to the MHU, and his allegations that medical decisions regarding his accommodations were in violation of the ADA and Rehabilitation Act are without merit.  While Mr. Thiersaint disagrees with these medical decisions the decisions were not so unreasonable as to be arbitrary and capricious, and there is no evidence of any discriminatory motive or indication that the treatment decisions rested on stereotypes of the disabled.[3]  Any allegations against the SCSD in Counts I and II based on medical treatment decisions should be dismissed.[4]

Lastly, even if this Court finds that the SCSD violated the ADA, the Eleventh Amendment precludes Thiersaint's claims for monetary damages where he has failed to show that the Defendant was deliberately indifferent to his constitutional rights under the Fourteenth Amendment. See Toledo v. Sanchez, 454 F.3d 24, 31-32 (1st Cir. 2006).

1. **The SCSD Defendant did not Intentionally Discriminate against the Plaintiff.**

"It is well settled that private individuals may recover compensatory damages under Title II only for intentional discrimination. Nieves-Marquez v. Puerto Rico, F.3d 108, 126 (1st Cir. 2003). Many circuit courts have held that the applicable standard for proving intentional discrimination is one of "deliberate indifference… however, the First Circuit appears to have adopted the more stringent standard of discriminatory animus." Cox v. Massachusetts Department of Correction, 13-10379-FDS, 2018 WL 1586019 at *7 (D. Mass. March 31, 2018), quoting Nieves, 353, F.3d at 126-127.

---

[2] Gabapentin is considered to have a high abuse potential in the prison system.

[3] See also, Hickey v. Tompkins, et al., 19-11349-LTS, 2021 WL 858439, at * 7 (D.Mass. 2021).  ("As with Eighth Amendment claims, prison officials may consider institutional security in responding to the needs of qualified individuals under the ADA and the Rehabilitation Act. See Kiman, 451 F.3d at 285 (affirming summary judgment on prisoner's Title II claim for temporary denial of the use of a cane because, among other reasons, it "could be used as a weapon"). The Court has already noted that both Suboxone and Gabapentin are at high risk of diversion in prisons. When the undisputed facts in the record are considered, no reasonable factfinder could conclude the defendants' denial of Hickey's preferred medications was "so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive. Lesley, 250 F.3d at 55")" (internal quotations omitted)

[4] The Defendant maintains that medical treatment decisions do not fall under the scope of the ADA, and should be dismissed. Without waiving this argument Defendant will alternatively address the Plaintiff's ADA argument on the merits.

"Proof of "deliberate indifference" does not require "a showing of personal ill will or animosity toward the disabled person." Meagley, 639 F.3d at 389. Rather, the test for deliberate indifference is comprised of two prongs: (1) "knowledge that a harm to a federally protected right is substantially likely," and (2) "a failure to act upon that ... likelihood." Barber, 562 F.3d at 1229 (citing Duvall, 260 F.3d at 1139). By contrast, proof of "discriminatory animus" requires a showing that defendant intended to discriminate against plaintiff based on his disability. See Liese, 701 F.3d at 344 ("Discriminatory animus ... requires a showing of prejudice, spite, or ill will."). See also Laurin v. Providence Hosp., 150 F.3d 52, 58 (1st Cir. 1998) (finding that direct evidence is usually needed to prove discriminatory animus); Moebius v. Tharperobbins Co., 2016 WL 6476941, at *17–18 (D. Mass. Nov. 1, 2016)." LeClair v. MBTA, 300 F. Supp.3d 318, 326 (D.Mass. 2018)

Here, it is clear that the SCSD was not deliberately indifferent to the Plaintiff's constitutional rights, because of his disability, where there is no evidence that the SCSD *knew that harm to a federally protected right was substantially likely* and *failed to act on that likelihood*. Id. The Plaintiff is also unable to meet the discriminatory animus standard because the undisputed material facts demonstrate that the SCSD did not intend to discriminate against the Plaintiff because of his disability with a showing of prejudice, spite or ill will.

    a. **Corrections Officials are entitled to rely upon the Judgment of Medical Professionals In the ADA Context.**

The Suffolk County Sheriff's Department has reasonably established a system to ensure that medical treatment and accommodation determinations are grounded in professional judgment, and it relied on the judgment of medical professionals as to Plaintiff's need for medical care.

