# EXHIBIT 1

# In the Matter of:

*Emmanuel Thiersaint vs*

*Department of Homeland Security, et al*

---

*William Chambers*

*December 14, 2020*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
                   Case No. 1:18-cv-12406-PBS
 3
    - - - - - - - - - - - - - - - - - - -x
 4   EMMANUEL THIERSAINT,                    :
                                            :
 5                    Plaintiff,            :
         v.                                 :
 6                                          :
    DEPARTMENT OF HOMELAND SECURITY,        :
 7   US IMMIGRATION AND CUSTOMS             :
    ENFORCEMENT; WILLIAM CHAMBERS,          :
 8   in his individual capacity; JOHN       :
    DOE DEFENDANTS 1-10, unknown ICE        :
 9   Agents, in their individual            :
    capacities; SUFFOLK COUNTY              :
10   SHERIFF'S DEPARTMENT; JOHN DOE         :
    DEFENDANTS 11-16, unknown               :
11   officers of the Suffolk County         :
    Sheriff's Department, in their          :
12   individual capacities; and            :
    UNITED STATES OF AMERICA,               :
13                                          :
                      Defendants.           :
14  - - - - - - - - - - - - - - - - - - -x

15

16              DEPOSITION OF WILLIAM CHAMBERS

17              Monday, December 14, 2020
                 Boston, Massachusetts
                Commencing at 9:06 a.m.
18

19

20       (This proceeding was conducted via Zoom.
          All participants appeared remotely.)

21

22

23     ---------------------------------------------

24        REPORTED BY:  Deanna J. Dean, RDR, CRR
```

2

1               A P P E A R A N C E S

2

3   Representing the Plaintiff:

4        WOLF, GREENFIELD & SACKS, PC

5        600 Atlantic Avenue

6        Boston, Massachusetts 02210-2206

7        (617) 646-8280

8        BY:  LIBBIE A. DIMARCO, ESQ.

9             elizabeth.dimarco@wolfgreenfield.com

10

11  Representing William Chambers and Federal

12  Defendants:

13       UNITED STATES DEPARTMENT OF JUSTICE

14       United States Attorney's Office

15       1 Courthouse Way, Suite 9200

16       Boston, MA 02210

17       (617) 748-3100

18       BY:  EVE A. PIEMONTE, ESQ.

19            eve.piemonte@usdoj.gov

20

21

22

23

24

Emmanuel Thiersaint vs

Department of Homeland Security, et al

William Chambers

December 14, 2020

3

1          A P P E A R A N C E S (cont'd.)

2

3   Representing Suffolk County Sheriff's Department:

4        SUFFOLK COUNTY SHERIFF'S DEPARTMENT

5        200 Nashua Street

6        Boston, MA 02114

7        (617) 704-6680

8        BY:  MELISSA J. GARAND, ESQ.

9             mgarand@scsdma.org

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

4

```
 1                    I N D E X

 2

 3    Examination                              Page

 4    WILLIAM CHAMBERS

 5        BY MS. DiMARCO                      8, 148

 6        BY MS. GARAND                         147

 7

 8

 9                  E X H I B I T S

10

11    Chambers      Description                Page

12     Exhibit 1    Defendants' Automatic        44

13                  Disclosures

14     Exhibit 2    Intergovernmental Service    45

15                  Agreement between Suffolk County

16                  Sheriff's Department and

17                  Department of Homeland Security,

18                  Bates Nos. SDSD000871 to 884

19     Exhibit 3    9/13/19 Letter to Wolf       50

20                  Greenfield from Suffolk County

21                  Sheriff's Department

22     Exhibit 4    Deportation Officer Job      54

23                  Description, Bates Nos.

24                  GOV000940 to 975
```

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

5

```
 1              E X H I B I T S (cont'd.)

 2

 3   Chambers       Description                    Page

 4    Exhibit 5     Government'S Answers to          56

 5                  Plaintiffs' First Set of

 6                  Interrogatories

 7    Exhibit 6     12/15/16 Assessment and          69

 8                  Accommodation for Detainees with

 9                  Disabilities, Bates Nos.

10                  GOV000020 to 34

11    Exhibit 7     9/20/00 INS Detention Standard -  72

12                  Medical Care

13    Exhibit 8     Dec. 12-14, 2017 Office of        80

14                  Detention Oversight Compliance

15                  Inspection

16    Exhibit 9     2/17/16 Email from K. O'Donnell,  92

17                  Bates No. GOV002999

18    Exhibit 10    Excerpt from Deposition          101

19                  Transcript of Brian Kaiser

20    Exhibit 11    2/19/16 Email from K. Brooks to  105

21                  W. Chambers, Bates No. GOV0002908

22    Exhibit 12    E. Thiersaint Medical Records,   108

23                  Bates Nos. GOV000087 to 168

24
```

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

6

```
 1              E X H I B I T S (cont'd.)

