# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **EMMANUEL THIERSAINT,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | |
| **DEPARTMENT OF HOMELAND SECURITY et al.,** | ) ) ) | **Case No. 18-cv-12406-DJC** |
| **Defendants.** | ) ) ) ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                              **January 25, 2022**

## I.     Introduction

Plaintiff Emmanuel Thiersaint ("Thiersaint") has filed this lawsuit against the United States, the Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE") (collectively, the "United States"), the Suffolk County Sheriff's Department ("SCSD"), and William Chambers ("Chambers") (collectively, "Defendants") alleging violations of the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 1346, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (the "Rehabilitation Act"), the Americans with Disabilities Act, 42 U.S.C. § 12189 (the "ADA") and constitutional violations. D. 1.[1] Thiersaint has moved for partial summary judgment against the United States, D. 144, and for summary judgment against SCSD, D. 149.

---

[1] Thiersaint dismissed his claims against the John Doe Defendants in his amended complaint, D. 199-1, pursuant to his voluntary dismissal, D. 141.

Defendants have also moved for summary judgment.  D. 153, D. 160, D. 164.  For the reasons stated below, the Court DENIES Thiersaint's partial motion for summary judgment against the United States, D. 144, DENIES Thiersaint's motion for summary judgment against SCSD, D. 149, ALLOWS SCSD's motion for summary judgment, D. 153, ALLOWS the United States' motion for summary judgment, D. 160, and ALLOWS Chambers' motion for summary judgment, D. 164.

## II.    Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

"Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Grp., Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  "When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56."  Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98

(D. Mass. 1991).

III.   **Factual Background**

Unless otherwise noted, the following facts are undisputed.  These facts are drawn from the various statements of undisputed material facts, D. 146, 151, D. 162, D. 174, each party's response to the same, D. 187, D. 192, D. 194, D. 197, D. 209, and the documents attached thereto.

Thiersaint is a lawful permanent resident of the United States who immigrated from Haiti in 1994.  D. 146 ¶ 1; D. 187 ¶ 1.  Following a serious car accident in 1997, Thiersaint's right leg was amputated above the knee, D. 146 ¶ 13; D. 187 ¶ 13.  Between February and April 2016, Thiersaint used a wheelchair.  D. 146 ¶ 15; D. 187 ¶ 15.  Thiersaint has also experienced significant symptoms of depression, including suicidal thoughts, since the early 2000s and first sought psychiatric care in 2003 following a suicide attempt.  D. 146 ¶ 20; D. 187 ¶ 20.

On February 5, 2016, DHS and ICE detained Thiersaint to remove him from the United States.  D. 146 ¶ 3; D. 187 ¶ 3.  ICE initially detained Thiersaint at Franklin County House of Correction ("FCHC") in Greenfield, Massachusetts from February 5 to February 18, 2016.  D. 146 ¶ 5; D. 187 ¶ 5.

A.   <u>**Detention at SCHC and LaSalle**</u>

On February 18, 2016, Thiersaint arrived at Suffolk County House of Correction ("SCHC"), run by the SCSD, and was housed there in the Medical Housing Unit ("MHU") until February 29, 2016.  D. 151 ¶ 29; D. 197 ¶ 29.  Naphcare, Inc. ("Naphcare"), the contracted medical provider for the SCHC, determined during Thiersaint's initial screening that he would be housed in the MHU, D. 151 ¶ 37; D. 197 ¶ 37, given his "recent fall in November of 2015, his above the knee amputation, his recent mobility issues regarding his broken prosthesis, and wheelchair use," he should be admitted to the MHU.  D. 197 ¶ 37 (citing D. 156-27 ¶¶ 9, 17).  Thiersaint was kept

in the MHU partly due to concerns about whether he was able to "transfer" himself from his wheelchair to the shower, toilet or other facilities.  D. 151 ¶ 45; D. 197 ¶ 45.  While housed in the MHU, Thiersaint was permitted no more than one hour per day to engage in recreational activities.  D. 151 ¶ 40; D. 197 ¶ 40.  Chambers was an ICE deportation officer who served as the ICE liaison between ICE detainees and staff at SCHC.  D. 166 ¶¶ 1-2; D. 186 ¶¶ 1-2.

Although Thiersaint claims he requested placement with the general population, D. 151 ¶ 43, he did not file any sick slips, submit a grievance or a written request for accommodation during this period.  D. 174 ¶ 52; D. 194 ¶ 52. On February 24 or February 27, 2016, Thiersaint was cleared to return to general population in Building 8 but remained housed in the MHU at the SCHC until his departure for another facility a few days later on February 29, 2016.  D. 151 ¶¶ 47-48; D. 197 ¶¶ 47-48.

On February 29, 2016, Thiersaint was transported from SCHC to Newark International Airport, D. 162 ¶ 33; D. 192 ¶ 33, which entailed ground transportation from Connecticut to Newark, New Jersey, D. 162 ¶ 35; D. 192 ¶ 35.  Once in Newark, Thiersaint was flown to Alexandria, Louisiana and detained at LaSalle ICE Processing Center ("LaSalle") from February 29, 2016 to March 3, 2016.  D. 151 ¶ 7; D. 197 ¶ 7; D. 196-5 at 10.  Thiersaint claims he was not assisted during his ground transport from Connecticut to New Jersey, D. 1 ¶¶ 68-72, or when he disembarked from the aircraft in Louisiana, id. ¶ 79.

## B.      Transport to Krome North Service Processing Center

On March 3, 2016, Thiersaint was transported from LaSalle via the Alexandria International Airport in Louisiana and the Miami International Airport in Florida.  D. 146 ¶ 23; D. 187 ¶ 23.  When Thiersaint boarded the plane at Alexandria International Airport, ICE officers used a specialized chair to help Thiersaint board.  D. 146 ¶ 33; D. 187 ¶ 33.  Thiersaint and the

United States dispute whether Thiersaint was assisted in deplaning the aircraft upon arrival from Miami and whether Thiersaint had to drag himself down the stairway step by step.  D. 146 ¶¶ 33-37, 41; D. 187 ¶¶ 33-37, 41.  Thiersaint and the United States also dispute whether Thiersaint was placed into a wheelchair after descending the stairs to reach a van that would transport Thiersaint to Krome.  D. 146 ¶ 49; D. 187 ¶ 49.  The van ICE used to transport him from airport in Miami to Krome was a non-wheelchair accessible van.  D. 146 ¶ 50; D. 187 ¶ 50.  Thiersaint claims he was forced to board the van by placing pressure on his left leg, turning around, sitting on the ground and crawling into the van.  D. 146 ¶ 70.  The United States claims that once at the bottom of the stairs, Thiersaint was placed into a wheelchair and Miami HUB officers assisted him to a van.  D. 187 ¶ 70.