The Plaintiff is asking this Court to enter judgment against the Defendant for medical decisions in admitting the Plaintiff to the MHU and in failing to provide him with certain medications and accommodations, despite the fact that medical doctors and nurse practitioners, who worked for NaphCare, Inc. ("NaphCare") a private corporation, had determined they were not medically necessary. The Defendant and its employees are SCSD officials, not clinicians, and therefore, they are entitled to rely upon the judgment of medical professionals regarding an inmate's diagnosis and the medical care required. Holden v. Hirner, 663 F.3d 336, 343 (8th Cir. 2011); Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008) ("The policy supporting the presumption that non-medical officials are entitled to defer to the professional

judgment of the facility's medical officials on questions of prisoners' medical care is a sound one."); Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) ("absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.) See also Durmer v. O'Carroll, 991 F .2d 64, 69 (3d Cir.1993) (non-medical professionals not deliberately indifferent for failing to respond to inmate's complaints when prisoner is ostensibly under care of medical professionals); Spencer v. Bender, 2010 WL 972207 (D. Mass.) (Corrections personnel not deliberately indifferent for relying on medical professionals' assessment of inmate's back injury.).

The same principle applies where the inmate is seeking a reasonable accommodation for a claimed medical condition; "[p]rison officials may reasonably require the inmate to obtain medical confirmation of the alleged need for accommodation." Bane v. Virginia Dep't of Corr.,No. CIV.A. 705CV00024, 2005 WL 1388924, at *4 (W.D. Va. June 9, 2005) (quoting Shedlock v. Dep't of Correction, 442 Mass. 844, 858 (2004)).

### A. The SCSD was not Deliberately Indifferent to the Plaintiff's Constitutional Rights because of his Disability.

Here, where a nurse practitioner ("**NP**") determined that Mr. Thiersaint should be housed in the MHU; a nurse practitioner and psychiatrist determined that the medications Gabapentin and Remeron should be tapered; and where medical clinicians determined that the cells that Mr. Thiersaint was assigned adequately met his medical needs, the SCSD was entitled to rely upon the sound judgment of these medical professionals. Further, because the SCSD relied upon its medical providers it did not know *that harm to a federally protected right was substantially likely* and *failed to act on that likelihood*.

The SCSD has policies and procedures in place to ensure that programs, activities and services will operate in a manner which provides for the full and non-discriminatory participation of any inmate with

special needs.[5]  In order to do so the Department makes accommodations for individuals committed to its custody on a daily basis.  The Department also has an overarching mandate to protect every person committed to its custody and to ensure their safety at all times.  One of the ways that the Department ensures the safety of those committed to its custody is to rely on its medical providers to make clinical decisions regarding the medical needs of inmates and detainees.

***The Plaintiff's admission to the MHU and His Medical Prescriptions.***

The SCSD did not have knowledge that the Plaintiff requested any accommodations while he was housed in the MHU and Building 8 during his commitment.

The Plaintiff arrived at the SCSD on February 18, 2016. At intake Plaintiff received both a medical and mental health screening by a nurse in the booking area who determined that Plaintiff required immediate medical housing.  When Plaintiff arrived in the MHU he was seen a second time by a mid-level provider[6], NP Carrie Grassi, and he received a physical examination.  This was all before going to his cell. The Nurse Practitioner made a decision "[a]fter speaking with Mr. Thiersaint about his recent fall in November of 2015, his above the knee amputation, his recent mobility issues regarding his broken prosthesis and wheelchair that she wanted to admit him to the medical unit so that his mobility and safety could be assessed by medical staff."  "Mr. Thiersaint agreed to this plan." (***Exhibit 27***)

NP Grassi did not admit the Plaintiff to the MHU because he was **disabled** but in order to ensure his safety in general population.  During the time period that NP Grassi worked at the SCHOC, individuals in wheelchairs and other assistive devices were housed in general population if they could perform their activities of daily living. (***Exhibit 27***) This is borne out by the fact that less than a month later when Plaintiff returned to the SCHOC he was in fact housed in general population.  The Plaintiff was housed in general