 2

 3   Chambers        Description                    Page

 4     Exhibit 13    Suffolk County Sheriff's        111

 5                   Department Answers to

 6                   Interrogatories

 7     Exhibit 14    Email Chain, Bates Nos.         115

 8                   GOV003135 to 136

 9     Exhibit 15    2/26/16 Email from R. Sousa to  122

10                   K. Sullivan, Bates No. GOV003090

11     Exhibit 16    2/26/16 Email from W. Chambers  130

12                   to R. Sousa, Bates Nos.

13                   GOV003142 to 144

14     Exhibit 17    Report Titled "ICE Detention    133

15                   Facilities, Failing to Meet

16                   Basic Standards of Care"

17     Exhibit 18    Complaint                       142

18

19

20

21

22

23

24
```

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

7

1              P R O C E E D I N G S

2         THE REPORTER:  My name is Deanna Dean.

3   I am a licensed court reporter and a Notary Public

4   in the Commonwealth of Massachusetts.

5              This deposition is being taken remotely.

6   This witness is appearing remotely from Boston,

7   Massachusetts.  The attorneys participating in this

8   proceeding acknowledge their understanding that I

9   am not physically present in the proceeding room,

10  nor am I physically present with the witness and

11  that I will be reporting this proceeding remotely.

12             They further acknowledge that, in lieu of

13  an oath administered in person, the witness will

14  verbally declare his testimony in this matter under

15  the pains and penalties of perjury.  The parties

16  and their counsel consent to this arrangement and

17  waive any objections to this manner of proceeding.

18             Please indicate your agreement by stating

19  your name and your agreement on the record, after

20  which I will swear in the witness and we may begin.

21         MS. DiMARCO:  Okay.  Elizabeth DiMarco

22    from Wolf Greenfield on behalf of the plaintiff,

23    and we agree with this arrangement.

24         MS. PIEMONTE:  Eve Piemonte on behalf of

8

1      Officer Chambers and the federal defendants, and

2      I agree.

3            MS. GARAND:  Melissa Garand on behalf of

4      the Suffolk County Sheriff's Department, and I

5      agree.

6                       WILLIAM CHAMBERS

7   a witness called for examination by counsel for the

8   Plaintiff, having been satisfactorily identified

9   and being first duly sworn by the Notary Public,

10  was examined and testified as follows:

11                      EXAMINATION

12  BY MS. DiMARCO:

13     Q.    Good morning, Officer Chambers.  My name

14  is --

15     A.    Good morning.

16     Q.    My name is Elizabeth DiMarco.  I represent

17  the plaintiff in this case, Emmanuel Thiersaint.  I

18  will be asking you a series of questions today.

19            I want to go over some ground rules that

20  you might already be familiar with, but especially

21  during a video deposition, I think it helps as we

22  get started.

23            Who is your current employer?

24     A.    I'm unemployed.

13

1  an age stipulation.  I had to retire because of my

2  age.

3      Q.   Is that an ICE policy?

4      A.   Correct.

5      Q.   At what age do you have to retire?

6      A.   The end of the month when I turn age 57.

7      Q.   And what was your position immediately

8  before you retired?

9      A.   I was also ICE liaison down at Bristol

10 County House of Correction.  I was a deportation

11 officer.

12     Q.   How long were you the ICE liaison at the

13 Bristol County House of Correction?

14     A.   Since October 2019.

15     Q.   At some point were you the ICE liaison at

16 the Suffolk County House of Correction?

17     A.   Correct, prior to that.  September.  And I

18 was ICE liaison at Suffolk from the end of January

19 2013 to that October of 2019.

20     Q.   And why did you stop serving as ICE

21 liaison at Suffolk County House of Correction in

22 October of 2019?

23     A.   Because they moved the ICE detainees out

24 of Suffolk County House of Correction and I did not

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

15

1      A.    In which way?

2      Q.    Well, in your -- how did you understand

3  ICE's mission as the ICE liaison, while you were

4  the ICE liaison from January 2013 to October of

5  2019?

6           MS. PIEMONTE:  I'll object.

7           Go ahead if you can.

8           THE WITNESS:  Say it again?

9           MS. PIEMONTE:  Go ahead and answer if you

10     can.

11          THE WITNESS:  Yes.

12     A.    My -- I'm not sure what ICE's mission was,

13  but I know what my duties were.

14     Q.    Okay.

15     A.    And my duties were to assist the ICE

16  detainees and plus -- plus any questions they had

17  and any issues.

18          MS. PIEMONTE:  Sorry, Libbie.  Just to

19     help with that question, if you want to revisit,

20     different components of ICE have varying

21     missions, and so that might be one of the

22     issues.

23          So if you want to drill that down, if

24     that's important to you, I just wanted to make

17

1      Q.    Who was the prior ICE liaison that you
2   learned your duties from?
3      A.    A Mr. Mark Leclerc.
4      Q.    How did Mr. Leclerc teach you your duties
5   as ICE liaison?
6      A.    At Suffolk he told -- he told me what he