At the time, the United States contracted with CSI Aviation, Inc. ("CSI") to provide air charter flight services for ICE Air Operations ("IAO") flights originating out of Miami and Alexandria.  D. 187 ¶ 23.  According to the ICE Air Operations Handbook, "[f]or safety reasons, detainees who are unable to board the aircraft on their own will not be boarded on the aircraft without authorization in advance from the ICE FOIC and/or the IAO [ICE Air Operations] SDDO."  D. 146 ¶ 30; D. 187 ¶ 30.  The Handbook also states that ""[t]ransport chairs are available for detainees with decreased mobility or paralysis. Under these circumstances, detainees will need to be transported with wheelchairs, crutches, and/or any other available medical assistance equipment to final destinations.  Officers will not carry detainees aboard the aircraft."  Id. ¶ 31.

C.   **Detention at Krome North Service Processing Center**

On Thiersant's March 3, 2016 arrival at Krome, a detention facility in Miami owned and operated by ICE, an ICE Health Service Corps ("IHSC") employee conducted a screening of Thiersaint and completed his medical intake form.  Thiersaint was then placed in Krome's MHU,

D. 146 ¶¶ 75, 79; D. 187 ¶¶ 75, 79, where he spent the entirety of his detention there from March 3 to March 17, 2016, D. 146 ¶ 80; D. 187 ¶ 80.  The parties dispute whether Thiersaint was required to be in his MHU cell for twenty or more hours per day, D. 146 ¶ 81; D. 187 ¶ 81, although they do not dispute that Thiersaint was permitted to have recreation with other individuals in the MHU, D. 146 ¶ 82; D. 187 ¶ 82.

While detained at Krome's MHU, Thiersaint was placed on fall precautions, with his bed set to the lowest position with both side rails up, and he was advised to notify staff if he needed assistance ambulating or if he had any medical concerns.  D. 162 ¶ 111; D. 192 ¶ 111.  He had access to the law library, which he used on several occasions, although Thiersaint disputes whether his access was to the same extent of those in the general population.  D. 162 ¶ 113; D. 192 ¶ 113. On March 15, 2016, Thiersaint requested placement in the general population.  D. 146 ¶ 98; D. 187 ¶ 98.  An IHSC staff doctor denied this request.  D. 146 ¶ 99; D. 187 ¶ 99.

### D.     Transportation from Krome to Miami Airport

On March 14, 2016, the Board of Immigration Appeals ("BIA") granted an emergency stay of Thiersaint's deportation.  D. 146 ¶ 7; D. 187 ¶ 7.  ICE then returned Thiersaint to Boston.  D. 146 ¶ 106; D. 187 ¶ 106.  On March 16, 2016, IHSC staff cleared Thiersaint for travel and stated there was no "special equipment required for travel."  D. 146 ¶ 107; D. 187 ¶ 107.  On March 17, 2016, Thiersaint was transported from Krome to Miami International Airport in a non-wheelchair-accessible vehicle.  D. 146 ¶¶ 110-11; D. 187 ¶¶ 110-11.  Thiersaint claims he asked ICE officers for help boarding the vehicle and that they declined.  D. 146 ¶ 112.  He also claims that he was forced to board the van by sitting down and scooting himself up the steps, dragging himself down the aisle to his seat, id. ¶ 113, and had to exit the vehicle in the same manner that he boarded the vehicle, id. ¶ 114.  Thiersaint also claims he asked for assistance on the staircase of the plane and

was denied a specialized chair to board the aircraft, id. ¶¶ 116-17, forcing him to again drag himself up the stairs and down the aisle of the plane, id. ¶ 119.

On March 22, 2016, Thiersaint returned to SCHC and, this time, was placed not in the MHU, but in general population housing (Building 8).  D. 151 ¶¶ 54-55; D. 197 ¶¶ 54-55.  On April 1, 2016, ICE released Thiersaint under supervision, D. 146 ¶ 8; D. 187 ¶ 8, after which Thiersaint was tentatively granted an absolute pardon by the Connecticut Board of Pardons and Paroles for his underlying criminal convictions, D. 146 ¶ 9; D. 187 ¶ 9.  In October 2016, following his release from ICE custody, Thiersaint was diagnosed with post-traumatic stress disorder ("PTSD").  D. 146 ¶ 22; D. 187 ¶ 22.

## IV.    Procedural History

Thiersaint instituted this action on November 16, 2018.  D. 1.  Thiersaint has moved for partial summary judgment against the United States, D. 144, and summary judgment against SCSD, D. 149.  SCSD has cross moved for summary judgment, D. 153, and the United States and Chambers moved for summary judgment, respectively, D. 160, 164.  Thiersaint has moved to amend.  D. 199.  The Court heard the parties on the pending motions and took these matters under advisement.  D. 215.

## V.    Discussion

### A.    <u>Federal Tort Claims Act</u>

Thiersaint seeks summary judgment on Count XXII of his FTCA claims against the United States, alleging ICE officials failed to provide him with adequate methods of transportation, both

air and ground, and adequate facilities in Florida.  D. 144 at 1.  The United States seeks summary

judgment against Thiersaint for all FTCA claims (Counts V to XXII).[2]  D. 160 at 2.

       *1.*      *Air Transportation Claim in Florida*

      As to this claim, the United States argues that given its contracts with CSI to provide air

charter flight services, as well as the CSI guard crew's responsibility for loading and unloading

detainees, it cannot be liable.  D. 161 at 28.  The FTCA, 28 U.S.C. § 2671, provides a waiver of

sovereign immunity, but only for suits against the United States for "personal injury or death

caused by the negligent or wrongful act or omission of any employee of the Government while

acting within the scope of his office or employment."  28 U.S.C. § 1346(b).  The definition of a

government employee for the purposes of the FTCA "does not include any contractor with the

United States."  28 U.S.C. § 2671.  Accordingly, the United States cannot be held liable for the

negligence of its independent contractors "whose daily operations are not closely supervised by

United States officials."  Carroll v. United States, 66 F.3d 87, 92 (1st Cir. 2011).  Accordingly, the

"key factor governing whether an entity providing services to the United States is an independent

contractor is whether the contractor, rather than the government, exercises day-to-day supervision

and control of its own activities."  Carroll, 661 F.3d at 95-96 (citing United States v. Orleans, 425

U.S. 807, 814 (1976)).  Although it is "possible for the government to hire independent contractors

---

[2] Thiersaint moved to amend to name the United States as a defendant for Count XIX, D. 199, which in the original complaint, states a claim against DHS and ICE, D.1.  The United States argues in its summary judgment motion, that the FTCA claim erroneously names DHS and ICE, rather than the United States, D. 161, which prompted this correction by Thiersaint, D. 201 at 3. Accordingly, the modification does not prejudice the United States, as the United States was on notice of the claim and itself acknowledges that Thiersaint "brings negligence claims against the United States pursuant to the [FTCA]," in its Statement of Undisputed Facts.  D. 162 ¶ 6.  The Court does not conclude that this amendment is futile, Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996), and, accordingly, allows the amendment and considers Count XIX as a claim against the United States, rather than its components—DHS and ICE.

while retaining responsibility for a discrete aspect of their operations, id. at 97, the United States contends that this was not the case here as to transportation in Florida.