---

[5] Employees are trained that if anyone asks for an accommodation to never ignore the request. They are to create a dialogue and to write a report thereafter. They are also trained to seek intervention from a supervisor and to maintain confidentiality. (***Exhibit 21***)

[6] Mid-level providers are Nurse Practitioners, Physician's Assistants and Doctors.

population in March of 2016, because he had been medically cleared from the MHU in February of 2016. (*Exhibit 27*)

NP Grassi decided to initiate a taper of the medication Gabapentin because it is a highly abused medication that was not in the formulary.   (*Exhibit 27*) A taper is done to minimize any withdrawal side effects.  Mr. Thiersaint received Gabapentin until 2/22/2016, and he received the medication Remeron until 2/25/2016.  While Mr. Thiersaint maintains that not receiving the medication Remeron caused him to "lose his appetite, suffer unusual sweating, loss of sleep and nightmares... cry and feel very depressed" (*Compl. ¶ 59),* this is not borne out by the medical records during this time period.

In fact in the medical records Plaintiff repeatedly told medical staff that he had no medical complaints or concerns.[7]  Nor did medical staff note, despite the fact that he was observed numerous times a day, that he had any of the above referenced symptoms.  On February 27, 2016, when Plaintiff first asked a nurse about his prescription for Remeron he did not express any other complaints and the nurse noted "no other medical issues at this time." (*Exhibit 10, NaphCare052*)  Further, the nurse followed up with the Plaintiff the following day to let him know that his prescription for Remeron had expired, with no renewal. The nurse instructed the Plaintiff to put in a sick slip for mental health concerning any further questions; however the Plaintiff did not do so.

While the Plaintiff asserts in his Complaint ¶60 that he "made repeated requests to obtain necessary medication to treat his depression [and] SCHC officials denied his requests" this is unsupported by the records.  The records show that he made one inquiry to a nurse (who was not a SCHC official) on February 27, 2016, in which he stated "what about my Remeron."  In fact at no time during Plaintiffs first

---

[7] On February 20, 2016, at 9:32 PM, Mr. Thiersaint stated when speaking with the nurse: "I'm alright." (*NaphCare065-066*) On February 21, 2016, at 3:29 AM, Mr. Thiersaint stated: I'm alright, no I am ok." (*NaphCare 065*) On February 21, 2016, at 9:35 PM, Mr. Thiersaint stated: I'm alright." (*NaphCare064*)  On February 22, 2016, at 3:42 AM, Mr. Thiersaint stated to the nurse: "I'm just hanging in here. I'm ok." (*NaphCare063*)  On February 22, 2016, at 9:17 PM, Mr. Thiersaint stated to the nurse: "I'm straight." (*NaphCare062*)  On February 24, 2016, at 3:33 AM, Mr. Thiersaint stated to the nurse: I'm good. Dentist gave me some antibiotics, no problems I feel ok." (*NaphCare059*) On February 24, 2016, at 10:02 AM, Mr. Thiersaint stated: I'm good." (*NaphCare059*)  In addition to these statements made by Mr. Thiersaint medical staff noted several times a day that Mr. Thiersaint had no concerns. (*NaphCare 050-070*)

commitment to the SCSD in February of 2016, did he submit any sick slips regarding any concerns that he had about his medical care.  Mr. Thiersaint's failure to submit any sick slips was not based upon his lack of knowledge regarding how to seek medication attention because when he was committed to the Franklin County House of Correction from February 6, 2016 through February 18, 2016, he submitted five (5) sick call requests. (**Exhibit 9 )** [8]

When the Plaintiff returned to the SCHOC on March 22, 2016, he was continued on his medications for Prozac and Ibuprofen and his prescription for Gabapentin and Remeron was discontinued. The Plaintiff contends that the denial of his medications caused him to suffer "withdrawal symptoms such as loss of appetite, unusual sweating, loss of sleep and nightmares when he was able to sleep." (**Compl. ¶ 124**)  However, the Plaintiff's assertions of loss of appetite are contradicted by his deposition in which he expressed how happy he was to be in general population stating "I was able to eat, to have seconds, able to get seconds, I was able to have soups. I was able to have cookies." (**Exhibit 1, p. 145-146**)