7   did on a weekly basis.
8      Q.    Did you then perform the same tasks on a
9   weekly basis after you learned that?
10     A.    Correct.
11     Q.    While you were ICE liaison for Suffolk
12  County House of Correction, what did you do on a
13  weekly basis?
14     A.    Again, I said I -- I talked to the ICE
15  detainees about their issues or if they have any
16  questions.  Usually it's either done verbally or
17  it's written down.  I -- if they had questions
18  about deportation, voluntary departure or bond
19  issues, I explained it to them.  I served
20  immigration paperwork such as a POCR or continued
21  detention that is sent to me from the Burlington
22  office from the individual case officer.  I deal
23  with hunger strikes.  I monitor hunger strikes.  I
24  deal with meal -- if there's any meal issues.  I

18

1    give them consulate calls.  I've given them

2    attorney calls.  I make sure the phone system is

3    working.  I make sure the computer legal LexisNexis

4    is working.  Let's see.  If they're put in

5    segregation, I input their information into a seg

6    database.  And that's pretty much it.

7              I also deal with money issues and property

8    issues.

9        Q.   When you served immigration paperwork, do

10   you mean you served the immigration paperwork on

11   ICE detainees?

12       A.   Correct.

13       Q.   So I think you stated if they're put in

14   segregation, you input -- you would input their

15   information into a -- did you say "seg database"?

16       A.   A national segregation database, yes.

17       Q.   Okay.  What do you mean when you say put

18   in segregation?

19       A.   If they have a fight and they're put in --

20   they are put in a restricted housing unit because

21   of that issue, or if they act up or many other

22   reasons why they should not be in population.

23       Q.   Where was the restricted housing unit at

24   the Suffolk County House of Correction?

20

1   in there for security reasons.

2      Q.   Why would they put -- first of all, what

3   do you mean when you say "they"?

4      A.   Suffolk would.

5      Q.   Okay.  Did you have any input into the

6   decision for ICE detainees being housed in the

7   medical housing unit?

8      A.   No, I don't.

9      Q.   Were you informed of it when it happened

10  while you were ICE liaison at Suffolk County?

11     A.   Informed of what?

12     Q.   That an ICE detainee would be housed in

13  the medical housing unit.

14     A.   Through a roster.  Through a -- an ICE

15  roster, I was notified.

16     Q.   What is an ICE roster?

17     A.   It's a roster with all the detainees on it

18  and told which units they were in.

19     Q.   So if a particular ICE detainee was put in

20  medical housing, you weren't specifically notified

21  about that ICE detainee, but you found out through

22  the roster?

23     A.   That way, or I would go to the medical

24  unit and see if there was any ICE detainees there.

Emmanuel Thiersaint vs                                    William Chambers
Department of Homeland Security, et al                    December 14, 2020

21

1    Q.   Okay.  You said the restricted housing was

2 for ICE detainees that acted up or should not be in

3 general population.  Is that right?

4    A.   Segregation, yes.

5    Q.   And that's a medical --

6    A.   Can you repeat that one more time?

7    Q.   I asked why an ICE detainee would be put

8 in segregation housing, and you stated if they have

9 a fight, they would be put in restricted housing

10 unit or another issue or act up or a reason they

11 should not be in the general population.

12         Is that accurate?

13    A.   Correct.  Correct.

14    Q.   Okay.  Then you later said that Suffolk

15 County would sometimes put people in the medical

16 housing unit for security reasons?

17    A.   Yes.

18    Q.   Why would someone be housed in a medical

19 housing unit for security reasons?

20         MS. PIEMONTE:  Objection.

21    A.   That was not my decision.  I do not know

22 why.

23    Q.   Is that consistent with ICE's policies to

24 house an ICE detainee in a medical housing unit for

Emmanuel Thiersaint vs                                    William Chambers
Department of Homeland Security, et al                    December 14, 2020

22

 1  security reasons?

 2          MS. GARAND:  Objection.

 3      A.   It's not ICE's policy.  It was Suffolk's

 4  policy.  It wasn't ICE's policy.

 5      Q.   Let me clarify.  Was Suffolk's policy

 6  consistent with ICE's policy?

 7          MS. PIEMONTE:  Objection.

 8          MS. GARAND:  Objection.

 9      A.   Yes.  Yes, it was.

10      Q.   So ICE's policy allows ICE detainees to be

11  separated in the medical housing unit for security

12  reasons?

13          MS. PIEMONTE:  Objection.

14      A.   Yes, it -- yes, it was.

15      Q.   You mentioned a national segregation

16  database?

17      A.   Correct.

18      Q.   What is that database used for?

19          MS. PIEMONTE:  Objection.  Asked and

20      answered.

21          Go ahead.

22      A.   To notice people that are in the SRMS

23  after 14 days, 30 days, and 60 days that they're in

24  a segregation -- they're in segregation.

Emmanuel Thiersaint vs                                    William Chambers
Department of Homeland Security, et al                    December 14, 2020

29