Here, the United States had a contract with CSI that required CSI to provide aircraft, flight crew, security crew, a flight nurse and aircraft-to-medical doctor communications capabilities.  D. 162-22 at 2.   Thiersaint points to this contract which, among other things, states that "ICE Officer(s) will be responsible for the custody of the alien national passengers," D. 192 ¶ 57 (citing D. 162 at 29), as well as ICE's Air Operations Handbook which provides that "[f]or safety reasons, detainees who are unable to board the aircraft on their own will not be boarded on the aircraft without authorization in advance from the ICE [Flight Officer in Charge] and/or the IAO [Supervisory Detention and Deportation Officer]," D. 147-18 at 9.  These duties were contracted to CSI, and these general ICE guidelines are inadequate to demonstrate the close supervision contemplated by the FTCA's contractor exception.  Brooks v. A.R. & S. Enters., Inc., 622 F.2d 8, 12 (1st Cir. 1980) (recognizing that "[t]he right to inspect does not nullify the general rule that the government is not liable for torts of independent contractors"); see Larsen v. Empresas El Yunque, Inc., 812 F.2d 14, 16 (1st Cir. 1986) (concluding independent contractor exception applied where the responsible party ran the day-to-day operations, despite the United States owning and controlling the premises on which the challenged conduct occurred).  During the period relevant to Thiersaint's transport, the United States had contracts with CSI to provide air charter flight services for IAO flights originating from Miami, Florida and Alexandria, Louisiana.  D. 162-22; D. 162-23.   ICE and CSI's contract states that CSI's "[g]uard crew duties may normally include . . . loading and unloading alien nationals (including those handicapped and/or requiring special assistance) . . ."  D. 162-22 at 29.

9

This undisputed record reflects the scenario that the independent contractor exception to the waiver of sovereign immunity under the FTCA contemplates:  "the government may not be held responsible for negligent acts or omissions committed by employees of government contractors whose daily operations are not closely supervised by United States officials—in essence, eliminating vicarious liability as a theory of recovery against the federal government." Carroll v. U.S., 661 F.3d 87, 92 (1st Cir. 2011).  Accordingly, the independent contractor exception applies and the Court lacks jurisdiction for Thiersaint's FTCA claims to the extent they pertain to Thiersaint's air transportation claims in Florida.

### 2.    *Ground Transportation Claims in Florida*

#### a)    Discretionary Function Exception

Thiersaint also alleges that DHS and ICE officials owed Thiersaint a duty of care and breached this duty by failing to provide Thiersaint with adequate methods of ground transportation, forcing Thiersaint to board vans without assistance in Florida.  D. 1 ¶¶ 264-68.  The United States counters that even if Thiersaint could make such showing, the discretionary function exception to the FTCA's waiver of sovereign immunity bars this claim.  D. 185 at 2-3; D. 210 at 3-4.  Another exception to the broad waiver of sovereign immunity under the FTCA is the discretionary function exception, 28 U.S.C. § 2680, which exempts "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a); Irving v. United States, 909 F.2d 598, 600 (1st Cir. 1990).

To determine whether a claim is barred by the discretionary function exception to a waiver of sovereign immunity, the Court must consider (1) whether the conduct "involv[es] an element of judgment or choice," and (2) "whether that judgment is of the kind that the discretionary function exception was designed to protect." United States v. Gaubert, 499 U.S. 315, 322 (1991) (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1986)). "'[I]f the act simply does not involve the exercise of [policy] judgment,' or if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' § 2680(a) does not apply." Irving, 909 F.2d at 600 (quoting Berkovitz, 486 U.S. at 546-47). "Even when the challenged action is the product of an employee's permissible use of judgment, a suit is barred only if that judgment 'is of the kind that the discretionary function exception was designed to shield.'" Id. (quoting Berkovitz, 486 U.S. at 536-37).

The United States argues that the Florida ground transportation claims fall within the discretionary function exception. D. 185 at 5-8. They specifically contend that the ICE agents had the latitude to make decisions, having no specific mandatory directive, such as a federal statute, regulation or policy to follow. Id. at 5-6 (citing Berkovitz, 486 U.S. at 544). Thiersaint argues that the Rehabilitation Act undermines this argument as to the ICE officers' judgment or choice, alleging that agents violated the Act's mandate by discriminating against Thiersaint on account of his disability, D. 204 at 8-9, and further that both the Performance Based National Detention Standards ("PBNDS") and Krome Transportation Policy include additional requirements ICE officers must follow, D. 204 at 9-10. The PBNDS 2011 § 1.3, Transportation (by Land) governs transportation of detainees in vehicles. D. 162-2 at 6. It states that "detainees . . . shall be protected from harm when detainees are transported . . . and that detainees will 'be transported in a safe and humane manner.'" Id. The United States asserts that "[d]uring the time of Plaintiff's detention,

the PBNDS 2011 detention standards applied to Krome, as did general post orders regarding, *inter alia*, the care and transportation of detainees with disabilities." D. 162 ¶ 81. These standards also state, in Section 1.3 V(J)(3)(h), that "[t]o confirm the identities of the detainees they are transporting, the vehicle crew shall . . . assist detainees with disabilities and special needs to their designated seat." D. 162-2 at 13. The PBNDS furthers that "reasonable accommodations shall be made for detainees with physical disabilities and/or special needs in accordance with security and safety needs and all applicable laws and regulations." Id. at 6.

"In considering the applicability of the discretionary function exception, a court must cut through the plaintiff's characterization of the Government's conduct[ ] and identify the nature and quality of the harm producing conduct." Garcia-Feliciano v. United States, 101 F. Supp. 3d 142, 145 (D.P.R. 2015) (internal quotation marks omitted) (quoting Rios Colon v. United States, 928 F. Supp. 2d 376, 383 (D.P.R. 2012)). In Miami, the conduct that allegedly harmed Thiersaint was when officers allegedly "forced Thiersaint to board vans . . . without assistance." D. 1 ¶ 267. Thiersaint's cited regulations and policies are too broad to mandate conduct outside of discretionary function. See, e.g., Adetiloye v. Cass Cty. Warden, No. 3:14-cv-05, 2015 WL 4208708, at *4 (D.N.D. July 10, 2015), aff'd, No. 15-2682 (8th Cir. Nov. 3, 2015) (concluding federal statute and regulation requiring marshals to "provide for the safekeeping of any person arrested, or held under authority of any enactment of Congress pending commitment to an institution" and "direct and supervise all activities of the U.S. Marshals Service including: . . . [r]eceipt, processing and transportation of prisoners held in the custody of a marshal or transported by the U.S. Marshals Service under cooperative or intergovernmental agreements" granted marshals' significant discretion when transporting prisoners and thereby satisfied the discretionary exception test); Garcia-Feliciano v. United States, 101 F. Supp. 3d 142, 147 (D.P.R.