The Plaintiff's statements of depression are also belied by the fact that his sick call request to see medical on March 25, 2016, asked to see a provider not about depression but nerve pain.  On the same day the Plaintiff put in a request to ICE for his legal materials and to place a legal call. (**Exhibit 17**)  The Plaintiff did not reference any issues that he was having in general population regarding access to medications, or his cell assignment. (**Exhibit 17**)  On March 28, 2016, when the Plaintiff saw a nurse pursuant to his sick call request, he informed her that he had previously taken Gabapentin for nerve pain and it was ineffective. He did not mention any issues of depression or difficulty with his cell. (**Exhibit 10, NaphCare48**)

---

[8] While the Plaintiff was cleared from the medical unit between February 24, 2016, and February 26, 2016, the medical record states that he remained in medical for security reasons because he had used his wheelchair as a weapon.  Regardless of whether Mr. Thiersaint did or did not use his wheelchair as a weapon security concerns are not an indication that Mr. Thiersaint remained in the medical unit because of discriminatory animus towards his disability.

Lastly, the Plaintiff's statements that he was suffering from the effects of not taking his medication from March 22, 2016 until April 1, 2016, is contradicted by the fact that after he was released from the SCSD on April 1, 2016, he stopped taking all of his medications including Prozac "because he did not believe that he needed them."  (*Exhibit 28)*  It's hard to reconcile Plaintiff's allegations that that he was suffering from intense depression, allegedly from the withdrawal effects of discontinued medication that he professed to needing, and then stopping all medication for depression the following week because "he did not need it anymore."[9]

***Plaintiff's Access to Services.***

Contrary to the Plaintiff's assertions, he was not denied access to Library Services or Inmate Legal Services while he was housed in the MHU for 11 days, and the medical decision to admit him to the MHU to assess his mobility was not "solitary confinement." (*Exhibit 6*) A librarian is in the medical unit on a regular basis to bring reading materials to inmates.  The librarian also maintains a catalog of books in the medical unit that inmates can access during the recreation period.  Upon request the SCSD can also make arrangements to bring inmates in the medical unit to the library.  Further if the Plaintiff required a computer for legal research, or if he needed assistance with legal research, he could have made a request through Inmate Legal Services.  The SCSD has a staff of attorney's and paralegals at the SCHOC whose sole job is to assist inmates with their legal research and legal issues. (*Exhibit 17*) However, Plaintiff did not make any requests for the librarian or inmate legal services assistance while he was in the medical unit.  When questioned about why he did not reach out to Inmate Legal Services, as set forth in the Inmate Guide Book

---

[9] The fact that Plaintiff ceased taking his medications after leaving SCSD is consistent with his pattern of starting and stopping medications. Contrary to Mr. Thiersaint's Declaration (Exhibit 5)  in which he states that he was consistently on medications for depression after 2004 this statement is contradicted by his medical records which show significant periods of time when he was not taking medications. In fact prior to arriving at the SCSD on February 18, 2016, he had only been taking Remeron for eight days, and was not taking any medications for depression for the duration of his 6 month incarceration in CT before he was released to ICE custody. (*Exhibit 6, pp. 9, 10, 21*.)

that he signed for, he stated: "I always ask my lawyer or the legal team." When asked if he called his legal team because he already had attorneys his response was "yes." (***Exhibit 1, pp. 244-245***)[10]

Even though the MHU does not have the same hours of recreation as general population that does not mean that every person who is admitted to the MHU for a medical reason is considered to be in "segregation" or "solitary confinement". (***Exhibit 6, p. 15-16***)  While it is understandable that the Plaintiff was unhappy with the restrictive nature of the MHU, the decision to place him there was not to punish him, or because he was disabled, but to ensure his safety particularly because the Plaintiff had recently suffered what he has described as a traumatic brain injury due to a fall while in custody at another facility.   "It is the preference of the SCSD to house inmates in general population as opposed to the MHU because there are space limitations, and so that they can have access to more recreation, and there are less restrictions." (***Exhibit 12, p. 119, 121***)