```
 1            MS. GARAND:  Objection.
 2      A.    For a mental health issue that a person
 3  was there for -- a combination of being in there --
 4  they usually didn't -- I usually -- I don't really
 5  recall too often that ever happened.
 6      Q.    Okay.  So can you -- are you unable to
 7  recall any instance where that happened?
 8      A.    Yeah, I am.  Yes, I am.
 9      Q.    You mentioned in your duties as ICE
10  liaison you helped the detainees with certain
11  issues.  Is that right?
12      A.    Correct.
13      Q.    And I think you said sometimes you found
14  out about them verbally?
15      A.    Yes.
16      Q.    Okay.  How did you interact with ICE
17  detainees verbally while you were the ICE liaison
18  of the Suffolk County House of Correction?
19      A.    I would walk around in each unit and talk
20  to them.
21      Q.    About how often would you walk through the
22  units at Suffolk County House of Correction?
23      A.    I would be there five days a week walking
24  through the units, or answering their issues
```

30

 1  through a -- through an ICE request sheet.

 2      Q.   You were on-site at the Suffolk County

 3  House of Correction five days a week in 2016?

 4      A.   Correct.

 5      Q.   Did you walk the units every day?

 6      A.   Not every unit, but I was in there -- I

 7  was in there every day and I walked the unit.

 8      Q.   Did you have a schedule that you followed

 9  for which you unit you would visit on which day?

10      A.   Yes.

11      Q.   What day of the week -- oh, go ahead.

12      A.   Tuesdays and Thursdays I would be in the

13  medical and female units.  The rest of the time I

14  would be in the main building, main ICE building.

15      Q.   How did you receive the ICE slips that you

16  mentioned, the forms?

17      A.   I would go into each unit and they were in

18  a lockbox and I would get them out of the lockbox.

19      Q.   How often did you retrieve the slips from

20  the lockbox for each unit?

21      A.   Every time I was in the unit.

22      Q.   If an ICE detainee in the medical housing

23  unit put a slip in the lockbox on a Friday, you

24  would retrieve it the next Tuesday?

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

31

1       A.    Correct.

2       Q.    Did you have an office space at the

3   Suffolk County House of Correction?

4       A.    Yes, I did.  Yes, I did.

5       Q.    Where was that located?

6       A.    In Building 8 on the first floor.

7       Q.    When did you first start using that office

8   space at the Suffolk County House of Correction?

9       A.    From day one.

10      Q.    Were there any other ICE officers who used

11  that same space?

12      A.    No.  I had my own office.

13      Q.    Did any other ICE officers have office

14  space at the Suffolk County House of Correction in

15  2016?

16      A.    Yes.  Yes, they did.

17      Q.    How many --

18      A.    Maybe one other officer.

19      Q.    And was it one specific ICE officer or did

20  it rotate?

21      A.    It was one specific ICE officer.

22      Q.    Who was --

23      A.    They would also do Air Ops there, out of

24  Suffolk.  They didn't have an office.

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

37