2015) (concluding officials had discretion in determining how to "comply with broad safety mandates," such as the "broad and general mandate to protect human life"); Chaney v. United States, 658 F. App'x 984, 990-91 (11th Cir. 2016) (concluding discretionary function exception inapplicable where plaintiff failed to identify a federal statute, regulation or policy that required officer to provide physical assistance to inmates entering or exiting a transportation vehicle"); Hooker v. United States, No. 17-cv-345-JNL, 2019 WL 4784593, at *5 (D. Me. Sept. 30, 2019) (concluding that neither the complaint or objection identified any federal statute, regulation or policy that dictated the kind of vehicle deputies must use to transport an impaired prisoner).  Given same, the Court concludes that the officers' alleged actions were discretionary for the exception's purposes.  Accordingly, the discretionary function exception to waiver of sovereign immunity applies to Thiersaint's ground transportation claims relating to ICE's conduct in Miami and these FTCA claims, also Counts XX and XXII, relating to ground transportation in Florida are barred by sovereign immunity.

### 3.   Detention Claim in Florida

Thiersaint alleges negligence in Count XXII that ICE officials breached their duty of care by failing to provide Thiersaint with adequate facilities.  D. 1 ¶ 266.  The United States does not dispute the existence of a duty, but disputes whether ICE officers breached said duty by placing him in the MHU at Krome.  D. 185 at 13.  Thiersaint contends that his negligence claim is not about his medical care, but about the emotional injury he suffered from being placed in medical segregation, allegedly based on his disability.  D. 204 at 19.

"[F]or injuries to be a foreseeable consequence of a negligent act, it is not necessary that the initial tortfeasor be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur," but "rather, all that is necessary in order for liability to arise

is that the tortfeasor be able to foresee that some injury will likely result in some manner as a consequence of his negligent acts." Crislip v. Holland, 401 So. 2d 1115, 1117 (Fla. Dist. Ct. App. 1981). "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." Kaisner v. Kolb, 543 So. 2d 732, 735 (Fla. 1989).

Here, Thiersaint purports that due to the ICE officers' alleged breach, he was forced to stay in his cell more than twenty hours per day, could not participation in recreation with the general population and could only use the law library on request in the early morning. D. 145 at 23. These claims fail to demonstrate, however, that there was a breach of duty. Thiersaint has not offered any evidence to refute the United States' evidence that Krome complied with PBNDS 2011, id.; see D. 162-25 at 2-43, and that Thiersaint was cleared to go to the cafeteria and law library with detainees outside of the MHU, see D. 187 ¶ 82; D. 187-3 at 2-3, 6-7, 9-10, 14; D. 187-9 at 11-12, or that his placement in the MHU for evaluation of his medical conditions, D. 185 at 14 (and record cited) violated such duty. For at least this reason, the Court denies Thiersaint's motion for summary judgment as to this claim and allows the United States' motion for summary judgment.

4.    *Ground Transportation in Connecticut (Counts V, VI and VIII)*

Thiersaint alleges that ICE officers transported him between Connecticut and Massachusetts several times in February 2016, requiring him to crawl into a van without assistance and failing to assist him at any time during his transportation. D. 1 ¶¶ 171-191. He asserts claims against the United States for intentional infliction of emotional distress (Count V), negligent infliction of emotional distress (Count VI) and negligence (Count VIII) in Connecticut.

a)     Independent Contractor's Exception

The United States counters each of Thiersaint's claims regarding ground transportation in Connecticut by pointing to its contractual relationship with the Franklin County Sheriff's Office ("FSCO").  Pursuant to that contract, the FSCO was hired to handle the care of federal detainees. D. 162-6 at 4.  It requires the FSCO "accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees in accordance with state and local laws, standards and procedures, or court orders applicable to the operations of the facility, consistent with federal law, policies and regulations."  Id.  The contract also requires that "local jail employees will continue to act on behalf of the Local Government in providing transportation to federal prisoners," id., at 7-9, and agreed that the FCSO would be liable for the actions of its employees while transporting detainees on the Government's behalf, id. at 8-9.

As discussed above, the FTCA's "waiver of sovereign immunity does not extend to independent contractors."  Giannaccio v. United States, 207 F. Supp. 3d 184, 191 (D. Conn. 2016). Here, it is undisputed that on February 18, 2016, March 21, 2016 and April 1, 2016, Thiersaint was transported by FCSO officers.  D. 162 ¶¶ 32, 46, 49; D. 192 ¶¶ 32, 46, 49; see D. 162-6 at 4 (agreement with FCSO), id. at 23-37 (confirming funding for transportation services performed by FSCO).  Nor is there evidence in the record that the United States controlled the FCSO's detailed physical performance or closely supervised FCSO's daily operations.  Accordingly, the Court allows the Government's motion for summary judgment as to Thiersaint's FTCA claims in Connecticut pertaining to his transportation on February 18, 2016, March 21, 2016 and April 1, 2016 as they are barred by the independent contractor exception to the FTCA waiver of sovereign immunity.

b)      Discretionary Function Exception

Turning to Thiersaint's claim pertaining to transport on February 29, 2016, ICE officers were assigned to transport Thiersaint from Connecticut to New Jersey on this date.  D. 162-16 at 4 (listing ICE officers who transported Thiersaint on February 29, 2016); D. 162-14 at 9, 95; D. 162-13 at 137.  Thiersaint alleges he was forced to crawl into and out of vehicles without assistance and that the ICE officers subjected him to improper treatment, D. 1 ¶¶ 188-89, recounting that ICE employees instructed him to get into the van by himself, under threat of segregation from the general population, D. 147-14 at 41 and  that he had to "scoot [him]self up" in order to get to the back of the van.  Id. at 40.  The United States disputes this account, as one ICE officer claims that he witnessed another officer assist Thiersaint off the vehicle that transported him from SCHC to Connecticut and onto the bus in Connecticut.  D. 161 at 16 (citing D. 162-13 at 10-12).  Regardless of this dispute, Thiersaint's claims are barred by the discretionary function exception to the waiver of sovereign immunity as to the February 29th transportation for the reasons that are noted above as to ground transportation claims in Florida.