It is very easy to second guess well-meaning decisions after the fact. Here, however the SCSD kept the Plaintiff safe, something which cannot be said for the last facility he was in.  Dr. Diener put it best when he was questioned about the medical decision to evaluate the Plaintiff in the medical unit:

 "He's new to the institution. I think they have an obligation to make an independent clinical assessment. MHU is where they do that. They use mid-levels to do it. And the risk of not doing it is that he could continue to have recurrent falls with serious injuries."… "If you don't do that, if they hadn't done that, and Mr. Thiersaint was attacked and he was not sufficiently able to defend himself and was harmed. I might imagine that today, instead of discussing why he was placed in the MHU, we would be discussing why he was so recklessly placed in population. So one can always look back and see how the decision could have its critics and detractors."  (***Exhibit 32 p. 273***)

Lastly, Plaintiff's sincerity regarding his brief stay in the MHU must be questioned in light of his contradictory representations made to ICE only a week after he left the custody of the SCSD on February 29, 2016.  During this time period Plaintiff filed an Urgent Request for Humanitarian Parole ("***Request***") on March 8, 2016, (***Exhibit 34)*** and a supporting Declaration signed on March 6, 2016. (***Exhibit 5***)   In

---

[10] When he was housed in general population in Building 8 Plaintiff states that he had improved access to the telephone, law library, and other detainees and does not have any complaints about access to programs in general population. (***Compl. ¶ 121***)

Plaintiff's Request, contrary to asserting that his admission to the MHU at the SCHOC was in violation of his rights he argued that his placement in medical was to "**accommodate his medical needs**" something that he would be unable to obtain if he were deported to Haiti.   In the Request the following representation is made: "Mr. Thiersaint's **disability and serious medical conditions required that he receive special treatment and reasonable accommodations. For example while in ICE detention in the Suffolk County Jail, Mr. Thiersaint's health conditions resulted in his placement in the Medical Health Unit, reflecting his need for extensive and detailed care. These requirements to accommodate Mr. Thiersaint's medical needs are entirely absent in Haiti.**[11]  (Exhibit 34)

It's interesting that what has been represented as "special treatment and reasonable accommodations" in one forum is construed as violation of ADA rights for failure to accommodate in another forum both regarding the very same treatment.

*Handicapped Shower.*

The Plaintiff asserts that "he used a shower in the recreational area. The shower in the recreational area lacked a medical shower chair for people with mobility disabilities. Instead, the shower had only an ordinary chair for Mr. Thiersaint to use, which he feared was unstable in the slippery shower area." (Complaint ¶ 56)  Contrary to the Plaintiff's assertions, while he utilized the handicapped shower in the medical unit, (not the shower in his cell) it included a "ramp, bariatric chair, grab bars and accessible shower controls." (***Expert Opinion of Jeffrey Quick p. 10***) The handicap shower complies with the code that was in effect at the time of construction which was the 3rd Edition (1982-1995) 521 CMR 1982 edition/1987 edition. (***Expert Opinion of Jeffrey Quick p. 10***)  In his deposition the Plaintiff stated that the handicapped shower in the medical unit was wheelchair accessible. (***Exhibit 1, p. 79***) Notably in his

---

[11] Mr. Thiersaint also states in his Declaration that "while in detention **I have received extensive medical treatment and have been held in the medical wing of detention facilities away from general population. In Boston they told me that it was because of my disability and for security since I am particularly vulnerable to violence from other detainees**." (***Exhibit 5***) Mr. Thiersaint has previously represented that if he was sent back to Haiti he would be susceptible to violence from other inmates. (***Exhibit 29***)

Complaint the Plaintiff does not assert any issues with the bathroom facilities in Building 8 where he states that "he was able to use a bathroom accessible to individuals with mobility disabilities. (*Compl. ¶121*)

***Assignments to Handicapped Cells.***

In his Complaint the Plaintiff does not make any specific assertions regarding the lack of accessibility of the cells that he was assigned to in the MHU and Building 8 other than to say that the cell in Building 8 did not have a grab bar next to the bed. (*Compl. ¶122*)  Grab bars next to beds in a correctional facility are not code required. (*Expert Opinion of Jeffrey Quick p. 13*)

The reason why the Plaintiff did not raise this as an issue in his Complaint, and in his deposition is because his cells were never an issue.  All cells in the MHU and Building 8 are wheelchair accessible; however some cells in the medical unit have grab bars next to the toilet.  It is the policy of the SCSD to rely on the recommendations of medical staff to identify the medical needs and accommodations of inmates because custody staff does not have access to an inmate's medical records. Further, in the medical unit it is presumed that all of the patients are there for a medical reason.