```
 1   authority over sheriff's department employees in
 2   2016?
 3            MS. PIEMONTE:  Objection.
 4            Go ahead.
 5       A.   No.  No, they don't.
 6       Q.   Did your role require you to interact with
 7   anyone from the Suffolk County Sheriff's
 8   Department?
 9       A.   Yes.
10       Q.   Who did you interact with --
11       A.   Correctional officers.
12       Q.   -- from Suffolk County Sheriff's
13   Department?
14       A.   All the correctional officers and the
15   lieutenant in the facility in Building 8, the
16   medical unit, and the female unit.
17       Q.   Do you remember who the lieutenant was in
18   2016 for Building 8?
19       A.   Yes.  Lieutenant Kaiser, Brian Kaiser.
20       Q.   Did the medical unit have a separate
21   lieutenant in 2016?
22       A.   Yes, they did.
23       Q.   Do you remember who it was?
24       A.   I do not.  I do not recall.
```

Emmanuel Thiersaint vs                                     William Chambers
Department of Homeland Security, et al                   December 14, 2020

38

1      Q.   Did you interact with the Suffolk County
2  Sheriff's Department medical personnel at Building
3  6 at all?
4      A.   I interacted with the NaphCare health
5  people.
6      Q.   And what -- how would you interact with
7  the NaphCare personnel in 2016?
8      A.   I would -- I would talk to the NaphCare
9  nurse, the RN, and ask her if there was any issues.
10     Q.   How frequently would you ask if there were
11 issues?
12     A.   Every time I went into the unit, usually
13 twice a week.  Unless I knew there was a reason to
14 go there.
15     Q.   I'm going to ask you about some acronyms
16 to see if you know -- if you're familiar with them.
17          Are you familiar with the acronym PCC?
18     A.   No, I'm not.
19     Q.   Are you familiar with the acronym OIC?
20     A.   Yes.
21     Q.   What does OIC --
22     A.   Officer in charge.
23     Q.   Who was the OIC for Suffolk County House
24 of Correction in 2016?

46

 1  know if you've ever seen this document before.

 2      A.    I have not.

 3      Q.    This is the intergovernmental service

 4  agreement in place between the Suffolk County

 5  Sheriff's Department and the Department of Homeland

 6  Security.

 7          On page with the label SCSD000873, there

 8  is a paragraph B, which states "The service

 9  provider shall provide adult BICE detainees with

10  safekeeping, housing, subsistence, medical, and

11  other services in accordance with this agreement."

12          Is your understanding that the Suffolk

13  County Sheriff's Department was responsible for

14  housing the ICE detainees at the House of

15  Correction?

16      A.    Correct.

17      Q.    And that the Suffolk County Sheriff's

18  Department was responsible for the safekeeping of

19  ICE detainees housed at the House of Correction?

20      A.    Correct.

21      Q.    As the ICE liaison, did you have any

22  functions related to ensuring that the Suffolk

23  County Sheriff's Department was complying with

24  applicable laws and regulations in this housing and

47

1   safekeeping?

2       A.   I would just make sure that my supervisor

3   knew that there was a -- if there was an issue.

4       Q.   What type of issues would you inform your

5   supervisor about?

6       A.   Hunger strikes.  Food issues.  Medical

7   issues.  Assaults.  And the -- how the unit is

8   functioning in the four major units.

9       Q.   What are the four major units?

10      A.   It would be -- there were three units in

11  Building 8.  They were done by classification:

12  1, 2, and 3, and a female unit.

13      Q.   And is the female unit the fourth unit you

14  were referring to?

15      A.   Correct.

16      Q.   The supervisor that you were -- when you

17  say "I would make sure my supervisor knew," you're

18  referring to SDDO Beth Sansone?

19      A.   Yes.

20      Q.   What type of medical issues did you take

21  to SDDO Beth Sansone?

22      A.   If a person needed outside surgery.  I

23  can't recall off the top of my head any medical

24  issues that I referred to.

Emmanuel Thiersaint vs                                    William Chambers
Department of Homeland Security, et al                    December 14, 2020

48

1      Q.    Was it more common that you were

2    contacting SDDO Beth Sansone about assaults or

3    hunger strikes?

4              MS. PIEMONTE:  Objection.

5              Go ahead.

6      A.    Yes.

7      Q.    Is it your understanding that the Suffolk

8    County Sheriff's Department was responsible for

9    providing medical services to ICE detainees while

10   they were housed at the house of correction?

11     A.    Yes.

12     Q.    And as ICE liaison, did you personally

13   have any functions for ensuring that ICE detainees

14   received adequate medical services?

15             MS. PIEMONTE:  Objection.

16             Go ahead.

17     A.    I had no responsibility, but I would look

18   into the issues for the individual.

19     Q.    So you had no formal job responsibilities,

20   but you looked into medical issues for your

21   detainees?

22             MS. PIEMONTE:  Objection.

23     Q.    Is that what you're saying?

24     A.    Yes.

52

 1  concerned you, what options did you have to correct

 2  it?

 3      A.   I would either bring it to Suffolk

 4  management or I would bring it to -- and I would

 5  also refer it to ICE management of the issue.

 6      Q.   Did you have any authority to influence

 7  when an ICE detainee was housed in the medical

 8  housing unit at the Suffolk County House of