Accordingly, as to the claims related to transportation in Connecticut, Counts V, VI and VIII, the Court allows summary judgment to the United States and denies Thiersaint's motion regarding same.

5.      *Ground Transportation and Detention in Massachusetts (Counts IX, XI, and XII)*

Thiersaint claims that during his transportation from SCHC, he was not transported in a wheelchair accessible van, nor was he assisted during the transport.  D. 1 ¶ 194.  As with other of Thiersaint's ground transportation claims discussed above, the United States points to the undisputed record that FSCO officers transported Thiersaint between FCHC on February 5, 2016, March 22, 2016 and April 1, 2016.  D. 161 at 18-19.  Thiersaint presents no evidence to dispute

that FSCO handled these trips.  Without more, for the reasons discussed above pertaining to FSCO's transport of Thiersaint in Connecticut, claims related to transport with FSCO officers cannot survive due to the FTCA's independent contractor exception.  See, e.g., Wood v. United States, 290 F.3d 29, 36 (1st Cir. 2002) (applying independent contractor exception where there was no evidence to support the contention that the government "retained close supervisory control" over independent contractor's work and plaintiff's argument had been "fashion[ed] . . . as one of direct rather than vicarious negligence").

Turning to Thiersaint's detention at SCHC, the independent contractor exception again bars this claim against the United States.  ICE and the SCSD had a contractual relationship by virtue of an Intergovernmental Service Agreement ("IGSA"), D. 162-25 at 36, pursuant to which SCHC was required to conform to ICE's detention standards or "adopt, adapt or establish alternatives, provided they meet or exceed the intent" of PBNDS 2011, D. 162-2 at 26.  In 2016, pursuant to the Government's contract with SCSD, SCSD provided for the detention and health care services of Government detainees at SCHC.  D. 162-25 at 36; D. 162-25 at 6.  Thiersaint's claims fall into the prescribed conduct assigned to SCSD per the IGSA, see D. 1 ¶¶ 194-212, and he presents no evidence to dispute that the United States did not control SCSD's performance or closely supervise SCSD's daily operations.  See, e.g., Larsen v. Empresas El Yunque, Inc., 812 F.2d 14, 16 (1st Cir. 1986) (concluding contractor exception applied where government was "not involved in the day-to-day operation" and company was an "independent contractor with full control over the operation of the responsible for the condition of the [ ] premises").  Accordingly, the independent contractor exception applies, and the United States' motion for summary judgment as to Counts IX, XI and XII against the United States for claims occurring in Massachusetts is allowed.

6.      *Air Transportation in New Jersey (Counts XIII, XV, XVI)*

Thiersaint alleges that he was additionally required to "hoist himself up a flight of stairs, backwards, one stair at a time, and hop down the aisle to his seat" when boarding a plane in Newark, New Jersey, D. 1 ¶¶ 218-20, 228, 230, 234, and asserts intentional infliction of emotional distress, negligent infliction of emotional distress and negligence claims against the United States on these grounds.  At the time of the alleged incident, the United States contracted with CSI to provide air charter flight services originating out of Miami, Florida and Alexandria, Louisiana. See, e.g., D. 162-22 at 2, 32.  The agreement also placed responsibility on CSI to load and unload detainees (including those who were handicapped and/or required special assistance), load and unload property onto and off of the aircraft, escort detainees to the restrooms, assist with perimeter security when requested, restrain detainees (or remove restraints), and "ensur[e] general security and safety of alien nationals when onboard the aircraft." Id. at 29.  The contract additionally states that the guard crew was under the operation control of CSI as either an employee or *de facto* employee when detainees were in ICE custody.  Id.  Accordingly, because Thiersaint's claims pertain to actions for which CSI was contractually responsible, and Thiersaint presents no evidence the United States controlled CSI's performance or closely supervised its daily operations, the contractor exception again applies, and the FTCA precludes liability for Thiersaint's claims pertaining to his air transportation in New Jersey.

7.      *Air Transportation and Detention in Louisiana (Counts XVII and XVIII)*

Thiersaint claims that he was not assisted when he disembarked from the aircraft in Louisiana and was forced to use non-accessible bathrooms and living quarters at LaSalle.  D. 1 ¶ 245.  He also claims that he was denied access to his medications.  Id.  Because the United States contracted with CSI at this time to provide air charter flight services for IAO flights originating

out of Alexandria, Louisiana, D. 22 at 8624, CSI was responsible for loading and unloading detainees for the flight at issue, id. ¶ 8626, and the independent contractor exception again applies.

Turning to Thiersaint's claims pertaining to his detention, under Louisiana law, Thiersaint had one year to file claims of intentional infliction of emotional distress, negligence and negligent supervision.  Reggio v. E.T.I., 15 So.3d 951, 956-57 (La. 2008).  "Because statutes of repose are substantive limitations on liability, an FTCA claim does not lie against the United States where a statute of repose would bar the action if brought against a private person in state court."  Anderson v. United States, 669 F.3d 161, 165 (4th Cir. 2011); see Augutis v. United States, 732 F.3d 749, 754 (7th Cir. 2013) (dismissing plaintiff's claim on grounds that FTCA's statute of limitations did not preempt state statute of repose).  Accordingly, the Louisiana statute of repose applies.  As Thiersaint was detained from February 29, 2016 to March 3, 2016 and March 17, 2016 to March 21, 2016, his claims are barred as of March 2017, before he filed this lawsuit on November 16, 2018.  D. 1.

　　　　8.　　Negligent Supervision in Connecticut, Massachusetts, New Jersey,
　　　　　　　Louisiana and Florida (Counts VII, X, XIV, XIX, and XXI)

Thiersaint alleges the United States is liable for negligent supervision in each of the pertinent states—Connecticut, Massachusetts, New Jersey, Louisiana and Florida.  D. 1 ¶¶ 182-85, 197-01, 221-24, 248-54, 259-62.  To show negligent supervision, a plaintiff must show that the defendant negligently placed the plaintiff under the supervision of an employee that the defendant either knew or should have known had a propensity to commit the torts committed.  Malicki v. Doe, 814 So. 2d 347, 362 (Fla. 2002); Adams v. City of Shreveport, 269 F. Supp. 3d 743, 771 (W.D. La. 2017) (reciting elements for negligent supervision claim as: "(1) the defendant had a duty to conform its conduct to a specific standard; (2) the defendant failed to conform its conduct to that standard; (3) the defendant's substandard conduct was a cause in fact of the

plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (in other words, the plaintiff and the plaintiff's injuries were within the scope of the defendant's duty); and (5) the plaintiff suffered damages"); Davis v. Marlin Broad., Inc., No. CV020820858, 2004 WL 422994, at *2 (Conn. Super. Ct. Jan. 26, 2004) (stating that "a plaintiff must ordinarily plead and prove injury by the defendants' own negligence in failing to properly supervise an employee or agent who (1) the defendant had a duty to supervise and (2) the defendant knew or should have known would cause the injury" to state a negligent supervision claim) (internal citation omitted); Miranda v. Anderson, 2006 WL 2006134, at *4 (Super. Ct. Apr. 6, 2006) (noting that plaintiff must show defendant's "awareness of a 'dangerous tendency'; 'a propensity for reckless or vicious behavior'; or a 'propensity for a particular type of harmful conduct' . . . as well as a lack of appropriate action on the part of the [defendant]") (internal citation omitted).