The Plaintiff was not placed in a cell with a grab bar next to the toilet because medical staff did not inform custody staff that he needed to be in that cell.  At no time did the Plaintiff inform NP Grassi that he did not want to be housed in the medical unit or that he required additional assistive devices including a grab bar.  (*Exhibit 27, ¶17, p. 3*)  If the Plaintiff had at any time informed medical staff that he required a cell with a grab bar it would have been accommodated either by moving his cell or by providing him with an over the toilet commode seat with handles which the medical unit had in supply.  (*Exhibit 27, ¶18, p. 3*)

While the Plaintiff may argue that he had an obvious disability that did not require custody staff to access his medical records, NP Grassi has treated numerous wheelchair patients in her practice many of whom do not require a grab bar to transfer from wheelchair to toilet.  (*Exhibit 27, ¶19, p. 3*)  Even if custody staff had made an honest mistake in not assigning the Plaintiff to a cell with a grab bar, despite a lack of medical recommendation, it could have been quickly remedied.  Certainly if the Plaintiff had placed

medical or custody staff on notice that he needed an accommodation it would have been made for him but he did not.

Further, while the Plaintiff will argue that it should have been obvious to custody staff that he needed a cell with a grab bar that clearly was not the case when medical clinicians including NP's and PA's, for the duration of his commitment to the MHU, never made a decision that his cell was not suitable for his needs.[12]  Medical staff were in the MHU 24 hours a day, seven days a week, and saw Mr. Thiersaint numerous times a day. "It was the policy of NaphCare to ensure that an inmate with mobility issues could safely transfer from bunk to chair or chair to toilet by observing them.  NaphCare did not just take the inmate's word that they could do this."   "A provider assessed Mr. Thiersaint ability to transfer in and out of his wheelchair while he was in the medical unit."  *(Exhibit 26, p. 81)*

Further, Nurses noted that Mr. Thiersaint did not have any mobility issues in his cell: "transferred independently via wheelchair around cell and to med cart", (*Exhibit 10, NaphCare068*) "he is independent when ambulating with the w/c", (*Exhibit 10, NaphCare066-067*) "patient ambulated to the med car using a wheelchair; alert and well appearing". (*Exhibit 10, NaphCare053-054*)  At no time did medical staff despite making independent mobility assessments of Mr. Thiersaint on a daily basis, and ultimately deciding that he could be cleared from medical, ever determine that his cell did not meet his medical needs.

"Medical staff makes the housing determination and informs the SCSD security staff who needs to be placed in a handicap cell based on the needs of the individual. *(Exhibit 25, pp. 141, 143)*  The officers will then make arrangements for that person to be housed in that cell even if it involves moving other people to different cells. **The SCSD does this all the time**." *(Exhibit 25, p. 142)* "If Mr. Thiersaint had a

---

[12] "The reasonable accommodation requirement of a public entity is not triggered unless both the disability and the need for an accommodation is patently obvious or a request for an accommodation has been made. See Shedlock v. Dept. of Correction, 818, N.E.2d 1022, 1031, 1034 (Mass. 2004) holding "[p]rison officials are not required to anticipate a prisoner's unarticulated need for accommodation or to offer accommodation sua sponte, and concluding the state was not liable for failing to offer an accommodation (of a first floor cell) before an inmate obtained a medical offer verifying the need for such accommodation, notwithstanding that the inmate's serious injuries were confirmed at prison intake and the inmate always used a cane to walk…". DeRosier v. State of Arizona, et al., No. 1 CA-CV-14-0145, 2015 WL 4653554 at *4

problem with his cell he could have been moved at any time." *(Exhibit 25, p. 175.)* Inmates are informed as soon as they are booked in that if they have concerns they can speak to a unit officer. If it's a medical issue they can fill out a sick slip. They can speak to staff during med pass. They see officers 24 hours a day and they see medical staff multiple times a day. But they always have the opportunity to fill in a sick slip. If they feel that they're not remedie[d] they can fill out a grievance." *(Exhibit 25, pp. 176-177)*