 9  Correction?

10      A.   No, I didn't.

11      Q.   Did you have any authority to influence

12  when an ICE detainee was placed in a segregation

13  unit at the Suffolk County House of Correction?

14          MS. PIEMONTE:   Objection.

15          Go ahead.

16      A.   No, I didn't.

17      Q.   During the time that you served as ICE

18  liaison at the Suffolk County House of Correction,

19  were there any times where you disagreed with where

20  an ICE detainee was held?

21      A.   Yes, I have disagreed.  And it was mainly

22  a classification issue.

23      Q.   Do you mean you disagreed with how ICE

24  classified a detainee?

54

1             (Chambers Exhibit 4 marked for

2             identification.)

3       Q.    Officer Chambers, I just introduced

4  another exhibit which is marked as Exhibit 4.  This

5  appears to be the job description for a deportation

6  officer, and I'm going to ask you to -- you should

7  be able to control the pages, if you have a mouse.

8             I am going to ask you to look at the

9  introduction and let me know when you've finished

10  looking through that.

11      A.    (Reviewing document.)

12            I'm finished.

13      Q.    Did this job description apply to you as

14  the ICE liaison?

15            MS. PIEMONTE:  Objection.

16            Go ahead.

17      A.    Yes, it does.

18      Q.    I have skipped ahead to page 3, which has

19  the label GOV000942 in the bottom right-hand

20  corner.  There is a section labeled "Custody," and

21  the third bullet states "Ensure the safe, secure,

22  and humane treatment of detainees while in ICE

23  custody in accordance with established standards."

24            Do you agree that that was one of your

55

1  responsibilities as the ICE liaison at the Suffolk

2  County House of Correction?

3       A.   Yes, I do.

4       Q.   What does "safe, secure, and humane

5  treatment" mean to you?

6       A.   It just means that each detainee should

7  not fear being in the facility and is treated

8  humanely.

9       Q.   Do you think humane treatment of detainees

10  includes access to recreation?

11       A.   Yes, I do.

12       Q.   While you were the ICE liaison at Suffolk

13  County House of Correction, approximately how many

14  ICE detainees did you encounter with an amputated

15  limb?

16       A.   Probably about three.

17       Q.   Which limbs were amputated in those three

18  examples that you can think of?

19       A.   An arm and a leg, and -- and Mr.

20  Thiersaint.

21       Q.   Was the individual with an amputated arm

22  housed in Building 8?

23       A.   I can't recall.

24       Q.   What about the --

62

1  Mr. Deslauriers would bring it up to you with the
2  facility.  What would you then do once that issue
3  was brought to your attention?
4      A.    Try to -- try to fix the issue.
5      Q.    And how did you accomplish fixing these
6  issues?
7           MS. PIEMONTE:  Objection.
8           Go ahead.
9      A.    It was on a case-by-case issue.  Files
10 might have the wrong paperwork, you know.  You
11 know, I would work with the Burlington ICE office
12 to fix those issues.  That would be an example.
13     Q.    Would you characterize your
14 responsibilities as the ICE liaison as
15 administrative in nature?
16          MS. PIEMONTE:  Objection.
17          Go ahead.
18     A.    Partially, but I was mainly -- I was
19 hands-on, too, because I was answering detainee
20 request forms daily.
21     Q.    If a detainee requested to have his
22 housing changed, what would you do?
23     A.    I would talk to the superintendent of -- I
24 mean talk to the lieutenant of the ICE building on

63

1    that.

2       Q.    But you had no ability to move the ICE

3    detainee's housing yourself?

4       A.    No, I -- no, I do not have that ability.

5       Q.    So you mentioned detention standards a few

6    times.  What are the ICE detention standards?

7             MS. PIEMONTE:  Objection.  Can we clarify

8       a time frame or --

9       A.    Detention standards of 2000.  That's

10   what -- a whole list of them in the book of -- NDS

11   2000, that's what Suffolk was.

12      Q.    So Suffolk County was under the 2000

13   National Detention Standards?

14      A.    Correct.

15      Q.    Do you know how many different detention

16   standards ICE has, total?

17      A.    Not on hand.

18      Q.    More than one?

19      A.    Yes.

20      Q.    How did you know that the 2000 National

21   Detention Standards were applicable to the Suffolk

22   County House of Correction?

23      A.    Through the inspections.

24      Q.    What about at Bristol County House of

73

1    Standard, Medical Care," and it has a date of

2    September 20, 2000, at the bottom.

3            Do you recognize this document?

4       A.   Where is it from again?

5       Q.   That's what I was going to ask you.

6            Are you able to tell where this document

7    is from?

8       A.   I believe -- it would probably be from the

9    2000 standards, NDS 2000.

10      Q.   I can inform you that I downloaded this

11   document from the ICE website, and it's on the

12   website labeled as the 2000 National Detention

13   Standards.

14           Does this look like what you've seen in

15   the 2000 National Detention Standards before?

16      A.   Yes.

17      Q.   At the bottom of page 1, there's a section

18   labeled "III.  Standards and Procedures," and in

19   the second paragraph, second sentence, it says "The

20   OIC with the cooperation of the clinical director