Thiersaint fails, however, to provide any evidentiary support for his assertion that DHS or ICE supervisors knew or should have known ICE officers would refuse assistance to a detainee with a disability.  For example, the record includes policy documents demonstrating that ICE's expectation, pursuant to the PBNDS, was for "reasonable accommodations [to] be made for detainees with physical disabilities and/or special needs" and for detainees to be "transported in a safe and humane manner, under the supervision of trained and experienced staff."  D. 162-2 at 6. On this record, the United States' motion for summary judgment as to Thiersaint's negligent supervision claim for acts committed in the aforementioned states is allowed.

### B.  Rehabilitation Act and ADA Claims

Thiersaint claims that SCHC, a detention facility operated by SCSD, in violation of the Rehabilitation Act and ADA, denied him access to programs and services that other inmates

without disabilities could enjoy, D. 1 ¶¶ 144-53, and that the United States violated the Rehabilitation Act by acquiescing to SCSD's discriminatory policies, id. Both SCSD and the United States have moved for summary judgment as to these claims. D. 149; D. 160.

        *1.*    *Rehabilitation Act Claim Against the United States (Count I)*

    As to Thiersaint's claims against the United States, Thiersaint alleges it intentionally discriminated against him on the basis of his disabilities, denying his requests for accommodations and causing him physical pain, emotional distress and humiliation. D. 1 ¶ 149. The United States counters that the Rehabilitation Act does not contain a private right of action for damages[3] against the United States and the United States has not waived its sovereign immunity for such claims. D. 210 at 17-18. Section 504(a) of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The remedies available for such violation are "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [§ 504]." 29 U.S.C. § 794a(a)(2).

    The Rehabilitation Act does not waive the United States' sovereign immunity for monetary claims arising from alleged discrimination "under any program or activity conducted by any Executive agency." Lane v. Peña, 518 U.S. 187, 197 (1996). A waiver of sovereign immunity

---

[3] In Thiersaint's amended complaint, D. 199-1, Thiersaint removes all claims for injunctive relief, see D. 201 at 1.

must "extend unambiguously to [ ] monetary claims." Id.  Accordingly, the Court does not have

subject-matter jurisdiction over Thiersaint's claim against the United States.  See, e.g., Plater v.

United States, 359 F. Supp. 3d 930, 938 (C.D. Cal. 2018) (concluding government had not waived

its sovereign immunity for alleged violation of Section 504); Gray v. United States, 69 Fed. Cl.

95, 102 (2005) (concluding court lacked jurisdiction over plaintiff's Rehabilitation Act claims

against the United States given holding in Lane that the federal government "had not waived its

immunity against monetary damages for violations of Section 504(a)" (emphasis omitted)).

Accordingly, the United States' motion for summary judgment as to Thiersaint's Rehabilitation

Act claim is allowed.

> 2.   *Rehabilitation Act and ADA Claims Against SCSD (Counts I and II)*

As to Thiersaint's claims against the SCSD pursuant to the Rehabilitation Act and ADA,

Thiersaint claims SCSD repeatedly denied Thiersaint services and programs other inmates

received and intentionally discriminated against him on the basis of his disability.  D. 1 ¶ 150.

Both Thiersaint and SCSD have moved for summary judgment as to these counts.  D. 149; D. 153.

While the ADA and Rehabilitation Act are "not identical," Partelow v. Massachusetts, 442 F.

Supp. 2d 41, 47 (D. Mass. 2006), Thiersaint's basis for claims against SCSD are the same under

each act, D. 1 ¶¶ 144-53, 154-63.  Consequently, the Court will address the merits of Thiersaint's

ADA and Rehabilitation Act claims together.  Partelow, 442 F. Supp. 2d at 47 (citing Parker v.

Universidad de P.R., 225 F.3d 1, 4 (1st Cir. 2000) (noting that "[i]n applying Title II, . . . [the

Court] rel[ies] interchangeably on decisional law applying § 504").  Pursuant to the Rehabilitation

Act and ADA, a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that

he was . . . excluded from participation in . . . a public entity's services, programs, or activities or

was otherwise discriminated against; and (3) that such exclusion . . . or discrimination was by

reason of [his] disability." Id.  "[D]eliberately requiring a plaintiff to endure unnecessary hardship in order to access a program or service, when that hardship could easily be eliminated by a reasonable accommodation, can amount to a form of 'discrimination' against that plaintiff" pursuant to both the Rehabilitation Act and ADA.  Shedlock v. Dep't Of Correction, 442 Mass. 844, 855 (2004).  "Impediments to access do not have to be totally insurmountable in order to give rise to a claim under the ADA or the [Rehabilitation Act]."  Id.

The SCSD does not dispute that Thiersaint is a qualified individual with a disability, but purports that that Thiersaint was housed in a wheelchair accessible cell that met his needs and was not admitted to the MHU solely because of his disability.  D. 191 at 1.  SCSD further contends that the decision to admit Thiersaint to the MHU was grounded in a medical judgment based on mobility and safety issues.  Id.

a)     Placement in MHU

Thiersaint claims that by separating him from the general population, SCSD excluded Thiersaint "from participating in, denied him the benefits of, and subjected him to discrimination under a service, program or activity of the [SCSD]."  D. 1 ¶ 162.  "Under the Rehabilitation Act, a patient may challenge [his] doctor's decision to refer [him] elsewhere by showing the decision to be devoid of any reasonable medical support."  Lesley v. Hee Man Chie, 250 F.3d 47, 55 (1st Cir. 2001).  A plaintiff's showing of medical unreasonableness, however, "must be framed within some larger theory of disability discrimination," such that "a plaintiff may argue that [his] physician's decision was so unreasonable—in the sense of being arbitrary and capricious—as to imply that it was pretext for some discriminatory motive, such as animus, fear, or 'apathetic attitudes.'"  Id. (quoting Alexander v. Choate, 469 U.S. 287, 296 (1985)).  "[C]ourts have differentiated ADA claims based on negligent medical care from those based on discriminatory

medical care." <u>Kiman v. New Hampshire Dep't of Corr.</u>, 451 F.3d 274, 284 (1st Cir. 2006) (citing

<u>Bryant v. Madigan</u>, 84 F.3d 246, 249 (7th Cir.1996) (recognizing that "[t]he ADA does not create

a remedy for medical malpractice").