While Plaintiff alleges that he made repeated verbal requests for medications, and repeatedly informed staff that he did not want to be in the medical unit, this is unsupported by the medical record. Further, during the Plaintiff's commitment to the SCSD he did not submit any written requests for an accommodation, and he did not file a single grievance to put the SCSD on notice that he had any issues with his accommodations while he was committed to its custody.

While Plaintiff has asserted that he was not given the opportunity to file a grievance that is not the case as ICE detainees at the SCSD were provided with numerous avenues to address issues of concern. (*Exhibit 16*) Further, when asked in his deposition if he requested an accommodation while he was in the medical unit his response was: "Accommodations like what?"   When he was again asked "Did you ask for accommodations while you were in the medical unit for anything?" his response was "I asked for help to go in the population. I asked for help to have access to the law library. I asked about medication for my tooth, for my anxiety, my meds, my depression meds." (*Exhibit 1, p. 249-250*)  It is clear that the Plaintiff never even made a verbal request to medical or SCSD regarding his cell assignment, in order to put staff on notice that he needed an accommodation.  Mr. Thiersaint should not be able to just sit back, say nothing, and wait to sue without alerting the Defendant of his needs. [13]

---

[13] "Nonetheless, the defendants are correct to the extent that they argue that an accommodation claim under Title II requires a request that puts the defendant on notice. As noted above, the Title II regulations require public entities to make "reasonable modifications in policies, practices, or procedures" when such modifications are reasonably necessary to avoid disability discrimination….In cases involving the denial of a reasonable accommodation, "the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request.' " Kiman II, 451 F.3d at 283 (quoting Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir.2001))." Kiman v. New Hampshire v. Department of Correction, et al., No. 01-cv-134-JD, 2007 WL 2247843, at *10 (D. N.H. 2007).

The SCSD was in no way deliberately indifferent to Plaintiff's needs because they did not know that Mr. Thiersaint had issues with his medications, or with anything else having to do with his commitment to the MHU or Building 8.  While the Plaintiff asserts in his Complaint that he complained to SCSD officials it appears that the only people whom he had conversations with regarding his medical care were not SCSD officials but medical staff employed by an independent contractor.[14]  Further, even where it is documented in the medical record that the Plaintiff inquired about why he was in the MHU versus general population (on one occasion) and when he asked  "where is my Remeron?" those inquiries would hardly rise to the level of deliberate indifference for the medical staff, never mind the SCSD.  Lastly, when the Physician's Assistant specifically asked the Plaintiff if he could evaluate his injury the Plaintiff declined. The PA noted that "Mr. Thiersaint did not wish to discuss injury or to have it assessed." *(Exhibit 10, NaphCare058)*  It is clear that the Plaintiff did not want to engage with medical staff regarding his medical needs.  If the Plaintiff had been having an issue with his cell he would have discussed it with the PA at that time but chose not to.

### B. Plaintiff is Unable to Satisfy the Discriminatory Animus Test.

Even if this Court determined that the Plaintiff established that the Defendant was deliberately indifferent, which the Defendant disputes, the undisputed material facts demonstrate that the Plaintiff is unable to satisfy the discriminatory animus test concerning his commitment to the SCSD.  The Plaintiff has failed to allege facts that could plausibly result in an inference that the SCSD acted with discriminatory intent. "To show discriminatory animus the Plaintiff must show that the Defendant intended to discriminate against Plaintiff because of his disability."  LeClair, 300 F. Supp. 3d. 326.  Here, even if the Plaintiff was not placed in a handicapped cell based upon a medical decision there is nothing to suggest that the SCSD did

---

[14] Mr. Thiersaint also asserts that he spoke to ICE Agent Bill Chambers about the fact that he wanted to be moved to general population (*Compl*. *¶ 63-64*). He did not raise any concerns about his medical care, access to library services, or medications to Mr. Chambers. (*Exhibit 13, p. 148*)

so with prejudice, spite or ill will towards the Plaintiff.[15]   The Suffolk County Sheriff's Department respectfully requests that this Court dismiss Counts I and II of the Complaint.