21   will negotiate and keep current arrangements," and

22   then it goes on.

23           At the Suffolk County House of Correction

24   in 2016, was the OIC -- I think you testified it

Emmanuel Thiersaint vs                                     William Chambers
Department of Homeland Security, et al                      December 14, 2020

99

1     A.    Yeah.  He had -- he wanted to know why he

2  was in medical, not in the main facility.

3     Q.    Did you answer that question for him?

4     A.    Not at that time.

5     Q.    Did you -- after you spoke with Mr.

6  Thiersaint and he asked you why he was in medical

7  and not the main facility, did you inquire as to

8  why he was housed in the medical housing unit?

9     A.    Yes.

10     Q.    Who did you ask?

11     A.    Lieutenant Kaiser.

12     Q.    Do you remember what date or around what

13  date you asked Lieutenant Kaiser?

14     A.    Probably afternoon on Tuesday -- let me

15  see -- the 23rd.

16     Q.    That same day that Mr. Thiersaint asked

17  you?

18     A.    Yes.

19     Q.    Did Lieutenant Kaiser give you an answer?

20     A.    I think it was safety reasons.

21     Q.    What do you mean by "safety reasons"?

22     A.    If he was sent to the main -- to the unit,

23  the main unit, he thought there would be a

24  possibility he wouldn't be able to defend himself.

100

 1    Q.    That Mr. Thiersaint would not be able to
 2   defend himself?
 3    A.    Correct.
 4    Q.    Against whom?
 5    A.    Other people in the -- the other people in
 6   the general population.
 7    Q.    So the concern as you understood it was
 8   that Mr. Thiersaint might be in danger of others in
 9   the general population?
10    A.    That's what he told me.
11    Q.    He did not tell you that Mr. Thiersaint
12   would pose a danger to others in the general
13   population?
14    A.    He didn't say -- he didn't say that.
15    Q.    Okay.  So your understanding was that it
16   was to protect Mr. Thiersaint?
17    A.    Correct.
18    Q.    Was there anyone particularly dangerous in
19   the general population at that time?
20         MS. PIEMONTE:  Objection.
21    A.    I wouldn't know that.
22    Q.    Did you share Lieutenant Kaiser's concern
23   that Mr. Thiersaint would be at risk in the general
24   population at that time?

Emmanuel Thiersaint vs
Department of Homeland Security, et al

William Chambers
December 14, 2020

101

1    A.    With who?

2    Q.    Did you agree with Lieutenant Kaiser that

3  Mr. Thiersaint would not be safe if he was housed

4  in the general population at that time?

5          MS. PIEMONTE:  Objection.

6    A.    That wasn't my decision.

7    Q.    Did you have any opinion on it?

8    A.    No, I didn't have any opinion on it.

9    Q.    Did you inform Lieutenant Kaiser that Mr.

10  Thiersaint did not want to be housed in the medical

11  housing unit?

12    A.    Yes, I said that.

13    Q.    Is the medical housing unit the only place

14  where the Suffolk County Sheriff's Department

15  housed people for safety reasons?

16          MS. PIEMONTE:  Objection.

17    A.    Could be restrictive housing, but I'm not

18  sure at that time.

19    Q.    Do you understand that Lieutenant Kaiser

20  has been deposed as part of this lawsuit?

21    A.    Yes.

22          (Chambers Exhibit 10 marked for

23          identification.)

24    Q.    I have introduced a document and marked it

102

1  as Exhibit 10.  This is an excerpt from the

2  transcript of Lieutenant Kaiser's deposition which

3  occurred on November 12, 2020.

4          During his deposition, Lieutenant Kaiser

5  was asked, "Just to be clear, would the Suffolk

6  County Sheriff's Department have had any role

7  whatsoever in a decision to house Mr. Thiersaint in

8  the medical housing unit?"

9          And he answered, "Not to my knowledge,

10 no."

11         Then he was asked, "Do you know why Mr.

12 Thiersaint was housed in the medical housing unit?"

13         And he answered, "I do not."

14         Is that testimony inconsistent with the

15 conversation that you just recalled?

16     A.   Yes.

17     Q.   Okay.  Does that change your answer at all

18 about what you discussed with Lieutenant Kaiser?

19         MS. PIEMONTE:  Objection.

20     A.   It does not.  Unless -- unless he had

21 spoken to an ICE supervisor.

22     Q.   What do you mean by that?

23     A.   I don't -- scratch that.

24     Q.   Okay.  So what did you mean when you said

Emmanuel Thiersaint vs                                    William Chambers
Department of Homeland Security, et al                    December 14, 2020

140

1  deficient medical, dental, and mental health care."

2          Do you agree with the Committee on

3  Homeland Security's conclusion here?

4          MS. GARAND:  Objection.

5          MS. PIEMONTE:  Objection.

6     A.   I do not.

7     Q.   Do you think that Mr. Thiersaint received

8  adequate medical care when he was housed at the

9  Suffolk County House of Correction?

10         MS. GARAND:  Objection.

11         MS. PIEMONTE:  Objection.

12    A.   Yes.

13    Q.   And what is your opinion based on?

14    A.   That he had -- he didn't bring up any

15 issues to me of -- any medical issues.

16    Q.   So is it fair to say that you trusted

17 NaphCare to provide adequate medical care to the

18 ICE detainees that were housed at the Suffolk

19 County House of Correction?

20         MS. PIEMONTE:  Objection.

21    A.   I did.

22    Q.   Going down one more to the deficiency

23 labeled No. 3, the report states "Detention

24 facilities often misuse and abuse segregation."

142