Here, a NaphCare nurse practitioner at SCSD who admitted Thiersaint to the MHU, noted

that "after speaking with Mr. Thiersaint about his recent fall in November of 2015, his above the

knee amputation, his recent mobility issues regarding his broken prosthesis and wheelchair use,"

she "wanted to admit him to the medical unit so that his mobility and safety could be assessed by

medical staff." D. 156-27 ¶ 17.  NaphCare policy states that all newly committed inmates with

mobility issues were required to be evaluated by a medical provider in the MHU to ensure that

they could function independently so that they could be safely housed in general population.  D.

156-26 at 60:18-61:8.  Thiersaint acknowledges that individuals requiring wheelchairs could be

housed in general population in 2016, as he himself was placed in general population in March

2016, one month after being placed in the MHU during his initial detention at SCHC.  D. 150 at

22.

When a medical provider's decision "stem[s] from an overabundance of caution, by no

means can the decision be thought to lack any reasonable medical basis," and in these instances,

the Rehabilitation Act is not "the appropriate law of resort."  <u>Lesley</u>, 250 F.3d at 58.  Thiersaint

contends that "unjustified segregation of persons with disabilities is a form of discrimination."  D.

184 at 18 (citing <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581 (1999)).  In <u>Olmstead</u>, treatment

professionals determined that two women could be cared for appropriately in community-based

programs, but the women remained segregated and institutionalized.  <u>Id.</u> at 582.  The Supreme

Court held that "under Title II of the ADA, States are required to provide community-based

treatment for persons with mental disabilities when the State's treatment professionals determine

that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 607. Thiersaint's care at SCHC was far different than Olmstead. He was admitted to the MHU for evaluation regarding mobility upon his first entry to the SCHC and, unlike in Olmstead, Thiersaint purports no evidence that his placement in the MHU was "unjustified." D. 184 at 18. Without more, Thiersaint has not established that SCSD's decision to place him in the MHU was "so unreasonable as to demonstrate that they were discriminating against him because of his disability," Kiman, 451 F.3d at 285, but for evaluation of concerns about mobility. Thiersaint's contention that he was assigned to the MHU solely because he was confined to wheelchair is belied by the undisputed fact that upon his return to SCHC less than a month later, on March 22, 2016, he was assigned to a cell outside of the MHU, in the general population, Building 8.

Turning to Thiersaint's claim that he was not placed in an accessible cell during his second stay at SCHC, to satisfy the final prong of the ADA and Rehabilitation Act, a plaintiff must show he was discriminated against solely because of his disability. Partelow, 442 F. Supp. 2d at 47 (citing Parker, 225 F.3d at 4). As to the need for reasonable accommodation, a plaintiff, however, must request accommodation. Shedlock, 442 Mass. at 856. "Prison officials are not required to anticipate a prisoner's unarticulated need for accommodation or to offer accommodation sua sponte." Id.

His cell in Building 8 was wheelchair accessible and provided him access to handicapped accessible bathroom and shower in common areas. D. 191 at 5 (and record cited). As to his prior stay in the MHU, he was not in a designated handicapped accessible cell with a grab bar next to the toilet. D. 191 at 6 (and record cited). As noted by Naphcare staff there, "not all individuals

who utilize wheelchairs require the use of grab bars next to toilets," id. ¶ 19, and that she had

treated numerous wheelchair patients who did not have this requirement.  Id.   That is, the use of

a wheelchair alone is inadequate to demonstrate whether further accommodations are necessary.

See Shedlock, 442 Mass. at  856-57 (noting that "it is incumbent on the prisoner to request

accommodation in the first instance," particularly where "[m]uch of the difficulty allegedly

encountered by [plaintiff] involved his subjective experience . . . and unless and until he

articulated the view that his cane was not a sufficient accommodation, prison officials would have

no way of knowing that he needed some further accommodation").  Thiersaint did not formally

requested accommodation or submitted a slip to inform officials his needs were not being met in

his designated cell.  Cf. Shedlock, 442 Mass. at 858 (stating that "the jury could conclude that [the

plaintiff's] request for a first-floor cell was a request for a reasonable accommodation, that it was

properly verified by prison medical personnel and communicated to prison officials . . . and that

failure to grant him that reasonable accommodation was in violation" of the ADA and

Rehabilitation Act).  Without any specification that Thiersaint's cell placement was causing him

harm, officers could not have been reasonably expected to anticipate such a need.  See Shedlock,

442 Mass. at 856-57.  Accordingly, Thiersaint also has failed to establish a triable issue of fact that

SCSD violated the ADA or Rehabilitation Act by his cell assignment while at SCHC.

        b)      Denial of Access to Services, Programs and Activities and Wheel-
                  Chair Accessible Restrooms

Thiersaint also contends that by placing him in the MHU initially from February 18 to 29,

2016, he was deprived of recreation and access to legal services.  D. 150 ¶ 1.  The Rehabilitation

Act "prohibit[s] 'discrimination,' and deliberately requiring a plaintiff to endure unnecessary

hardship in order to access a program or service, when that hardship could easily be eliminated by

a reasonable accommodation, can amount to a form of 'discrimination' against that plaintiff." Shedlock, 442 Mass. at 855.

While the record shows that detainees in the MHU generally do not have the same access or opportunities as those in the general population, Thiersaint fails to assert or present evidence to support that he specifically was discriminated against within the MHU or that individuals in wheelchairs more broadly were discriminated against within the MHU. SCSD does not dispute that detainees in the MHU have fewer hours of recreation than inmates in the general population or that they do not have the same level of access to SCSD's legal services. D. 191 at 14. Rather, the undisputed facts demonstrate that Thiersaint's differential treatment was due to his assignment to SCSD's MHU. Accordingly, Thiersaint has failed to establish a triable issue of fact as to whether SCSD violated the ADA or Rehabilitation Act regarding his MHU placement.

c)   <u>Denial of Access to Medication</u>

Thiersaint further alleges that SCSD failed to provide him necessary medication, despite repeated requests. D. 1 ¶ 161. "Access to prescription medications is part of a prison's medical services and thus is one of the 'services, programs, or activities' covered by the ADA." Kiman, 451 F.3d at 286. SCSD's failure to give Thiersaint access to his medications would not be "a medical 'judgment' subject to differing opinion," but instead "an outright denial of medical services." Id. Even so, a reasonable factfinder could not conclude that there was an outright denial of such services here. Although Thiersaint asked a nurse "what about my Remeron" (one of his medications) on February 27, 2016, D. 174 ¶182; D. 194-1 ¶ 182, he did not submit any sick slips at SCSD in February 2016—despite submitting sick call requests when he was at FCHC. D. 174 ¶ 218; D. 194-1 ¶ 218; D. 162-9. When Thiersaint returned to SCSD in March 2016, he received Prozac and Ibuprofen, but his prescriptions for Gabapentin and Remeron were discontinued. D.