## II.   **The Suffolk County Sheriff's Department is entitled to Sovereign Immunity as to the Plaintiff's claims under the ADA.**

The Eleventh Amendment to the United States Constitution provides that states and state officials in their official capacities are not subject to suit in the federal courts of the United States. The federal courts have long held that they lack jurisdiction to entertain suits against individual states and their officials, unless the state has waived the immunity. See e.g., Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996), quoting Hans v. Louisiana, 134 U.S. 1, 15 (1890) (noting that "[f]or over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States"). See also Kentucky v. Graham, 473 U.S. 159, 167, n. 14 (1985) ("[u]nless a State has waived its Eleventh Amendment immunity or Congress has overridden it, a State cannot be sued directly in its own name regardless of the relief sought").

The ADA states that "[a] State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or state court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.  The Supreme Court has held that because the Fourteenth Amendment grants Congress the power to enforce its provisions Title II validly abrogates state sovereign immunity to the extent that it creates a private cause of action for damages against the States for conduct that ***actually*** violates the Fourteenth Amendment," U.S. v. Georgia, 546 U.S. 151, 159 (2006).

---

[15] See also, Snell v. Mici, et al., 16-cv-11643-DJC 2019 WL 4303264, at *7 (D.Mass. 2019)( "…[T]he DOC Defendants relied upon the recommendations of medical personnel who determined that Snell did not require a "no stairs" restriction, in deciding to terminate Snell's access to the first floor library. Additionally, there are no facts indicating that the medical treatment that Snell received, or the recommendations made by Ruze and other medical personnel, were based on any discriminatory animus. As there has been no showing of discrimination based on Snell's disability, summary judgment is granted in favor of Defendants. Sepulveda, 160 F. Supp. 3d at 392 (dismissing ADA claim based on inmate's allegations of inadequate medical treatment where inmate failed to show "discriminatory animus" or that the medical providers' "treatment decisions rested on stereotypes about [inmate's] conditions").

For all of the reasons set forth in Section I the SCSD's did **not** a violate Mr. Thiersaint's Fourteenth Amendment rights, and this is not the type of case that would still require abrogation.  "For claims involving conduct that does not actually violate the Fourteenth Amendment, Title II may nonetheless abrogate sovereign immunity if Congress's proscription of that "class of conduct" constitutes a valid exercise of its § 5 enforcement powers." <u>Id</u>.[16]  Here, there has been no history and pattern of unconstitutional conduct by the SCSD with respect to these particular provisions of medical care that would warrant the abrogation of sovereign immunity.  See also <u>Cox</u> at *9.

## CONCLUSION

For the aforementioned reasons, summary judgment should enter in favor of the Suffolk County Sheriff's Department on Counts I and II of the Plaintiff's Complaint.

Respectfully submitted,
Suffolk County Sheriff's Department

By Attorney,
MAURA HEALEY
ATTORNEY GENERAL
Allen H. Forbes
Special Assistant Attorney General

<u>/s/ Melissa J. Garand</u>
Melissa J. Garand
Assistant General Counsel
BBO No. 554727
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA  02114
(617) 704-6680
mgarand@scsdma.org

Dated:  April 12, 2021

---

[16] "Abrogation of sovereign immunity under Title II is determined on a claim by claim basis. See <u>Georgia</u>, 546 U.S. at 159.  Thus, for each claimed ADA violation, the complained-of-conduct (must violate Title II and (2) either (a) must violate the Fourteenth Amendment or (b) its proscriptions must bear congruence and proportionality to the rights protected under that Amendment. See <u>Id</u>.; <u>Buchanan v. Maine</u>, 469 F.3d 158, 172-173 (1st Cir. 2006)."  <u>Cox</u>, at *9.

## CERTIFICATE OF SERVICE

I certify that this document is being filed through the Court's electronic filing system and sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 12, 2021.

/s/ Melissa J. Garand
Melissa J. Garand