```
 1           MS. PIEMONTE:  Objection.
 2      A.   Correct.
 3           (Chambers Exhibit 18 marked for
 4           identification.)
 5      Q.   Mr. Chambers, I have uploaded a document
 6  that is Exhibit 18 to the deposition.  This is a
 7  copy of the plaintiff's complaint in this lawsuit.
 8           Have you seen this before?
 9      A.   I have.
10      Q.   Looking at page 12 of the complaint,
11  paragraph 57, Mr. Thiersaint alleges that "Despite
12  being in the medical wing of the Suffolk County
13  House of Correction, Mr. Thiersaint was denied
14  access to necessary medication and medical care
15  that he had been receiving at Osborn and Franklin
16  County House of Correction."
17           Do you know of any facts that would
18  contradict that allegation?
19           MS. PIEMONTE:  Objection.
20      A.   I wasn't aware that he was denied any --
21  access to any medication.
22      Q.   Did you know anything about the medication
23  that he received while he was in the Suffolk County
24  House of Correction medical housing unit?
```

143

1     A.    No, I did not.

2     Q.    In the next paragraph, Mr. Thiersaint

3   alleges "Defendant William Chambers was empowered

4   to ask the Suffolk County House of Correction staff

5   to provide Mr. Thiersaint with his medication."

6           Did you have the ability to ask the

7   Suffolk County House of Correction to provide Mr.

8   Thiersaint with medication as the ICE liaison?

9           MS. PIEMONTE:  Objection.

10           Go ahead.

11     A.    I'm not a medical doctor, so I couldn't

12   make that decision.

13     Q.    Do you have the authority to speak with

14   the Suffolk County Sheriff's Department employees

15   about whether Mr. Thiersaint was receiving the

16   medication he required?

17     A.    I could always talk to NaphCare about

18   medication.

19     Q.    On page 13 of the complaint, Mr.

20   Thiersaint alleges "Rather than address Mr.

21   Thiersaint's requests for accommodations, the ICE

22   case manager, Defendant Chambers, refused to let

23   Mr. Thiersaint transfer to the general population

24   unless he agreed to use crutches instead of a

144

 1  wheelchair."

 2          Do you deny that?

 3      A.   I do.

 4      Q.   So if Mr. Thiersaint takes the stand at

 5  trial and testifies that that occurred, is it your

 6  position that he would be lying?

 7          MS. PIEMONTE:  Objection.

 8          Go ahead.

 9      A.   I didn't have the power to do that.

10      Q.   And when you say "the power to do that,"

11  what is it that you did not have the power to do?

12      A.   I couldn't -- I couldn't have him -- I

13  couldn't have him go to general population because

14  I said that.

15      Q.   So you didn't have the power to transfer

16  him to the general population --

17      A.   Right.  I --

18      Q.   -- even if he did use crutches?

19      A.   No, I didn't have that.  It was Suffolk

20  who was able to make that decision.

21      Q.   Who at Suffolk County would have had the

22  power to transfer Mr. Thiersaint back to the

23  general population out of the medical housing unit?

24          MS. PIEMONTE:  Objection.

148

1        To your knowledge, did Mr. Thiersaint file

2   a grievance regarding his medical housing while he

3   was at the Suffolk County Sheriff's Department?

4        A.   Not to my knowledge.  I don't believe he

5   did.

6        Q.   And to your knowledge, did he ever file a

7   grievance regarding any failure to accommodate his

8   disability?

9        A.   He did not.

10        Q.   And Mr. Chambers, other than Mr.

11   Thiersaint's questions to you about why he was in

12   medical housing and his prosthetic leg, did he

13   express any other questions or concerns to you

14   during his commitment to the Suffolk County

15   Sheriff's Department?

16        A.   No, he didn't.

17        Q.   Did he ever ask you for help accessing the

18   library services?

19        A.   He did not.

20        Q.   Did he ever ask you for help accessing

21   inmate legal services?

22        A.   He did not.

23        Q.   Did he ever express a concern to you about

24   his medications?

149

1      A.    He did not.

2            MS. GARAND:  That's all that I have.

3            MS. PIEMONTE:  I'm not going to question

4      my witness.  So are we all set?

5            MS. DiMARCO:  I'm going to ask just a few

6      follow-up questions about the grievances that

7      Melissa mentioned.

8                        EXAMINATION

9  BY MS. DiMARCO:

10     Q.    Mr. Chambers, can you tell me about the

11 grievance process at the Suffolk County House of

12 Correction?

13     A.    Yes.  There were -- there is a grievance

14 form at the correction office front desk.  You fill

15 out the grievance form, you put it in the grievance

16 box, and then within 24 hours they usually would

17 give a response.

18     Q.    When you say "they," who received the

19 grievances?

20     A.    The grievance board.

21     Q.    And is that ICE employees or Suffolk

22 County Sheriff's Department employees?

23     A.    Suffolk County.

24     Q.    How would you know whether he filed a