174 ¶ 189; D. 194-1 ¶ 189.  Similarly, Thiersaint made no sick call requests in March 2016 related to his depression.  Cf. Kiman, 451 F.3d at 286 (concluding issue of material fact existed where "plaintiff presented evidence supporting his assertions that he was not receiving his medication on a regular basis, that he informed prison officials, and that they did not act despite his repeated requests," having "issued inmate request slips on [four dates], complaining of the failure of correction officers to deliver his medications on a timely and regular basis").  Thiersaint admits to not having filed any sick slips, arguing that he was attempting to resolve issues informally before filing a written grievance.  D. 186 ¶ 32.  Thiersaint further alleges that he told medical staff about his concerns about not getting his medications including on March 22, 2016, "when I don't take any medication I hear things" and that he needed medication to feel well, D. 186-1 ¶ 6.  Even if the parties dispute what inquiries Thiersaint made about his medications, there has been no showing that Thiersaint failed to receive any treatment that was medically necessary such that there was an outright denial of medical services, particularly in light of the undisputed record that he was not denied medication, but was being tapered off of certain medications, and continue to receive other medications to treat his depression.  D. 207 at 5-6 (and record citations noted). Accordingly, the Court allows SCSD's motion for summary judgment as to his Rehabilitation Act and ADA claims and denies Thiersaint's motion regarding same as to access to medications while at SCHC.[4]

---

[4] SCSD purports that as it did not violate Thiersaint's Fourteenth Amendment rights, this is not the type of case that would require abrogation of the sovereign immunity. D. 154 at 19-20.  Federal courts lack jurisdiction to entertain suits against individual states and their officials unless the state waives immunity. Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996).  Title II, however, abrogates state sovereign immunity to the extent "it creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment." United States v. Georgia, 546 U.S. 151, 159 (2006) (emphasis omitted).  For conduct that does not violate the Fourteenth Amendment, the courts must still assess "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." Id.  Here, where the Court

C.      **Deliberate Indifference Claim Against William Chambers (Count IV)**

Thiersaint claims that Chambers refused to assist him in accessing adequate medical care, acting with deliberate indifference to Thiersaint's medical needs, in violation of the Fifth Amendment.  D. 1 ¶¶ 166-70.  The Due Process Clause of the Fifth Amendment governs claims for those civilly detained, and its protections extend "at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990).  "[T]o establish that prison personnel violated the Eighth Amendment in connection with the provision of medical care, the plaintiff 'must prove that the defendants' actions amounted to 'deliberate indifference to a serious medical need.'" Cordell v. Howard, 879 F. Supp. 2d 145, 155 (D. Mass. 2012) (quoting DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir. 1991)). "Deliberate indifference has both a subjective and an objective component." Id. (internal quotation marks omitted) (citing Kosilek v. Maloney, 221 F.Supp.2d 156, 180 (D. Mass. 2002)).  "[T]o satisfy the objective portion of the standard, an inmate must show that he has a serious medical need and that this need has not been adequately treated," id. (internal quotation marks omitted), and "to satisfy the subjective prong, the complainant must establish that the responsible official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference,'" id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

---

concludes that SCSD is entitled to summary judgment as to the Title II claims and there has been no showing of deliberate indifference to a substantial risk of serious harm to Thiersaint and there has been no showing that it violated his substantive due process or equal protection rights, there has been no abrogation of sovereign immunity.  Georgia, 546 U.S. at 159.

Chambers does not dispute that Thiersaint satisfies the first prong of having a sufficiently serious medical condition, but rather, disputes whether he was deliberately indifferent to Thiersaint's medical needs.  D. 165 at 7.  The 'deliberate indifference' prong may be satisfied where the treatment provided was "so inadequate as to shock the conscience"  Cordell, 879 F. Supp. 2d at 155 (internal quotation marks omitted) (quoting Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir.1991)).  "It also may be met where the responsible official's acts or omissions were 'so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred." Id.  "[W]here 'knowledge of the need for medical care is accompanied by the intentional refusal to provide that care,' the deliberate indifference standard has been met." Leavitt v. Corr. Med. Servs., 645 F.3d 484, 499 (1st Cir. 2011) (quoting Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir. 1985)).

Chambers does not dispute that Thiersaint asked him why he was being moved into the MHU and informed him that he wanted to be in the general population.  D. 166 ¶ 12.  It is also undisputed by both parties, however, that Chambers did not have the authority to assign Thiersaint to different housing.  Id. ¶ 13; D. 186 ¶ 13.  Turning to Thiersaint's claim as to medications, Chambers denies Thiersaint ever expressed any concerns to him about his medications, D. 166 ¶ 18, whereas Thiersaint claims he raised the issue to Chambers and was told that he would have to accept the decision of the medical staff, D. 186 ¶ 18.  Chambers furthers, however, that even if Thiersaint had raised such concerns to him, Chambers was not a medical provider and could not ask SCHS to provide Thiersaint medication.  D. 166 ¶ 26.  Thiersaint does not dispute that Chambers did not have the power to get Thiersaint his medication or make decisions pertaining to Thiersaint's medication but asserts generally that it was Chambers' responsibility to ensure SCSD compliance with ICE standards.  D. 186 ¶¶ 26-27.  A Bivens claim, however, is "brought against

the individual official for his or her own acts, not the acts of others." Ziglar v. Abbasi, __ U.S. __, 137 S. Ct. 1843, 1860 (2017). "The purpose of Bivens is to deter the officer," id. (quoting Meyer, 510 U.S., at 485), not to "hold officers responsible for acts of their subordinates," id. Accordingly, as Chambers did not have the power to move Thiersaint to a different cell or to change the medical staff's medications for him and there has been no shown of his deliberate indifference to Thiersaint's needs, a constitutional claim does not survive here against Chambers on this record.

## VI.    Conclusion

For the foregoing reasons, the Court DENIES Thiersaint's partial motion for summary judgment, D. 144, DENIES Thiersaint's motion for summary judgment, D. 149, ALLOWS SCSD's motion for summary judgment, D. 153, ALLOWS the United States' motion for summary judgment, D. 160, and ALLOWS Chambers' motion for summary judgment, D. 164.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge